## UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

|  |  |
|---|---|
| SECURITIES AND EXCHANGE COMMISSION | ) |
| Plaintiff, | ) |
| v. | ) |
| PATRICIA B. ROCKLAGE, WILLIAM M. BEAVER, and DAVID G. JONES, | ) |
| Defendants. | ) |

**05 CV 10074 MEL**

Civil Action No.

JURY TRIAL
REQUESTED

RECEIPT
AMOUNT $____ N/A
SUMMONS ISSUED 3
LOCAL RULE 4.1____-____
WAIVER FORM____-____
MCF ISSUED____-____
BY DPTY. CLK.___MP
DATE____1/12/05
MAGISTRATE JUDGE___MBB

## COMPLAINT

Plaintiff Securities and Exchange Commission (the "Commission") alleges:

## SUMMARY

1.      This Commission enforcement action concerns the violation of insider trading laws by Defendants Patricia B. Rocklage ("P. Rocklage"), William M. Beaver ("Beaver"), and David G. Jones ("Jones"). On December 31, 2001, P. Rocklage learned from her husband, Scott M. Rocklage, Ph.D. ("S. Rocklage"), the then Chairman of the Board and Chief Executive Officer ("CEO") of Cubist Pharmaceuticals, Inc. ("Cubist"), that Cubist had received negative results in clinical trials for Cidecin, one of the company's most important products. At some point shortly thereafter, P. Rocklage told her husband that she intended to give her younger brother, Beaver, "a wink and a nod" concerning the negative trial results so Beaver could sell his Cubist stock. Although her husband urged her not to do so, P. Rocklage insisted on tipping her brother and thereby induced him to sell his stock. On the morning of January 2, 2002, after receiving this signal from his sister, Beaver sold all his Cubist stock, worth approximately

1

$196,000. In turn, Beaver tipped his close friend and neighbor, Jones, to the negative news about Cubist, thereby inducing him to sell all his Cubist stock, worth approximately $262,000. Jones executed the sale on the morning of January 3. After the market closed on January 16, 2002, Cubist publicly announced the negative clinical trial results. Following the announcement, Cubist's stock price dropped 46%, from a closing price of $31.75 on January 16, to a closing price of $17.02 on January 17. By selling when they did, Beaver and Jones avoided losses of approximately $99,527 and $133,222 respectively.

2.    By virtue of their respective conduct, P. Rocklage, Beaver and Jones engaged in fraud in connection with the sale of securities, in violation of Section 17(a) of the Securities Act of 1933 ("Securities Act") [15 U.S.C. § 77q(a)], Section 10(b) of the Securities Exchange Act of 1934 ("Exchange Act") [15 U.S.C. § 78j(b)], and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5]. Accordingly, the Commission seeks the following relief as to each Defendant: (i) the entry of a permanent injunction prohibiting him or her from future violations of the federal securities laws; (ii) disgorgement, on a joint and several basis, equal to the ill-gotten gains and/or loss avoided by his or her illegal trading of Cubist stock and/or such trading by any of the Defendants he or she directly or indirectly tipped or otherwise induced to sell Cubist stock while he or she was in possession of material nonpublic information regarding Cubist, plus prejudgment interest; and (iii) the imposition of a civil monetary penalty of up to three times the ill-gotten gains and/or loss avoided by his or her illegal trading of Cubist stock and/or such trading by any of the Defendants he or she directly or indirectly tipped or otherwise induced to sell Cubist stock while he or she was in possession of material nonpublic information regarding Cubist.

2

## JURISDICTION

3.     The Commission brings this action pursuant to the enforcement authority

conferred upon it by Sections 20(b) and 20(d) of the Securities Act [15 U.S.C. §§ 77t(b), 77t(d)]

and Sections 21(d) and 21A of the Exchange Act [15 U.S.C. §§ 78u(d), 78u-1]. This Court has

jurisdiction over this action pursuant to Section 22(a) of the Securities Act [15 U.S.C. § 77v(a)]

and Sections 21(e), 21A and 27 of the Exchange Act [15 U.S.C. §§ 78u(e), 78u-1 and 78aa].

Additionally, the acts and practices alleged herein occurred substantially within the District of

Massachusetts, which is also where one of the Defendants resides and where the publicly-traded

issuer is located.

4.     In connection with the conduct described in this Complaint, Defendants P.

Rocklage, Beaver, and Jones directly or indirectly made use of the means or instrumentalities of

interstate commerce, of the mails, of the facilities of a national securities exchange, and/or of the

means and instruments of transportation or communication in interstate commerce.

5.     Defendants P. Rocklage, Beaver, and Jones, unless enjoined, will continue to

engage in the acts, practices, transactions and courses of business alleged herein, or in acts,

practices, and courses of business of similar object and purpose.

## DEFENDANTS

6.     P. Rocklage, age 53, is a resident of Sudbury, Massachusetts. She is the wife of

S. Rocklage, Cubist's former Chairman and CEO, and the sister of Beaver, one of the two traders

in this matter.

7.     Beaver, age 51, is a resident of Charlotte, North Carolina. He is P. Rocklage's

younger brother.

8.    Jones, age 52, is a resident of Charlotte, North Carolina. Jones, Beaver, and P. Rocklage grew up on the same street in Charlotte. Jones and Beaver also attended the same college, where they were fraternity brothers. Since 1984, Beaver and Jones have lived across the street from one another and each considers the other to be one of his best friends.

## RELEVANT ENTITY

9.    Cubist is and was, at all relevant times, a biotechnology company based in Lexington, Massachusetts. Cubist's common stock is registered with the Commission pursuant to Section 12(g) of the Exchange Act [15 U.S.C. §78l(g)] and is traded principally on the NASDAQ National Market System under the symbol CBST.

## FACTUAL BACKGROUND

10.    In 2001, Cubist's leading drug candidate was an antibiotic named Cidecin, an injectable form of the drug Daptomycin. In September 2001, Cubist completed enrollment in a Phase III clinical trial on the effect of Cidecin on pneumonia. At that time, Cidecin was the only Cubist product to have reached the Phase III level of testing.

11.    On or about Friday, December 28, 2001, individuals at Cubist learned that the trial results were negative. S. Rocklage, who was out of the office that day, first learned of the negative results when he returned to the office on Monday, December 31.

### S. Rocklage Tells P. Rocklage About the Failure of the Cidecin Clinical Trial

12.    On the afternoon of December 31, S. Rocklage spoke by telephone to his wife, P. Rocklage, who was in a limousine on her way home from the airport. During that call, S. Rocklage informed her that the Cidecin clinical trial had failed. Later that evening, S. Rocklage talked to P. Rocklage in more depth about the failure of the Cidecin clinical trial. He told her that Cubist would be making a public announcement concerning the trial results and that, until

4

then, the results were nonpublic. When P. Rocklage asked how this news would affect Cubist's stock price, S. Rocklage told her that the stock price would drop significantly as a result.

13.    At the time S. Rocklage conveyed this information to P. Rocklage, S. Rocklage had a reasonable expectation that he could communicate information to her about Cubist and that she would keep it confidential. From the time that S. Rocklage joined Cubist in 1994 until then, he had routinely communicated material, nonpublic information concerning Cubist to her and she had always kept such information confidential.

14.    In addition, prior to initially telling P. Rocklage about the trial results, S. Rocklage specifically instructed her not to react to what he was about to tell her and not to talk about the results in front of the limousine driver. P. Rocklage agreed to these instructions. Based on this exchange as well as on their prior history of sharing nonpublic information concerning the company, S. Rocklage reasonably expected, before conveying the information, that P. Rocklage would maintain the trial results in confidence. Similarly, P. Rocklage understood, before the results were conveyed to her, that S. Rocklage expected that she would not disclose the trial results to anyone.

### P. Rocklage Tells S. Rocklage That She Intends to Tip Beaver

15.    At the time that P. Rocklage learned the negative trial results, P. Rocklage knew or had reason to believe that her brother, Beaver, owned Cubist stock and she decided to notify him about the negative news so that he could sell his stock and avoid losing money. Unbeknownst to her husband, P. Rocklage had a pre-existing understanding with her brother that if she ever became aware of bad news about Cubist that might affect its stock price, she should signal him to sell his stock with "a wink and a nod."

5

16.     On or about the evening of December 31, after S. Rocklage had told her about the Cidecin trial failure, P. Rocklage told him that she intended to signal her brother to sell his Cubist stock. S. Rocklage responded by urging her not to and he made it clear that he would be unhappy with any communication she might have with her brother regarding the trial results. Notwithstanding her husband's entreaties, P. Rocklage said that she intended to warn her brother about the results anyway.

## P. Rocklage Tips Beaver, Who Trades on Wednesday, January 2

17.     By no later than the morning of January 2, 2002, P. Rocklage spoke to Beaver by telephone and induced him to sell his Cubist stock by saying, in sum and substance, "[a]s far as Cubist is concerned, I'm giving you a wink and a nod." In doing so, P. Rocklage was providing a gift of confidential information to a relative and thereby intended to benefit personally from the disclosure.

18.     Given their pre-existing understanding, Beaver correctly interpreted P. Rocklage's statement to mean that P. Rocklage knew negative nonpublic information about Cubist that was going to affect its stock price and that she was encouraging him to trade the company's stock.

19.     After receiving the signal from P. Rocklage, Beaver sold all 5,583 shares of Cubist stock he owned or controlled for a price of approximately $196,000. Beaver executed the sale at approximately 10:02 a.m. on Wednesday, January 2, 2002, the first possible trading day after receiving the signal.

## Beaver Tips Jones, Who Trades on Thursday, January 3

20.     After he received the "wink and nod" from P. Rocklage, Beaver also tipped his close friend and neighbor, Jones, as to the negative news about Cubist and induced Jones to sell

all the Cubist stock Jones owned. In doing so, Beaver was providing a gift of confidential information to a close friend and thereby intended to benefit personally from the disclosure.

21.    At the time he received this tip about Cubist, Jones knew that Beaver's brother-in-law was S. Rocklage, Cubist's Chairman and CEO.

22.    On the morning of January 3, 2002, after having communicated with Beaver about Cubist, Jones sold all 7,500 Cubist shares he owned for approximately $262,000.

### Cubist's Announcement and the Market's Reaction

23.    On January 16, 20002, after the market closed, Cubist publicly announced the negative Cidecin trial results. Following the announcement, Cubist's stock price dropped 46%, from a closing price of $31.75 on January 16, to a closing price of $17.02 on January 17. By selling when they did, Beaver had avoided a loss of $99,527 and Jones had avoided a loss of $133,222.

### P. Rocklage's Breach of Fiduciary Duties

24.    Having received material nonpublic information concerning negative news about Cubist from her husband, Cubist's CEO, P. Rocklage had a duty of trust and confidence to her husband and/or to Cubist and its shareholders not to trade, or direct others to trade, in Cubist's securities while she was in possession of that information.

25.    When P. Rocklage directly or indirectly disclosed the material, nonpublic information concerning the negative news about Cubist to Beaver and Jones, and directly or indirectly induced Beaver and Jones to buy Cubist stock at a time when she was in possession of that information, P. Rocklage knowingly or recklessly breached her duty to S. Rocklage and/or to Cubist and its shareholders.

7

26.     When P. Rocklage disclosed the material, nonpublic information regarding the negative news about Cubist to Beaver, Beaver knew or was reckless in not knowing that P. Rocklage was breaching a duty of trust and confidence that she owed to her husband and/or to Cubist and its shareholders.

27.     When Beaver disclosed the material, nonpublic information regarding the negative news about Cubist to Jones, Jones knew or was reckless in not knowing that this information was being conveyed to him as a result of a breach of a duty of trust and confidence owed to S. Rocklage and/or to Cubist and its shareholders.

### False and Inconsistent Statements

28.     During the Commission's investigation of the trading by Beaver and Jones, Beaver and Jones made a number of false and/or inconsistent statements, which include the following:

a)      Beaver denied that he ever asked his sister to give him "a wink and a nod" if she learned news that would have a negative impact on Cubist's stock. P. Rocklage, however, expressly testified that prior to December 31, 2001, Beaver had asked her to give him "a wink and a nod" if she ever learned any bad news about Cubist.

b)      During his initial telephonic interview on September 12, 2002, Beaver told the Commission staff that in the months prior to January 16, 2002 (the date of Cubist's public announcement), his sister, P. Rocklage, had not had any communication with him concerning Cubist. During his subsequent testimony on December 10, 2002, however, Beaver changed his story, admitting that in early January 2002, his sister had given him "a wink and a nod" regarding Cubist. Beaver said that he had told his original story to the Commission staff because he did not want to put his sister "in harm's way or to get her in trouble."

8

c)    During his telephone interview on September 12, 2002, and his investigative testimony on December 10, 2002, Beaver stated, in sum and substance, that he sold his Cubist stock on January 2, 2002 for tax reasons. More specifically, he said that he sold on that date because he wanted to delay the capital gains tax he would have to pay on the sale of this stock. However, the majority of the Cubist stock Beaver sold on that date was held in IRA accounts and thus was not subject to the capital gains tax.

d)    During telephone interviews by the Commission staff on September 12 and 13, 2002, Beaver said that prior to the interviews, he had been completely unaware of any inquiry into his Cubist trading. In his telephone interview by the Commission staff on September 13, 2002, however, Jones stated that Beaver had told him approximately two weeks earlier that an inquiry was being made into Beaver's Cubist trading.

e)    On September 16, 2002, three days after telling the staff that Beaver had been aware of the inquiry into Beaver's Cubist trading, Jones called the staff to change his testimony. He said that he had since discussed this issue with Beaver and now wanted to state that he may only have dreamt that Beaver had told him two weeks earlier about an inquiry into Beaver's Cubist trading.

## FIRST CLAIM

### Unlawful Insider Trading
### (Violation of Exchange Act Section 10(b) and Rule 10b-5 Thereunder)

29.    The Commission repeats and realleges paragraphs 1 through 28 above.

30.    By reason of the foregoing, P. Rocklage, Beaver and Jones each directly or indirectly, by use of means or instrumentalities of interstate commerce or of the mails, or any facility of any national securities exchange, in connection with the purchase or sale of securities:

9

(a) employed devices, schemes or artifices to defraud; (b) made untrue statements of material fact or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; or (c) engaged in acts, practices or courses of business which operated or would operate as a fraud or deceit upon any persons, in violation of Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5].

## SECOND CLAIM

### Unlawful Insider Trading
### (Violation of Securities Act Section 17(a))

31.     The Commission repeats and realleges paragraphs 1 through 28 above.

32.     By reason of the foregoing, P. Rocklage, Beaver, and Jones each, in the offer or sale of securities, by use of means or instruments of transportation or communication in interstate commerce or by the use of the mails, directly or indirectly:  (a) employed devices, schemes or artifices to defraud; (b) obtained money or property by means of untrue statements of material fact or omissions to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; or (c) engaged in transactions, practices, or courses of business which operated or would have operated as a fraud or deceit upon the purchaser of securities in violation of Section 17(a) of the Securities Act [15 U.S.C. § 77q(a)].

## PRAYER FOR RELIEF

33.     Accordingly, the Commission respectfully requests that this Court issue a Final Judgment of Permanent Injunction and Other Relief:

A.      Permanently restraining and enjoining each Defendant, their agents, servants, employees, attorneys, successors and assigns, and those persons in active concert or participation with them, and each of them, from violating, directly or indirectly, Section 17(a) of the Securities Act [15 U.S.C. § 77q(a)] and Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5];

B.      Ordering each Defendant to disgorge, on a joint and several basis, the ill-gotten gains and/or loss avoided by his or her illegal trading of Cubist stock and/or such trading by any of the Defendants he or she directly or indirectly tipped or otherwise induced to sell Cubist stock while he or she was in possession of material nonpublic information regarding Cubist, plus prejudgment interest;

C.      Ordering P. Rocklage, Beaver, and Jones each to pay civil penalties, pursuant to the Insider Trading Sanctions Act of 1984, codified at Section 21A of the Exchange Act, as amended [15 U.S.C. § 78u-1], of up to three times the amount of the ill-gotten gains and/or loss avoided by his or her illegal trading of Cubist stock and/or such trading by any of the Defendants he or she directly or indirectly tipped or otherwise induced to sell Cubist stock while he or she was in possession of material nonpublic information regarding Cubist;

D.      Retaining jurisdiction over this action to implement and carry out the terms of all orders and decrees that may be entered; and

E.      Granting such other and further relief as this Court may deem just and proper.

## JURY DEMAND

The Commission hereby demands a trial by jury on all claims so triable.

11

Respectfully submitted,

**SECURITIES AND EXCHANGE
COMMISSION**

By its attorneys,


Luke T. Cadigan (Mass. Bar No. 56117)
  Senior Trial Counsel
Daniel P. Barry (Mass. Bar No.564037)
  Senior Counsel
73 Tremont Street, Suite 600
Boston, MA 02108
(617) 573-8919 (Cadigan)
(617) 424-5940 (facsimile)


Dated:  January 12, 2005