## UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

SECURITIES & EXCHANGE COMMISSION

      Plaintiff

v.

PATRICIA B. ROCKLAGE, WILLIAM M.
BEAVER, and DAVID G. JONES

      Defendants.

C.A. No. 05-CV-10074 MEL

## MEMORANDUM OF LAW IN SUPPORT OF DEFENDANT
## PATRICIA B. ROCKLAGE'S MOTION TO DISMISS

# TABLE OF CONTENTS

I.    INTRODUCTION ........................................................................................................1

II.   FACTUAL ALLEGATIONS ......................................................................................1

      A.    General Background ......................................................................................1

      B.    Communications Between Dr. And Mrs. Rocklage .................................2

      C.    Mrs. Rocklage Calls Her Brother And Mr. Beaver Sells
            His Cubist Stock ............................................................................................3

III.  ARGUMENT...............................................................................................................3

      A.    The Supreme Court's Decision In O'Hagan Precludes
            Liability Under The "Misappropriation Theory" ....................................4

      B.    Mrs. Rocklage Cannot Be Liable Under The "Classical
            Theory" Because She Had No Duty To Cubist Or Its
            Shareholders And Did Not Acquire Such A Duty By
            Receiving Information From Her Husband .................................................8

            1.    Mere Receipt of Information From
                  An Insider Does Not Create A Duty...............................................9

            2.    The Commission Does Not Allege Facts
                  Showing That Mrs. Rocklage Acquired A
                  Duty To Cubist Or Its Shareholders .............................................9

                  a)    Mrs. Rocklage Did Not Acquire Any
                        "Derivative" Duty From Her Husband .........................10

                  b)    Mrs. Rocklage Did Not Become A "Temporary Insider" .............11

# TABLE OF AUTHORITIES

## Federal Cases

Chiarella v. United States,
   445 U.S. 222 (1980)........................................................................................3, 8

Dirks v. S.E.C.,
   463 U.S. 646 (1983).........................................................................................passim

Kowalski v. Gagne,
   914 F.2d 299 (1st Cir. 1990)...........................................................................6

Locicero v. Leslie,
   948 F. Supp. 10 (D. Mass. 1996) ....................................................................6

Salovaara v. Jackson Nat'l Life Ins. Co.,
   66 F. Supp. 2d 593 (D.N.J. 1999) ...................................................................5

S.E.C. v. Cherif,
   933 F.2d 403 (7th Cir. 1991) ..........................................................................12

S.E.C. v. Downe,
   No. 92 Civ 4092, 1993 WL 22126 (S.D.N.Y. Jan. 26, 1993)..........................12

S.E.C. v. Gaspar,
   No. 83 Civ. 3037, 1985 WL 521 (S.D.N.Y. April 16, 1985) ...........................12

S.E.C. v. Ingram,
   694 F. Supp. 1437 (C.D. Cal. 1988) ...............................................................12

S.E.C. v. Lund,
   570 F. Supp. 1397 (C.D. Cal. 1983) ...............................................................12

S.E.C. v. Musella,
   578 F. Supp. 425 (S.D.N.Y. 1984) ..................................................................12

S.E.C. v. Sargent,
   229 F.3d 68 (1st Cir. 2000)..............................................................................11

S.E.C. v. Softpoint, Inc.,
   958 F. Supp. 846 (S.D.N.Y. 1997) ..................................................................11

S.E.C. v. Yun,
   327 F.3d 1263 (11th Cir. 2003) .......................................................................11

S.E.C. v. Zandford,
   535 U.S. 813 (2002)..........................................................................................7

S.E.C. v. Troung,
  98 F. Supp. 2d 1086 (N.D. Cal. 2000) ................................................................6

United States v. Chestman,
  947 F.2d 551 (2d Cir. 1991) ...............................................................................11

United States v. O'Hagan,
  521 U.S. 642 (1997)..................................................................................passim

United States v. O'Hagan,
  92 F.3d 612 (8th Cir. 1996), rev'd by 521 U.S. 642 (1997)...................5, 6

United States v. Reed,
  601 F. Supp. 685 (S.D.N.Y. 1985),
  rev'd on other grounds by 773 F.2d 447 (2d Cir 1985) .....................10, 11

## Federal Regulations

17 C.F.R. 240.10................................................................................................12

## Other Authorities

Randall W. Quinn, The Misappropriation Theory of Insider Trading
  In The Supreme Court: A (Brief) Response To The (Many) Critics of
  United States v. O'Hagan,
  8 Fordham J. Corp. & Fin. L. 865 (2003) ...................................................7

Donna M. Nagy, Reframing the Misappropriation Theory of Insider Trading
  Liability: A Post-O'Hagan Suggestion,
  59 Ohio St. L.J. 1223 (1998) .........................................................................7

Richard W. Painter, et al., Don't Ask, Just Tell: Insider Trading
  After United States v. O'Hagan,
  84 Va. L. Rev. 153 (1998) ..............................................................................7

## I.     INTRODUCTION

Defendant Patricia B. Rocklage ("Mrs. Rocklage") is the wife of Dr. Scott Rocklage ("Dr. Rocklage"), who at the time relevant to the Complaint was the Chairman and CEO of Cubist Pharmaceuticals, Inc. ("Cubist"), a biotechnology company.  In December 2001, Cubist learned that the clinical trial results for a new drug were negative, and Dr. Rocklage told Mrs. Rocklage this information in confidence.  Subsequently, Mrs. Rocklage told Dr. Rocklage that she intended to warn her brother, defendant William Beaver, about the test results.  According to the Complaint, Mrs. Rocklage signaled to her brother that bad news was coming about Cubist, allegedly inducing him to sell Cubist stock before Cubist disclosed the negative trial results to the market.

The Commission has filed a complaint against Mrs. Rocklage even though Supreme Court precedent clearly establishes that these facts, even if true, do not state a claim for a violation of the insider trading laws.  As a matter of law, because Mrs. Rocklage told Dr. Rocklage that she intended to warn her brother about the bad news, she cannot be liable for having "misappropriated" information in deceptive breach of a duty to Dr. Rocklage.  Nor on the facts alleged did Mrs. Rocklage have any duty to Cubist shareholders that could have been breached by her disclosure of information to her brother.  Accordingly, the Complaint should be dismissed.

## II.     FACTUAL ALLEGATIONS[1]

### A.     General Background

Cubist is a biotechnology company based in Lexington, Massachusetts.  (Compl. ¶ 9).  In 2001, the company was conducting clinical trials for a new drug called Cidecin.  (Id. ¶ 10).  On

---

[1]     This summary of the factual allegations is taken from the Complaint.  Mrs. Rocklage does not admit the truth of the allegations, and accepts them at face value only for purposes of this motion.

or about December 28, 2001, company officials learned the clinical trial results for Cidecin were negative.  (Id. ¶ 11).

Mrs. Rocklage is the wife of Dr. Rocklage, who was the Chairman and CEO of Cubist during all relevant time periods.  (Id. ¶¶ 1, 6).  William M. Beaver ("Beaver") is Mrs. Rocklage's brother. (Id. ¶ 7).  Prior to January 2, 2002, Beaver owned stock in Cubist.  (Id. ¶ 1, 19).  According to the Complaint, Mrs. Rocklage had an understanding with her brother (unbeknownst to her husband) that if she ever became aware of bad news concerning Cubist that might affect its stock price, she would give him "a wink and a nod."  (Id. ¶ 15).

### B.    Communications Between Dr. And Mrs. Rocklage

According to the Complaint, Dr. Rocklage spoke by telephone with his wife, who was in a limousine on her way home from the airport, on the afternoon of December 31, 2001.  (Id. ¶ 12).  He told her the Cidecin clinical trial had failed, and that she should not to talk about the results in front of the limousine driver.  (Id. ¶ 12, 14).  He also told her that the results of the clinical trial were nonpublic. (Id. ¶ 12).  At the time he conveyed this information, he had a reasonable expectation that Mrs. Rocklage would keep the information confidential.  (Id. ¶ 13, 14).  He had routinely communicated confidential information to her in the past, and she had always kept such information confidential.  (Id.)

The Complaint alleges that Mrs. Rocklage told Dr. Rocklage later that evening that she intended to signal her brother to sell his Cubist stock.  (Id. ¶ 16).  Dr. Rocklage urged her not to, and made it clear he would be unhappy if Mrs. Rocklage told her brother about the trial results.  (Id.).  Notwithstanding Dr. Rocklage's "entreaties," Mrs. Rocklage stated that she was going to warn her brother about the results anyway.  (Id.).

- 2 -

      **C.**    **Mrs. Rocklage Calls Her Brother And Mr. Beaver Sells His Cubist Stock**

According to the Complaint, Mrs. Rocklage telephoned her brother no later than the morning of January 2, 2002, and induced him to sell his stock by saying, in substance, "as far as Cubist is concerned, I'm giving you a wink and a nod."  (Id. ¶ 17).  Mr. Beaver allegedly understood his sister to be giving him a warning about negative information concerning Cubist, and proceeded to sell his stock the morning of January 2, 2002.  (Id. ¶ 18).

## III.    ARGUMENT

Trading securities on the basis of material nonpublic information -- or "tipping" such information (i.e., disclosing it to third parties who then trade on the information) -- does not always violate the federal securities laws.  To the contrary, the Supreme Court has repeatedly rejected "per se" theories of insider trading liability.  See Chiarella v. United States, 445 U.S. 222, 233-35 (1980) (refusing to recognize "a general duty between all participants in market transactions to forgo actions based on material, nonpublic information" and holding that "a duty to disclose under § 10(b) does not arise from the mere possession of nonpublic market information"); Dirks v. S.E.C., 463 U.S. 646, 657 (1983) ("only some persons, under some circumstances, will be barred from trading while in possession of material nonpublic information").  Instead, a person can be liable for insider trading or "tipping" only where they deceive a person to whom they owe a legal duty.  See Chiarella, 445 U.S. at 233-35.  If the defendant owes no legal duty to someone whom she arguably deceives, or if disclosure is made to the person to whom she owes a duty and that person therefore is not deceived, any insider trading or "tipping" is not unlawful.

Within this duty-based framework, the law recognizes two theories of liability: the "misappropriation theory" and the "classical theory."  The Complaint does not state a claim under either theory.

### A.    The Supreme Court's Decision In **O'Hagan** Precludes Liability Under The "Misappropriation Theory"

The "misappropriation theory" of liability for insider trading applies primarily to outsiders -- individuals who have no pre-existing business connection with the company whose securities are at issue -- who are entrusted with material nonpublic information.[2]  Liability is premised not on a fiduciary duty to the issuer's shareholders, but rather on the outsiders' deception of the person who entrusted them with the information.  As the Supreme Court explained in O'Hagan:

> The "misappropriation theory" holds that a person commits fraud "in connection with" a securities transaction, and thereby violates Section 10(b) and Rule 10b-5, when he misappropriates confidential information for securities trading purposes, in breach of a duty owed to the source of the information....  Under this theory, a fiduciary's undisclosed, self-serving use of a principal's information to purchase or sell securities, in breach of a duty of loyalty and confidentiality, defrauds the principal of the exclusive use of that information.  In lieu of premising liability on a fiduciary relationship between company insider and purchaser or seller of the company's stock, the misappropriation theory premises liability on a fiduciary-turned-trader's deception of those who entrusted him with access to confidential information.

United States v. O'Hagan, 521 U.S. 642, 652 (1997).[3]

"Deception through nondisclosure is central" to the misappropriation theory.  O'Hagan, 521 U.S. at 654.  Thus, as the Supreme Court has explicitly said, "*if the fiduciary discloses to the*

---

[2]    Prior to courts' acceptance of the misappropriation theory, liability for insider trading was generally limited under the "classical theory," discussed infra, to insiders of a company who traded in the securities of their company on the basis of material nonpublic information.

[3]    O'Hagan was a criminal prosecution of a lawyer whose firm represented a company considering a potential tender offer for the common stock of another company.  O'Hagan allegedly learned of the acquisition, purchased stock and call options for stock of the target company, and profited when the takeover was announced and the price of the target company's stock increased.  The indictment was brought on the theory that O'Hagan defrauded his firm (and its client) by using the material nonpublic information about the takeover for his own trading purposes.  See O'Hagan, 521 U.S. at 647-48.

- 4 -

*source that he plans to trade on the nonpublic information, there is no 'deceptive device' and thus no Section 10(b) violation*." Id. at 655 (emphasis added).[4]

This "disclosure to the source" is exactly what the Commission alleges happened in this case. In particular, the Commission alleges that Mrs. Rocklage *told* Dr. Rocklage "that she intended to signal her brother to sell his Cubist stock" and "that she intended to warn her brother about the results." Compl. ¶ 16. Because she did so, there was no "deceptive device," and Mrs. Rocklage cannot be held liable for insider trading under the misappropriation theory. See O'Hagan, 521 U.S. at 652-655.[5]

Any doubt that O'Hagan means precisely what it says is dispelled by examining the Eighth Circuit opinion which was on review and the oral argument before the Court. Viewed in this context, the portions of the opinion in which the Court discussed the requirement of nondisclosure to the source of the information reflect the Supreme Court's explanation of the theoretical underpinnings and statutory basis of the misappropriation theory (which the Supreme Court was adopting for the first time). See O'Hagan, 521 U.S. at 654-55. More specifically, the Court of Appeals for the Eighth Circuit had rejected the misappropriation theory because in its view the theory penalized conduct that was not deceptive and therefore not covered by the language of §10(b). See id. at 660; United States v. O'Hagan, 92 F.3d 612, 617-18 (8th Cir. 1996), rev'd by 521 U.S. 642 (1997). According to the Eighth Circuit, "the misappropriation

---

[4]    O'Hagan is clear that disclosure to the source, not the source's consent, is what eliminates liability: "To satisfy the common law rule that a trustee may not use the property that has been entrusted to him, there would have to be consent. To satisfy the requirements of the Securities Act that there be no deception, ***there would only have to be disclosure***." O'Hagan, 521 U.S. at 654 (emphasis added).

[5]    Dr. Rocklage was the source of Mrs. Rocklage's nonpublic information concerning the clinical trials, see Compl. ¶ 12, and her disclosure obligation ran only to him. See O'Hagan, 521 U.S. at 655 n.6 ("Under the misappropriation theory urged in this case, the disclosure obligation runs to the source of the information" not "to those with whom the misappropriator trades"); Salovaara v. Jackson Nat'l Life Ins. Co., 66 F. Supp. 2d 593, 601-602 (D.N.J. 1999). Even if, arguendo, Mrs. Rocklage was required to disclose her intentions to Cubist (which she was not), she plainly satisfied any such obligation by telling her husband of her intentions at a time when he was Chairman and CEO of the company.

theory r[an] counter to [previous Supreme Court] holdings that the mere breach of a fiduciary obligation, without misrepresentation or nondisclosure, is not deception within the meaning of § 10(b)." United States v. O'Hagan, 92 F.3d at 617-18 (8th Cir. 1996). However, the Supreme Court, in reversing the Eighth Circuit, held that it was only O'Hagan's failure to disclose his trading to the source of his information that made his conduct deceptive within the meaning of the statute, thereby identifying the line between mere breach of a duty (which does not violate 10(b)) and actionable deception. See O'Hagan, 521 U.S. at 660.[6]

The language at issue is especially compelling because the government crafted the very theory which mandates dismissal of the Complaint here. At oral argument before the Supreme Court, in arguing for adoption of the misappropriation theory, the government repeatedly acknowledged that there would be no deception and no liability where a defendant discloses his intentions before using the information. See Ex. A at pp. 1-7 (transcript of oral argument in O'Hagan case).[7] For example, the Deputy Solicitor General explained in response to the Court's questions that a breach of a duty of trust and confidence would only violate the securities laws where there was deception, i.e. no disclosure to the source:

> Q:    . . . I mean, *suppose the defendant here had instead come clean, and he told his superiors in the law firm that he was going to use this information*. Then he would not be posing as a loyal employee any more, and it would have been okay.
>
> A:    He would not have deceived his employer. He still would have breached independent fiduciary duties that he owed to that employer.

---

[6]    The O'Hagan case (and the Chiarella case cited earlier) were decided under §10(b) of the Exchange Act, 15 U.S.C. § 78j(b). The Commission brings its Complaint in this matter under both §10(b) and §17(a) of the Securities Act, 15 U.S.C. § 77q (a). However, this additional cause of action does not affect the analysis contained herein because the standards for liability under the two sections are the same. See S.E.C. v. Troung, 98 F. Supp. 2d 1086, 1096 (N.D. Cal. 2000).

[7]    This Court can take judicial notice of the proceedings before the Supreme Court in O'Hagan and consider the transcript of the oral argument without converting a motion to dismiss into a motion for summary judgment. See Kowalski v. Gagne, 914 F.2d 299, 305 (1st Cir. 1990) ("It is well-accepted that federal courts may take judicial notice of proceedings in other courts if those proceedings have relevance to the matters at hand"); Locicero v. Leslie, 948 F. Supp. 10, 12 (D. Mass. 1996) (taking judicial notice on motion to dismiss of transcript in state court proceeding).

Q:      And you say he would still have breached the securities laws.

A:      ***No, I do not think he would have breached the securities laws***.

Q:      ***So that's the line.  He didn't tell them that he was going to go out and use it***.

A:      ***That's absolutely correct***, and the reason why that is significant is that section 10(b) prohibits deceptive devices and contrivances.  It requires deception.  ***The misappropriation theory does involve a breach of fiduciary duty, but the distinctive factor about that breach is that it is a deceptive breach***. . . .

See Ex. A at p. 2 (emphasis added).

The Commission's assertion of liability here under the misappropriation theory is therefore directly at odds with O'Hagan and the analytical path – specifically urged by the government – followed by the Supreme Court in deciding it.  Since O'Hagan, the Supreme Court has reaffirmed that liability under the misappropriation theory is not viable where, as here, the fiduciary discloses her intent to use the information for trading purposes before doing so.  See S.E.C. v. Zandford, 535 U.S. 813, 824 (2002) (under the misappropriation theory, "the fiduciary's fraud is consummated, not when the fiduciary gains the confidential information, but when, ***without disclosure to his principal***, he uses the information to purchase or sell securities.") (emphasis added) (quoting O'Hagan, 521 U.S. at 656).[8]

Accordingly, Mrs. Rocklage cannot be liable for insider trading under the misappropriation theory and the Complaint should be dismissed.

---

[8]     Similarly, commentators have noted that the result of the Supreme Court's holding in O'Hagan is that fiduciaries that disclose to their source their intent to use the material nonpublic information cannot be liable under 10(b).  See Randall W. Quinn, The Misappropriation Theory Of Insider Trading In The Supreme Court: A (Brief) Response To The (Many) Critics of United States v. O'Hagan, 8 Fordham J. Corp. & Fin. L. 865, 893-94 (2003) ("this gap in the theory's coverage is compelled by section 10(b)'s deception requirement.  Deception cannot exist if there is full disclosure by the misappropriator or consent by the source or owner of the information."); Donna M. Nagy, Reframing the Misappropriation Theory of Insider Trading Liability: A Post-O'Hagan Suggestion, 59 Ohio St. L.J. 1223, 1256-57 (1998) (discussing situation, such as this one, where "family members who use confidences placed in them by other family members" disclose their intent to trade;  "O'Hagan makes clear that . . . full disclosure to family members . . . would seem to foreclose a finding of deception, even if they were to voice an objection to the trading."); Richard W. Painter, et al., Don't Ask, Just Tell: Insider Trading After United States v. O'Hagan, 84 Va. L. Rev. 153, 180 (1998) ("a fiduciary is permitted to trade even without the principal's consent so long as disclosure is made to the principal first . . . . Once the intent to trade is disclosed to the principal, the trading is legal under Section 10(b), no matter how strenuously the principal objects.").

**B.    Mrs. Rocklage Cannot Be Liable Under The "Classical Theory" Because She Had No Duty To Cubist Or Its Shareholders And Did Not Acquire Such A Duty By Receiving Information From Her Husband**

No doubt aware that O'Hagan precludes liability based on Mrs. Rocklage's duty to her husband, the Commission inserts into the Complaint a fleeting assertion that Mrs. Rocklage also acquired a duty to Cubist and its shareholders when she "received material nonpublic information concerning negative news about Cubist from her husband, Cubist's CEO." See Compl. ¶ 24. This alternative theory, based entirely on this single allegation, is inconsistent with Supreme Court precedent describing the circumstances under which outsiders can acquire duties to a company's shareholders. The law is clear that Mrs. Rocklage did not have any duty to Cubist or its shareholders, and she cannot be liable for breach of a duty that she did not have.

The "classical theory" of insider trading, which this allegation presumably seeks to invoke, applies primarily to corporate insiders trading the securities of their own corporations or tipping others to material nonpublic information so that they can use the information.[9] Such insiders have a duty to abstain from trading/tipping (or to disclose to the market the material nonpublic information in their possession) because "a relationship of trust and confidence exists between the shareholders of a corporation and those insiders who have obtained confidential information by reason of their position with that corporation." O'Hagan, 521 U.S. at 652. Under the classical theory, liability can be avoided by disclosure the other party to the securities transaction (present shareholders or those becoming shareholders), to whom the insider has a duty. See Chiarella, 445 U.S. at 227.

In addition, an outsider who receives a "tip" from an insider who "tips" *for the purpose of receiving an improper personal benefit* can acquire a duty to "abstain or disclose." Such

---

[9]    The classical theory also applies "to attorneys, accountants, consultants, and others who temporarily become fiduciaries of a corporation." See O'Hagan, 521 U.S. at 652.

"tippees" "assume an insider's duty to the shareholders not because they receive inside information, but rather because it has been made available to them *improperly*." Dirks, 463 U.S. at 660 (emphasis in original). The "tippee," having acquired a derivative duty from the insider, then cannot trade or "tip" without disclosing the material nonpublic information.

### 1.    Mere Receipt of Information From An Insider Does Not Create A Duty

The Commission seems to allege that Mrs. Rocklage acquired a duty to Cubist and its shareholders solely because she received material nonpublic information from her CEO husband. See Compl. ¶ 24.[10]  This is precisely the argument that the Supreme Court rejected in Dirks. There, the Commission argued that "anyone who knowingly receives nonpublic material information from an insider has a fiduciary duty to disclose before trading." Dirks, 463 U.S. at 657.  The Court flatly rejected that argument:

> As we emphasized in *Chiarella*, mere possession of nonpublic information does not give rise to a duty to disclose or abstain; only a specific relationship does that. And ***we do not believe that the mere receipt of information from an insider creates such a special relationship between the tippee and the corporation's shareholders***.

Dirks, 463 U.S. at 657 n. 15 (emphasis added).

Accordingly, it is insufficient as a matter of law for the Commission to simply allege that Mrs. Rocklage merely received material nonpublic information from a Cubist insider.

### 2.    The Commission Does Not Allege Facts Showing That Mrs. Rocklage Acquired A Duty To Cubist Or Its Shareholders

In order to establish Mrs. Rocklage's liability under the classical theory, the Commission must allege facts showing a "special relationship" between her and Cubist giving rise to a purported duty to its shareholders.  In Dirks, the Supreme Court described only two situations in which an outsider can acquire duties to a company's shareholders under the classical theory: by

---

[10]      As an initial matter, the Commission does not (and cannot) allege that Mrs. Rocklage was herself a Cubist "insider."  Her only connection with Cubist was her marriage to Dr. Rocklage, and accordingly she did not have any pre-existing duty to Cubist shareholders.

acquiring a derivative duty to "abstain or disclose" due to an insider's improper "tip," or by becoming a "temporary insider." Neither is applicable here.

> **a)    Mrs. Rocklage Did Not Acquire Any "Derivative" Duty From Her Husband**

An outsider who receives information from an insider only acquires a derivative duty to the company's shareholders if the insider's disclosure was improper. See Dirks, 463 U.S. at 660. Such disclosures are improper where the insider breaches his fiduciary duties by disclosing the information for the improper purpose of receiving some personal benefit, for example as part of a *quid pro quo* or as a gift of confidential information so that the "tippee" can profit from the information in the securities markets. See id. at 659-64. Where the insider's disclosure is not improper, the "tippee" cannot be liable for using the information. See id. at 665-67.

The Commission cannot proceed on this theory because it has not alleged that Dr. Rocklage's disclosure was improper. The Complaint does not allege that Dr. Rocklage (a non-defendant) disclosed the clinical trial results to Mrs. Rocklage for the purpose of receiving any improper personal benefit. To the contrary, the Commission alleges that Mr. Rocklage intended and reasonably expected that Mrs. Rocklage would keep the information confidential. See Compl. ¶¶ 13, 14. Because the Complaint does not allege that Dr. Rocklage breached his fiduciary duties by making the disclosure to Mrs. Rocklage, she could not have acquired any derivative duties to Cubist shareholders. See Dirks, 463 U.S. at 660 ("a tippee assumes a fiduciary duty to the shareholders of a corporation not to trade on material nonpublic information only when the insider had breached his fiduciary duty to the shareholders by disclosing the information to the tippee"); United States v. Reed, 601 F. Supp. 685, 699 (S.D.N.Y. 1985), rev'd on other grounds by 773 F.2d 447 (2d Cir. 1985) ("In the absence of such a breach by the insider,

defendant's father, the Government concedes that there can be no derivative "tippee" liability by Reed").[11]

### b)  Mrs. Rocklage Did Not Become A "Temporary Insider"

Mrs. Rocklage also cannot be held liable as a "temporary insider," the other situation under which outsiders can acquire duties to a company's shareholders under the classical theory.  In Dirks, the Supreme Court described what has since been called a temporary insider as follows:

> Under certain circumstances, ***such as where corporate information is revealed legitimately to an underwriter, accountant, lawyer, or consultant working for the corporation***, these outsiders may become fiduciaries of the shareholders. The basis for recognizing this fiduciary duty is not simply that such persons acquired nonpublic corporate information, but rather that they have ***entered into a special confidential relationship in the conduct of the business of the enterprise and are given access to information solely for corporate purposes***.

Dirks, 463 U.S. at 657 n. 14 (emphasis added).[12]  Thus, temporary insiders are almost exclusively professionals who have gained nonpublic information by virtue of providing services to a company in furtherance of a corporate purpose, such as "attorneys, accountants, consultants and others...."  O'Hagan, 521 U.S. at 652.  Indeed, in sharp contrast to the marital relationship in this case, the courts that have applied or discussed the application of the temporary insider theory have done so in the context of professionals who were providing services to the corporation. See, e.g., S.E.C. v. Softpoint, Inc., 958 F. Supp. 846, 863-64 (S.D.N.Y. 1997) (consultant to the company who facilitated stock sales, prepared public filings and press releases, and participated

---

[11]     Significantly, in factually similar cases the courts have only discussed whether a recipient of information owed a duty of trust and confidence to the source of the material information (as required under the misappropriation theory); they have not even suggested that the recipient acquired a duty to the company or its shareholders.  For example, in S.E.C. v. Sargent, 229 F.3d 68 (1st Cir. 2000), Aldrich, a director of Purolator, told defendant Shepard in confidence that Purolator was a takeover target.  The court considered whether Shepard owed a duty to Aldrich, but never discussed the possibility that Shepard acquired a duty to Purolator or its shareholders. See id. at 75-76.  Similarly, in cases involving disclosures to family members, the inquiry has been whether the outsider family member owed a duty to the insider family member, not whether the outsider family member acquired a duty to the company or its shareholders.  See S.E.C. v. Yun, 327 F.3d 1263, 1269-74 (11th Cir. 2003); U.S. v. Chestman, 947 F.2d 551, 564-71 (2d Cir. 1991); Reed, 601 F. Supp. 685 at 695-720.

[12]     See also Chestman, 947 F.2d at 565 ("This theory clothes an outsider with temporary insider status when the outsider obtains access to confidential information solely for corporate purposes in the context of 'a special confidential relationship.'")

in business and marketing planning); S.E.C. v. Downe, No. 92 Civ 4092, 1993 WL 22126, at *6-7 (S.D.N.Y. Jan. 26, 1993) (individual who acted as a financial public relations consultant and confidential advisor to the company and its CEO); S.E.C. v. Cherif, 933 F.2d 403, 410 n.4 (7th Cir. 1991) (employees of a bank that provided financing for tender offers and buy-outs and thus obtained material nonpublic information); S.E.C. v. Musella, 578 F. Supp. 425 (S.D.N.Y. 1984) (employees of a law firm); S.E.C. v. Ingram, 694 F. Supp. 1437 (C.D. Cal. 1988) (broker who received confidential information regarding merger negotiations, attended meetings regarding the merger, advised on aspects of the merger and helped arrange some of the important meetings); S.E.C. v. Gaspar, No. 83 Civ. 3037, 1985 WL 521 (S.D.N.Y. April 16, 1985) (analyst, vice president, director and stockholder of an investment bank that represented the company in discussions regarding the company's potential acquisition of certain assets).[13]

Mrs. Rocklage cannot be liable under this "temporary insider" theory because the Commission does not allege any facts suggesting that she had a confidential relationship with Cubist stemming from "the conduct of the business of the enterprise." Nor does the Commission allege that she was told of the clinical trial results "solely for corporate purposes;" indeed the Complaint pleads no facts regarding the purpose of the disclosure.[14]

---

[13] Even in the one case (of which Mrs. Rocklage is aware) that the court applied the temporary insider theory to a person who was not retained by the company, the court found that the relationship between the corporate insider and the temporary insider related to the conduct of the business, and that the disclosure was for a corporate purpose. See S.E.C. v. Lund, 570 F. Supp. 1397 (C.D. Cal. 1983). In that case, Lund was a business associate of a corporate insider who approached him with a proposed business deal, and Lund gained nonpublic information concerning the corporation in the process. In finding that Lund was a temporary insider, the court held that "[t]he information was made available to Lund solely for corporate purposes. It was not disclosed in idle conversation or for some other purpose . . . . Lund knew or should have known that the information he received was confidential and that it had been disclosed to him solely for legitimate corporate purposes." Id. at 1403.

[14] In addition, the fact that the Commission has specifically defined the duty of trust or confidence expected of husbands and wives in the context of the *misappropriation* insider trading cases, but not "classical theory" cases, confirms that spousal communications are intended to be analyzed under the misappropriation theory, not under the temporary insider theory. See 17 C.F.R. 240.10b5-2(b)(3) (in misappropriation cases, duty of trust or confidence exists between spouses).

**CONCLUSION**

For the reasons set forth above, Defendant Patricia B. Rocklage respectfully requests that

the Complaint against her be dismissed in its entirety.

Respectfully Submitted,

/s/ Daniel H. Gold
David H. Erichsen (BBO #155600)
Daniel H. Gold (BBO #654909)
Wilmer Cutler Pickering Hale and Dorr LLP
60 State Street
Boston, Massachusetts 02109
(617) 526-6000
(617) 526-5000 (facsimile)
*Attorneys for defendant Patricia B. Rocklage*

Dated:  February 18, 2005

CERTIFICATE OF SERVICE

I, Daniel H. Gold, hereby certify that I caused a copy of the within document to be served

electronically on:


Luke T. Cadigan                                    David E. Marder
U.S. Securities and Exchange Commission            Robins, Kaplan, Miller & Ciresi L.L.P.
Boston District Office                             111 Huntington Avenue
73 Tremont Street                                  Boston, MA 02199
Suite 600                                          617-267-2300
Boston, MA 02108                                   Fax: 617-267-8288
617-573-8919
Fax: 617-424-5940

Brian E. Whiteley
Scibelli, Whiteley and Stanganelli, LLP
50 Federal Street
5th Floor
Boston, MA 02110
617-227-5725
Fax: 617-722-6003




                                        /s/ Daniel H. Gold
                                        Daniel H. Gold


Dated:  February 18, 2005




- 14 -

# Exhibit A



1997 WL 182584                                                    Page 1
1997 WL 182584 (U.S.)

For opinion see 117 S.Ct. 2199, 117 S.Ct. 759

**Briefs and Other Related Documents**

<<Material appearing in DIGEST section, including Topic and Key Number
classifications, Copyright 2005 West Publishing Company>>

Supreme Court of the United States.
UNITED STATES, Petitioner
v.
JAMES HERMAN O'HAGAN
**No. 96-842.**
Wednesday, April 16, 1997

Washington, D.C.

 The above-entitled matter came on for oral argument before the Supreme Court of
the United States at 10:02 a.m.

 APPEARANCES:

 MICHAEL R. DREEBEN, ESQ., Deputy Solicitor General, Department of Justice,
Washington, D.C.;   on behalf of the Petitioner.

 JOHN D. FRENCH, ESQ., Minneapolis, Minnesota;  on behalf of the Respondent.

**\*2** CONTENTS
ORAL ARGUMENT OF MICHAEL R. DREEBEN, ESQ. On behalf of the Petitioner ... 3

ORAL ARGUMENT OF JOHN D. FRENCH, ESQ. On behalf of the Respondent ... 27

REBUTTAL ARGUMENT OF MICHAEL R. DREEBEN, ESQ. On behalf of the Petitioner ... 50

**\*3** PROCEEDINGS
(10:02 a.m.)

 CHIEF JUSTICE REHNQUIST:  We'll hear argument now in Number 96-842, United States
v. James Herman O'Hagan.

 Mr. Dreeben.

ORAL ARGUMENT OF MICHAEL R. DREEBEN
ON BEHALF OF THE PETITIONER
 MR. DREEBEN:  Mr. Chief Justice, and may it please the Court:

 Information is the lifeblood of the securities markets.   Markets thrive on
legitimate efforts to acquire, analyze, and use information, but the deceptive

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

1997 WL 182584                                                              Page 2
1997 WL 182584 (U.S.)

acquisition and use of information in securities trading serves no legitimate
purpose.   Respondent's securities trading involved just such deception.

 Respondent is a lawyer whose firm was entrusted with the confidential plans of a
client that had planned to make a tender offer for the Pillsbury company. While
posing as a loyal partner in his law firm, respondent misappropriated that
information in breach of his fiduciary duties to the firm and his client and
reaped personal profits in virtually risk-free trading in Pillsbury stock and
options.

 By engaging in that form of deception in *4 connection with his trading,
respondent violated three prohibitions of Federal law:  section 10(b) of the
Securities Exchange Act, section 14(e) of the Exchange Act, and the mail fraud
statute.

 Now, the misappropriation theory under section 10(b) of the Securities Exchange
Act posits that a fiduciary or other person with a similar relationship of trust
and confidence commits deception on the legitimate owner of information if that
fiduciary or other agent misappropriates the information by using it in securities
trading, contrary to the view of the United States Court of Appeals for the Eighth
Circuit.

 QUESTION:  Mr. Dreeben, just by misappropriating?   I mean, suppose the defendant
here had instead come clean, and he told his superiors in the law firm that he was
going to use this information.   Then he would not be posing as a loyal employee
any more, and it would have been okay.

 MR. DREEBEN:  He would not have deceived his employer.   He still would have
breached independent fiduciary duties that he owed to that employer.

 QUESTION:  And you say he would still have breached the securities laws.

 MR. DREEBEN:  No, I do not think he would have breached the securities laws.

 *5 QUESTION:  So that's the line.   He didn't tell them that he was going to go
out and use it.

 MR. DREEBEN:  That's absolutely correct, and the reason why that is significant
is that section 10(b) prohibits deceptive devices and contrivances.   It requires
deception.

 The misappropriation theory does involve a breach of fiduciary duty, but the
distinctive factor about that breach is that it is a deceptive breach.   It
involves, just as the facts did in Carpenter v. United States, an agent entrusted
with information by a principal under the understanding between the parties that
the agent would not use that information for any personal gain without obtaining
the principal's agreement.

 QUESTION:  Well, Mr. Dreeben, then if someone stole the lawyer's briefcase and
discovered the information and traded on it, no violation?

 MR. DREEBEN:  That's correct, Justice O'Connor.

                     © 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

1997 WL 182584                                                                Page 3
1997 WL 182584 (U.S.)

 QUESTION:  And if a partner perhaps in the law firm, the lawyer let his daughter
know about the planned merger inadvertently and the daughter relied on the
information and bought stock options, violation?   The daughter has no obligation
to disclose.

 MR. DREEBEN:  Correct, Justice O'Connor, and the answer to that is probably not,
although there has been *6 litigation about whether in particular circumstances a
family relationship is sufficiently imbued with a business context that there is a
duty that runs to it, but I accept the general thrust of your hypotheticals.

 There are forms of improper conduct that section 10(b) does not reach, and the
reason why section 10(b) does not reach them is it is a statute that is framed to
reach fraudulent deceptive activity in connection with securities trading. That
is--

 QUESTION:  Well, Mr. Dreeben, where is--the thing that bothers me about the case
here is, where is the connection between the deceptive device and the purchase or
sale of a security?

 MR. DREEBEN:  The connection, Chief Justice Rehnquist, lies in the fact that the
misappropriation does not occur until the lawyer uses the information as the basis
for his trades.   It is that very information which drives his participation in
the market and allows the profits to be reached--reaped by him.

 QUESTION:  But he didn't deceive anyone who sold him securities.

 MR. DREEBEN:  That is true.   The misappropriation theory doesn't rely on the
notion that he owed a duty of disclosure to the shareholders on the other side of
the transaction, but it does satisfy the requisite *7 connection between the fraud
and the securities trading, because it is only in the trading that the fraud is
consummated.   There could be no closer--

 QUESTION:  But you think of fraud being practiced on a person who is damaged by
it.

 MR. DREEBEN:  I think that under the common law view of fraud, Chief Justice
Rehnquist, that is an accurate statement, but the securities laws are not framed
to pick up only those violations that are covered by common law fraud. Congress
did not pass a statute that says, it is unlawful to commit fraud on the purchaser
or seller of securities.

 Congress did not pass a law even that said it is unlawful to commit fraud in a
securities transaction.   It passed a law with a broader phrase, in connection
with a securities transaction, because the very aim of this section was to pick up
unforeseen, cunning, deceptive devices that people might cleverly use in the
securities markets--

 QUESTION:  That's rather unusual, for a criminal statute to be that open-ended,
isn't it?

 MR. DREEBEN:  I don't think that it's unusual to give the text of this statute
its natural reading.   What it requires is proof of fraud, and then it requires

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

1997 WL 182584                                                                Page 4
1997 WL 182584 (U.S.)

proof that there's a connection between the fraud and the *8 trading.   In this
case, as I've said, there could be no closer connection.   It is only by the
trading itself that the fraud is consummated, and that is exactly a connection
that is picked up by the language of the statute.

 QUESTION:  What if Grand Met had its own strategy to purchase shares for some
reason to make the price go up temporarily?  I don't know quite how the
hypothetical would play out, but suppose this was in Grand Met's interest, and yet
all the facts were the same.   The lawyer--it didn't know the lawyer was doing it.
  It was doing it on it's own, but what the lawyer did was also helping its grand
scheme.

 MR. DREEBEN:  That--

 QUESTION:  Would there be a misappropriation there?

 MR. DREEBEN:  Yes, there would.   First of all that wouldn't have any effect on
the violation that respondent committed on his law firm.   He owed his law firm a
duty of trust and confidence in addition to the duty he owed to the client, but
more importantly than that, in this case there was no evidence that Grand Met knew
about--

 QUESTION:  But in the hypothetical you and I are discussing, if he came clean
with the law firm and the whole law firm was doing it, then no violation?

 *9 MR. DREEBEN:  If he didn't deceive anyone by doing this, he would not--

 QUESTION:  What if he didn't tell the client.

 MR. DREEBEN:  Well, then the client would be deceived.   Whoever does not know
about this and has not authorized it is a victim of the fraud, just as in the
Carpenter case, if Weinans had gone to the Wall Street Journal and said, look, you
know, you're not paying me very much.   I'd like to make a little bit more money
by buying stock, the stocks that are going to appear in my Heard on the Street
column, and the Wall Street Journal said, that's fine, there would have been no
deception of the Wall Street Journal.

 The statute does require deception, but there can be no doubt in a case like this
that there is deception.   This is the identical kind of fraudulent conduct that
the Court had before it in the Carpenter case.

 QUESTION:  Well, I'm not so sure I agree with you on that point, at least as to
the--the Wall Street Journal in Carpenter was said to have a property interest in
the confidentiality, or in the use of the notes for the column. Here, there
doesn't seem to be any property interest involved.

 MR. DREEBEN:  Well, the property interest here *10 is exactly the same as it was
in Carpenter.   It's the information itself, which Grand Met has a right to
determine how it would be used.

 It has a right to maintain its exclusive right to use the information and not to
have the agents, upon whom it must rely if it's going to engage in any kind of

                    © 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

1997 WL 182584                                                              Page 5
1997 WL 182584 (U.S.)

business activity, misappropriate that information for personal gain, and I think
it's a very well-settled concept of the common law and of the law of fraud that
information is a species of property, so that--

 QUESTION:  Mr.--I'm sorry.   I didn't mean to interrupt.

 MR. DREEBEN:  So the deceptive conduct here is, in essence, indistinguishable
from the deceptive conduct that the Court found in the Carpenter case.

 QUESTION:  Do you take the position that every relationship of trust also implies
the duty to disclose if the trust is to be breached?

 MR. DREEBEN:  I don't, Justice Souter.   I think that--

 QUESTION:  How do we know this is such a case and the others are not, then?

 MR. DREEBEN:  Well, this is such a case because it involves a relationship right
at the core of what has been defined as the principal agent-fiduciary trustee *11
relationship.

 QUESTION:  Well, but so does a--I suppose a lawyer in a trust relationship with
his client in the handling of funds, and yet if a lawyer--I presume that if a
lawyer disclosed to his client that he was going to commingle, or he was going to
borrow, as it were, the client's funds for personal reasons, that that would not
be a defense either to a professional or a statutory charge against him.

 Perhaps I'm wrong there, but I assumed it would not, so I'm not sure why, then,
number 1 there is a disclosure obligation here, whereas a disclosure obligation
there would be of no point--

 MR. DREEBEN:  The--

 QUESTION:--and the one would be a defense and the other wouldn't.

 MR. DREEBEN:  Justice Souter, the reason why it makes a difference is that the
disclosure obligation is a prerequisite to obtaining the consent of the principal
or the owner of the trust.

 QUESTION:  But I thought--maybe I misunderstood your answer earlier.   I thought
that if there were a disclosure but no consent that would in effect preclude
liability.   You're saying there must be a disclosure and consent.

 *12 MR.  DREEBEN:  To satisfy the common law rule that a trustee may not use the
property that's been entrusted with him, there would have to be consent.   To
satisfy the requirement of the Securities Act that there be no deception, there
would only have to be disclosure.

 QUESTION:  I thought that was what you answered Justice Scalia when he asked the
question.

 QUESTION:  Yes, that's what I thought, too.

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

1997 WL 182584                                                          Page 6
1997 WL 182584 (U.S.)

 MR. DREEBEN:  That's correct.

 QUESTION:  And--but there would be in that case other sanctions immediately.

 MR. DREEBEN:  That's correct.

 QUESTION:  If you told the law firm, look, I'm going to do this, the law firm
isn't going to consent but it's not likely he'll retain his job, and there might
be other sanctions.

 MR. DREEBEN:  That's correct.    It would still be--

 QUESTION:  In that case it's not 10(b)5.

 MR. DREEBEN:  It's not 10(b)5.    It would still be a breach of fiduciary duty,
but that makes the point that I'm trying to make here.    Not every breach of
fiduciary duty involves deception, but a breach of fiduciary duty when that breach
involves the obligation to make disclosure does involve deception. That, in fact,
is *13 the foundation of this Court's rulings in Chiarella and Dirks that an
insider in a corporation has a duty to his shareholders to make disclosure before
trading with them.

 QUESTION:  There's one thing that I'm still not clear on, and that is, what is it
that is peculiar about some breaches of trust, or some obligations of trust, that
raise the disclosure obligation whereas others do not have a disclosure obligation
that would at all be relevant?

 MR. DREEBEN:  The answer, Justice Souter, is that there are some things that a
trustee cannot do even if he does disclose them.    They will still be breaches of
fiduciary duty, but there are some breaches of fiduciary duty that inherently
require a breach of the duty to make disclosure.

 QUESTION:  You rely on disclosure as just a reverse mechanism for defining
deception.

 MR. DREEBEN:  Correct.    I think that it's clear under this Court's decisions in
Chiarella and Dirks that generally silence is not fraudulent in conducting a
transaction, but it becomes fraudulent if there is a duty to make disclosure, and
the Court in the Chiarella and Dirks cases looked to well-settled understandings
which it then believed were incorporated into 10(b) about when disclosure is
required.

 QUESTION:  If you read a horn-book on tort law *14 does it say that the essence
of deception is nondisclosure?    That's what you're asking us to write, I suppose.

 MR. DREEBEN:  I'm not asking the Court to do anything more than to reaffirm the
basic principle that it adopted in Carpenter v. United States that an agent who
misappropriates his principal's property by posing as a loyal employee when in
fact he's reaping personal gain with that property has committed a form of
deception, indeed, a form of fraud, and that fraud satisfies both the mail fraud
statute and it satisfies section 10(b).

            © 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

1997 WL 182584                                                          Page 7
1997 WL 182584 (U.S.)

 QUESTION:  May I ask you one question, Mr. Dreeben?   I'm a little puzzled by
your statement that--if I understood you correctly, that if the defendant here had
disclosed to his partners, that would have avoided liability, and you're
suggesting there was therefore no duty to disclose to the client.

 MR. DREEBEN:  No, I think there is a duty to disclose to the client as well.  I
think that there are two victims, direct victims of the deception.

 QUESTION:  But supposing in this case he had disclosed to his partner, and his
partner had just kept the information to himself, and then he had gone--the
defendant had gone ahead with his trading.   Would there be a violation?

 *15 MR.  DREEBEN:  Yes, there would, but we would not have been able to charge it
the same way as we charged this case.

 QUESTION:  I see.   You then would have said there was a breach of the firm's
duty to the client.

 MR. DREEBEN:  That's correct.   In this case, the jury was instructed that it
could rely on a finding of a breach of duty either to the law firm or to the
client or to both, and it had to be unanimous about which one it found, but it had
to find one or the other, or it could find both, and if there was disclosure, the
party that received the disclosure would not be a victim of the fraud on our
theory.

 QUESTION:  Mr. Dreeben--

 QUESTION:  Now, Mr. Dreeben, we--this Court has always required either a
misrepresentation or an omission to find 10(b) liability, I think, and you say
there was an omission here by the failure to disclose.

 MR. DREEBEN:  Yes, and I say that there is an omission by the failure to disclose
in exactly the same way as there was in Carpenter.   I also believe that the Court
has never ruled out what seems commonsensical under 10(b), the idea that the
conduct itself, even without a statement or an omission, can be deceptive.

 I mean, here you have a lawyer who worked in his *16 firm, came to work every day
posing as a loyal partner, engaging his partners in discussions about firm
business, under the understanding that he was doing this in the interests of the
firm, when in fact, as the jury concluded, he used the information that he
acquired to finance--to enable his own securities purchases and to profit--

 QUESTION:  Well, any, any fraud is deception, then.   I assume that, you know, if
a lawyer takes the client's money that's supposed to be in a trust account and
just removes it posing as an honest lawyer, I mean, you know, everybody who
commits any fraud is guilty of deception.   Isn't that right?

 MR. DREEBEN:  And the Court--yes, Justice Scalia, and the Court said--

 QUESTION:  What if I appropriate some of my client's money in order to buy stock?

 MR. DREEBEN:  The fact--

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

1997 WL 182584                                                        Page 8
1997 WL 182584 (U.S.)

 QUESTION:  Have I violated the securities laws?

 MR. DREEBEN:  I do not think that you have.

 QUESTION:  Why not?  Isn't that in connection with the purchase of security just
as much as this one is?

 MR. DREEBEN:  It's not just as much as this one is, because in this case it is
the use of the information that enables the profits, pure and simple.  There
would be *17 no opportunity to engage in profit--

 QUESTION:  Same here.  I didn't have the money.  The only way I could buy this
stock was to get the money.

 MR. DREEBEN:  The difference--

 QUESTION:  And I got the money posing as an honest lawyer.

 MR. DREEBEN:  The difference, Justice Scalia, is that once you have the money you
can do anything you want with it.  In a sense, the fraud is complete at that
point, and then you go on and you can use the money to finance any number of other
activities, but the connection is far less close than in this case, where the only
value of this information for personal profit for respondent was to take it and
profit in the securities markets by trading on it.

 QUESTION:  Why isn't the client entrusted just as totally when he entrusts money
as when he entrusts information?  I don't under--I guess my problem is--

 MR. DREEBEN:  He does, Justice Souter.

 QUESTION:--the same as Justice Scalia's.  I don't--if we're starting with a
breach of trust, I don't see why a breach of trust with respect to a fact which is
communicated gives rise to a disclosure obligation when a breach of trust with
respect to some other thing of value, e.g., the contents of the trust account,
does not.

 MR. DREEBEN:  I perhaps was not clear in *18 answering Justice Scalia, Justice
Souter.  It is just as much of a breach, and it is just as much fraudulent and
deceptive, and that, in fact, is what the Court said in Carpenter.  Embezzlement
is a form of fraud.

 The question is whether that fraud is in connection with the purchase or sale of
the security, and the question is whether that form of fraud which I submit is
complete at the time the money is obtained is in connection with the purchase or
sale versus this one.

 QUESTION:  So that every breach does give rise to a duty to disclose.

 MR. DREEBEN:  Every breach that involves the misuse of information entrusted to a
person or the misuse of property entrusted to a person--

 QUESTION:  Yes.

                    © 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

1997 WL 182584                                                    Page 9
1997 WL 182584 (U.S.)

 MR. DREEBEN:--for personal gain, yes.

 QUESTION:  Okay.

 MR. DREEBEN:  That's hornbook law, and I don't think that there's any dispute
about that at all.

 QUESTION:  So what you're saying is, is in this case the misappropriation can
only be of relevance, or is of substantial relevance, is with reference to the
purchase of securities.

 MR. DREEBEN:  Exactly.

 QUESTION:  When you take the money out of the *19 accounts you can go to the
racetrack, or whatever.

 MR. DREEBEN:  That's exactly right, and because of that difference, three can be
no doubt that this kind of misappropriation of property is in connection with the
purchase or sale of securities.

 Other kinds of misappropriation of property may or may not, but this is a unique
form of fraud, unique to the securities markets, in fact, because the only way in
which respondent could have profited through this information is by either trading
on it or by tipping somebody else to enable their trades.

 QUESTION:  With respect to the tip, I wasn't quite sure of your answer to Justice
O'Connor when she brought up the child.  Were you responding to her word
inadvertent, because if this parent tipped off the child and told the child to
purchase the security, surely there would be--

 MR. DREEBEN:  Yes.

 QUESTION:--responsibility.

 MR. DREEBEN:  Yes, there would.  In a case like that, Justice Ginsburg, a
fiduciary cannot do indirectly what he's prohibited from doing directly, and so
using the child as the medium for conducting the transaction would be equally
forbidden.

 I think Justice O'Connor's question was getting *20 at the point about whether
the child would be committing fraud on the parent if the child engaged in this
trading after having learned inadvertently

 QUESTION:  Right.  Now--

 MR. DREEBEN:--of the information, and I--

 QUESTION:  Let me ask you whether you think section 14(e) provides you with an
easier argument for liability than 10(b).

 MR. DREEBEN:  Well, I certainly think that 14(e) provides us with a perfectly
valid argument for liability.  The theory under section 14 is that Congress

                    © 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

1997 WL 182584                                                          Page 10
1997 WL 182584 (U.S.)

specifically gave the Commission regulatory authority in the area of tender offers because it recognized that tender offers pose a very significant threat to investors in the target company having the ability to make decisions about whether to buy, sell, or hold when a tender offer is on the horizon.

 Congress also knew that there is a great opportunity for insider profiting because the information about a tender offer is necessarily circulated to many professionals in advance of the tender offer who then have the opportunity to go out and trade on it, and as a result of its recognition about the dangers of fraudulent and deceptive practices and tender offers, Congress was not content to rely simply on section 10(b) but drafted a new *21 and different antifraud provision which is backed up by regulatory authority that gives the SEC the power to define and prescribe means reasonably designed to prevent fraudulent, deceptive, manipulative conduct.

 QUESTION:  You omitted one little part there from that sentence, Mr. Dreeben-- designed to prevent such acts and practices as are fraudulent, deceptive, or manipulative.

 MR. DREEBEN:  That's correct, Justice--

 QUESTION:  And it seems to me one could read that as saying that that does not give the SEC authority to define what is fraudulent, what is deceptive or manipulative, but simply to define practices which are in fact fraudulent, and you can't expand on the definition of fraudulent or deceptive.

 MR. DREEBEN:  There are several reasons, Chief Justice Rehnquist, why I think that you're correct that I omitted the words, acts or practices as are fraudulent, but I think that the statute is accurately paraphrased the way that I read it.

 First, the regulatory authority that is found in section 14(e) was modeled on a different section of the securities laws, not section 10(b), but section 15(c), which dealt with regulating broker-dealers, and in that context Congress had specifically given the SEC the *22 authority to define fraudulent practices because it wanted to establish a higher standard of obligations and duties than would otherwise be imposed by the common law.  It adopted that language in section 14(e) after the SEC had previously exercised its power to create new obligations that weren't found in the common law, unless it's reasonable to infer that Congress expected that authority to be exercised in that fashion.

 QUESTION:  Well, except, now, the Schreiber case indicated that the SEC can't define offensive conduct more broadly than the statute provides.

 MR. DREEBEN:  Actually the Schreiber case, Justice O'Connor, didn't involve any SEC regulation at all.  It involved simply the question about whether a fully disclosed act would be deemed manipulative under the first sentence of section 14(e).  There were no regulations at issue in the case whatsoever.

 QUESTION:  But there certainly is language in that opinion.  I think footnote 11 indicates that SEC can't go more broadly than the terms of the statute.

 MR. DREEBEN:  I think the footnote, read in context, says that the mere

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

1997 WL 182584                                                          Page 11
1997 WL 182584 (U.S.)

promulgation of the regulatory authority for the SEC, the addition of the sentence
that gave the SEC regulatory authority, didn't change the meanings of the words in
the first sentence, but the Court *23 expressly recognized that Congress had
authority--that Congress had given authority to the SEC not only to define acts or
practices as are fraudulent but to prescribe means reasonably designed to prevent
them, and the Court explicitly said there that the SEC could prohibit nondeceptive
conduct as a means reasonably designed to prevent fraud.

  So the Court in Schreiber I think did acknowledge that the SEC has very vast
regulatory power in order to protect against the abuses that Congress had
identified in the tender offer context.  Rule 14(e)3 does that by establishing a
flat ban on trading by persons who come into possession of information about an
upcoming tender offer when they know that it was received from the bidder or
somebody acting on its behalf, and that flat ban serves two valuable purposes.

  The first is that it protects shareholders who are going to be facing a tender
offer, or who actually are facing a tender offer, from not having adequate time
and adequate information to make a decision whether to buy, sell, or hold.

  It also prevents collusion between the bidder and other parties operating in the
marketplace that has not disclosed to the marketplace, as the Williams Act
requires, from buying up stock from unsuspecting *24 shareholders in the target
company.

  A second purpose that is served by 14(e)3 is the prevention of fraudulent
activity that involves, as this case did, the deceptive acquisition of information
from the bidder or law firm's accountants, investment bankers that represent it,
and it thereby serves to prevent that kind of fraud from occurring, which is a
very great danger, and which involves a very great danger of not being detected,
because this is in essence a crime that involves surreptitious activity that is
not often easy to bring to light.

  So 14(e)3 carves out in the tender offer context very special heightened rules.
It carves out and creates in the tender offer context a disclose or abstain from
trading obligation, but it does not apply, as section 10(b) does, to the rest of
the universe of securities transactions in which the misuse of information can
pose very serious threats.

  QUESTION:  Well, 10(e) perhaps does not require a breach of fiduciary duty, or
does it?

  MR. DREEBEN:  I'm sorry, which section?

  QUESTION:  10(e), liability under--excuse me,

  QUESTION:  14.

  QUESTION:  14(e).  Does that require a breach of fiduciary duty?

  *25 MR. DREEBEN:  As the SEC has defined the acts that are prohibited in 14(e)3,
it does not.

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

1997 WL 182584                                                          Page 12
1997 WL 182584 (U.S.)

 QUESTION:  Right.

 MR. DREEBEN:  And I think that that is justified, Justice O'Connor, on two bases.
 First, Rule 14(e)3 in essence creates the duty to make disclosure, drawing on
Congress' recognition that tender offers pose particular shareholder harms, and
they pose particular dangers that the shareholders will not be able to make an
important decision.

 The SEC drew on the regulatory authority it was given to impose a duty to make
disclosure, and second, the SEC's rule prevents violations that are akin to the
misappropriation violation that occurs under section 10(b) by ensuring that when
someone has material information of this character, they simply may not trade,
even when there is no proof of a breach of fiduciary duty and deception in that.

 QUESTION:  So that would extend liability to the thief?

 MR. DREEBEN:  It would extend liability to the thief so long as the thief
acquired the information from the bidder or somebody acting on its behalf and knew
that.

 Now, what is important about section 10(b)'s application to fraudulent conduct of
this kind is that *26 investors in the securities markets rely on the fact that
the markets are essentially honest.  No investor expects that he may have the
skill, expertise, or analytical ability of everybody else in the market, and
everyone who enters the market knows that they may be trading with somebody who's
smarter than you are or better informed, and you're going to lose.

 But investors do assume that they are not trading with someone who acquired the
informational advantage simply by fraud, simply by stealing information in breach
of a fiduciary duty and using it for trading.  That--

 QUESTION:  Mr. Dreeben, may I--you've come back to 10(b), and I had a question
that I wanted to ask you and then I got distracted, and I'd like to pose it now.

 You made it clear, I think, that if the defendant in this case had simply
disclosed his intention to use the information but did not receive authority, that
there still would be a violation.

 MR. DREEBEN:  No, I think that my position on that is that if there is disclosure
to the client there would be no deception of the client.  If there's disclosure
to the firm, there would be no deception of the firm.  There might be--

 *27 QUESTION:  Okay. That's the point at which I guess I got mixed up.  You've
clarified it now.

 MR. DREEBEN:  Okay. Thank you.

 I would like to reserve the remainder of my time for rebuttal.

 QUESTION: Very well, Mr. Dreeben.   Mr. French, we'll hear from you.

                    ORAL ARGUMENT OF JOHN D. FRENCH

             © 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

1997 WL 182584                                                              Page 13
1997 WL 182584 (U.S.)

ON BEHALF OF THE RESPONDENT
MR. FRENCH:  Mr. Chief Justice, and may it please the Court:

The respondent in this case was a regular substantial investor in the stock
market.  He was convicted of 57 counts arising out of an alleged securities fraud
and sentenced to 41 months in prison.

The basis of that conviction was a set of legal theories that are not
incorporated into the text of any statute, that have sown confusion among the
courts, and that provide no guidance to participants in the stock market.

I ask the Court to consider briefly the application of the Government's theories
to what are, for purposes of this appeal, the undisputed facts in this case.   I
am not now contesting facts.   I am asking the Court to think about the way the
Government's theories *28 apply to these facts.

On August 12, 1988, the Wall Street Journal reported that a British firm called
Grand Metropolitan had put its hotel subsidiary, Intercontinental, up for auction
to raise money for an acquisition.

On August 18, just 6 days later, a financial columnist named Dan Dorfman,
announced on the Cable News Network that people close to Grand Metropolitan-- and
that is a common synonym in the trade for people inside Grand Metropolitan--are
telling people in the street that Grand Metropolitan is interested in acquiring
Pillsbury.

Also on August 18, a broker called respondent to advise that he'd received a  $9
million order to buy 250,000 shares of Pillsbury stock for a customer in London.

QUESTION:  Mr. French, I gather you're trying to convince us that the doctrine
would apply even if all the relevant information were in the public domain, and
I'm assuming that we have a case that the jury found the relevant information was
not in the public domain.

MR. FRENCH:  What I'm suggesting is that if a theory can be applied to result in
a conviction of Mr. O'Hagan on the basis of facts which very clearly in the record
indicated that he placed all of his orders for *29 Pillsbury options before August
26, and the Government only indicts him, as the prosecutor says, for trades made
from August 26 on, then the theory is grotesque.   You cannot, with--

QUESTION:  The reason it's grotesque, as I understand your presentation, is
because the relevant information was in the public domain at the time he made his
purchases.

MR. FRENCH:  The relevant information was in the public domain and, as Your Honor
knows, you may only be convicted, even under the Government's theory, if you trade
on the basis of.

QUESTION:  Right, but I would like to try and address the question of what we do
with a case in which the facts are the way the Government presents them and the
way presumably the jury thought they were, namely that your client acted entirely
on the basis of inside information that was not in the public domain.

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

1997 WL 182584                                                          Page 14
1997 WL 182584 (U.S.)

 MR. FRENCH:  That's--

 QUESTION:  And in that connection I'd be curious to know your view on whether, if
it was--instead of your client, if it had been the partner who was in charge of
the matter within the firm who had done this, would you say he would also
be--would he be covered or not, in your view?

 *30 MR.  FRENCH:  In my view, we are dealing here with a statute that involves,
as Mr. Dreeben said, disclosure.

 If Mr. O'Hagan had made--had had this private, nonpublic information that you're
hypothesizing and disclosed to the Dorsey firm that he was going to trade on it,
according to the Government's theory he couldn't have been prosecuted.

 To me, that seems to be preposterous.    What's wrong with the Government's theory
is, it doesn't have anything to do with unfair advantage being taken of a
participant in the marketplace.

 QUESTION:  Well, I'm--my question is, what if he had been the partner in charge
of the matter within the firm, and had acted entirely on the basis of nonpublic
information.    Could the statute apply in that situation, in your view?

 MR. FRENCH:  In my view, according to the Government's theory, the statute would
apply.

 No. In my view, the statute cannot apply.    There has been no--

 QUESTION:  Even if this man were the only lawyer working on the matter in the
firm for the client.

 MR. FRENCH:  That's correct.

 QUESTION:  And had a clear duty to his client *31 not to disclose.

 MR. FRENCH:  That's correct, Justice Stevens.    In my view, it could not apply
because--

 QUESTION:  But Mr. French, you would give a different answer, would you not, if
the lawyer were in the firm that was assisting Pillsbury in this matter?

 MR. FRENCH:  I certainly would, Your Honor.

 QUESTION:  You have two lawyers, both with the same information, but one is
working for the target company and the other is working for the potential takeover
company, and you would distinguish those two cases.

 So everything that you said in the beginning, if we just made one change, made
O'Hagan with the firm that's representing Pillsbury, there would be liability and
you wouldn't contest that.

 MR. FRENCH:  I wouldn't be here today, Your Honor.    The--

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

1997 WL 182584                                                    Page 15
1997 WL 182584 (U.S.)

 QUESTION:  Is--

 MR. FRENCH:  The statute encompasses deception, and in the context of a
nondisclosure, deception occurs in the presence of a fiduciary duty.  The lawyer
inside Pillsbury has a fiduciary duty to the Pillsbury shareholders. The lawyer
outside Pillsbury does not have a fiduciary duty to the Pillsbury shareholders.

 *32 QUESTION:  Well, are you basing your--

 QUESTION:  Deceive the sellers not just deceive somebody who's working for
the--for--right?

 MR. FRENCH:  That's correct.   He has to have deceived the sellers in order--

 QUESTION:  That's the basis for the distinction.

 MR. FRENCH:  A deception in connection with the purchase or sale of a security is
the basis of--

 QUESTION:  But what you're focusing on is not the definition of fraud, not the
definition of deception, but in connection with securities.

 MR. FRENCH:  I'm focusing on two things, Your Honor.   First of all, I believe
that what the Congress tried to adopt here was something to prevent securities
fraud.

 I don't believe the Congress is attempting to regulate the relationships between
lawyers and their firms, which are regulated by codes of professional
responsibility, or husbands and wives, or fathers and sons, which is the context
in which these misappropriation cases come up.

 QUESTION:  Well, is it wrong for me to proceed through the statute and the
relevant--and 10(b)5 by asking first, is there fraud?   Second, is it in
connection with the sale of securities?   And it seems to me that in *33 the case
that Justice Stevens put to you, where the principal partner working for Grand Met
starts trading on the inside information, that there is fraud in the sense of
deception.

 MR. FRENCH:  It is possible--

 QUESTION:  Now--now, maybe that's right, maybe that's wrong under your view, and
I'd like to hear why.

 Now, I could understand if you went further and said there's not in connection
with the sale of securities, but that's quite a different point.

 MR. FRENCH:  There is not even deception there.   There is theft, and contrary to
Mr. Dreeben's position, theft of a piece of information is no different from theft
of money.   It's not fraud.

 You can be prosecuted for the theft vis-a-vis yourself and the person from whom
you stole, or the person from whom you stole may proceed against you to recover

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

1997 WL 182584                                                    Page 16
1997 WL 182584 (U.S.)

the money, but it's not deception.   Otherwise, every single theft would result in
a prosecution for fraud, and that never happens.

 QUESTION:  What about the Carpenter case, Mr. French?   What about the Carpenter
case?   I mean, doesn't that suggest that theft can be brought within the
securities statute?

 MR. FRENCH:  It suggests that theft can be **34** brought within the mail fraud
statute, Your Honor.   As to the securities fraud statute, the Court was equally
divided, and therefore I don't know what the Court thinks with respect to that
issue.   The Government cannot rely on Carpenter with respect to the mail fraud
claim.

 QUESTION:  Is it possible that some of these difficult cases--you know, what you
call the preposterous cases, the mothers, whatever it is--would be fairly dealt
with through a requirement that a criminal conviction must be willful?

 I notice that word was in the criminal section, and does wilful mean that in this
area, if you don't know the law, that's an excuse, so therefore in any of these
borderline cases a defendant who didn't realize that what he was doing was against
the securities law would be home free, and this would be reserved for the
instances where people know that what they're doing is wrong as a matter of
securities law.

 I'd like your reaction to that.   I'm not certain whether that's correct or not.

 MR. FRENCH:  Yes, Justice Breyer.   I have several problems with it.

 One is that under the misappropriation theory no one will ever really know,
because the misappropriation theory, even in the courts that have adopted it and
follow **35** it, is so confusing that the courts themselves--the court in Chestman,
for example, says when you get outside the relationship with the shareholder,
the--knowing whether or not the relationship applies is unclear.

 QUESTION:  But you see, that's the basis of my question.   The defendant would be
entitled to an instruction that if he didn't know that what he was doing was
unlawful, he hasn't done it willfully.

 I'm thinking of Ratzlaf.   I'm thinking of the cases that interpret willfully,
and I wonder if that saves for the Government--saves them from your argument,
because you're arguing this is all very unclear, and that's what I'd like a
response to.

 MR. FRENCH:  Well, it would be very helpful if that turned out to be, as the
Government prosecutes these cases, the instruction.   There are several
instructions in this case, as the record shows, against Mr. O'Hagan, that tell the
jury that he doesn't have to know elements of the offense, for instance that he
didn't have to know substantial steps were taken.

 But to me, it doesn't answer the question.   I believe, as Judge Luttig said in
the Bryan case, this mode of analysis pulls apart a unitary concept.   The unitary
concept is deception or manipulation in connection with the purchase or sale of a

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

1997 WL 182584                                                      Page 17
1997 WL 182584 (U.S.)

security.   To me, that means the **36** buyer or seller of the security deceives the
person on the other side of the transaction.   It's not as if you deceive someone
over here and then later on you benefit from it by dealing with somebody else.

 Mr. Dreeben's remark, it seems to me, fits with my theory of this case.   He
says, there--it has to be in connection with the purchase or sale of a security
because the only way Mr. O'Hagan could profit was in the purchase or sale of a
security.   Not so.   That assumes Mr. O'Hagan has no imagination.   Mr. O'Hagan
could have said, I now have a useful piece of information.   I have
misappropriated it.   I'm going to profit on it by selling it to the trade press.
 I can get a good fee for this information.

 So the misappropriation would have occurred, but it had been disconnected from
the purchase or sale of the security.

 QUESTION:  It's not entirely disconnected.   The trade press would only be
interested in it because the people who read the trade press would be able to buy
securities on the basis of this confidential information.

 QUESTION:  I doubt if they would have--

 QUESTION:  They would have just pushed it one step further back, but it still
necessarily--

 QUESTION:  They wouldn't have paid this kind of **37** price for it, either.

 MR. FRENCH:  All right.   I'll give you another hypothetical, Your Honor, because
I'm firmly convinced that the statute doesn't read the way Mr. Dreeben says it
does.   You cannot disconnect the misappropriation from the purchase and sale of
securities and say it's satisfied.

 Mr. O'Hagan's office in Minneapolis is across the street from the Pillsbury
Company.   He could have said to himself, I have always wanted the business of the
Pillsbury Company.   I will walk across the street, misappropriating this
information of my law firm and its client, deliver it to the Pillsbury Company,
and suggest to the Pillsbury Company that in the future they might find it very
desirable to use me for legal work.

 That wouldn't have had anything to do with the purchase and sale of the security,
and yet it would have profited Mr. O'Hagan if it had worked.

 QUESTION:  Yes, but all you're saying is, he could have done a lot of things that
were not in connection with the sale of the security, but what he did it seems to
me was in connection with the sale of the security.

 MR. FRENCH:  The cases of this Court have confined the statute to relationships
between market participants.   I admit not merely buyers and sellers.   **38**
They've included brokers.   They've included other investors.

 But at the time of the alleged fraud, neither Dorsey & Whitney nor Grand Met was
a market participant.   Grand Met had a desire for a takeover.   It had no money
for the takeover.   The transactions presumably ended by August 26. Grand Met's

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

1997 WL 182584                                                      Page 18
1997 WL 182584 (U.S.)

own chief financial officer said that by September 18th they still didn't have the
money.

 They wanted to make a takeover.  They couldn't make a takeover.  It wasn't
until October 4th that the takeover was proposed, was announced, so we have, I
think for the very first time, a proposal by the Government that a fraud on a
nonmarket participant be deemed to be in connection with the purchase and sale of
securities.

 QUESTION:  Well, the rule is written that way.  The rule--I know you're going to
bring me back to the statute, but just so far as the rule is concerned, the rule
says it's unlawful to have a deceit or a fraud upon any person--

 MR. FRENCH:  Right.

 QUESTION:--in connection with the purchase or sale of securities.  It doesn't
say upon a purchaser or seller of securities.  That's what it would say if your
theory were to be adopted.

 MR. FRENCH:  I agree it says any person, but it *39 seems to me that rules are
not allowed to stray outside the scope of their statute.

 QUESTION:  Then we have to assume that Congress wouldn't intend--on your theory
we could take the insiders, the most complete insiders of a corporation, say Grand
Met if it were American, and they could go out and buy all the shares they wanted,
knowing that those companies are about to be taken over.  They can buy the shares
of the companies that are about to be taken over, and that would be lawful under
the securities law, in your view.

 MR. FRENCH:  It would up until a point, but there's a whole panoply of regulation
relating to tender offers.  Once you've embarked on a tender offer you have to
announce it, and there's restraints on how you can conduct it, and you cannot make
misrepresentations in connection with it.

 I do not think this particular reading of this statute is necessary to keep
tender offers clean.

 QUESTION:  Mr. French, would you tell me, if your position is the one we adopt,
what becomes of the 1988 legislation that provides--provided for a private right
of action?  It appeared that Congress was operating on the basis of certain
understandings about what 10(b) and 14(e) meant.

 *40 MR. FRENCH:  Well, Justice Ginsburg, two things about the 1988 legislation.
 First, it was adopted--whatever they mean, it was adopted after my client's acts,
and therefore it seems to me he can't have anticipated--

 QUESTION:  Oh, I don't mean with respect to your case, but you're asking us to
make a ruling that will govern not simply this day and case--

 MR. FRENCH:  Yes.

 QUESTION:--but that will interpret 10(b) and 14(e), and so I would like to know

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

1997 WL 182584
1997 WL 182584 (U.S.)                                    Page 19

what becomes of that later legislation.    Is it in shambles?

 MR. FRENCH:  I think what I'd like the Court to do is think about all of the
legislation and attempted legislation throughout the 1980's in thinking about that
issue.    In 1984, the SEC went to the Congress and proposed legislation that would
have covered this subject matter, would have covered the misappropriation area,
and then when Congress got ready to enact it said no, we would prefer vagueness
and ambiguity.    Please don't enact it.

 Then in 1987, when the SEC went to the Congress with a proposal to enact the
misappropriation theory, the Congress rejected it.

 Then in '88 it enacted something having to do with participants in the market
that once again did not amend the language of 10(b)5, so it seems to me there is
*41 no basis for saying, as some of the amici have said, that the Congress has
codified these theories into law.    It has not enacted any of this into law.

 So my answer is the 1984 legislation and the 1988 legislation have to be left to
apply to 10b-5 as interpreted ultimately by this Court, and the Congress, if it
wants to get the misappropriation theory into law, has to write it into law.

 QUESTION:  So you disagree with what one of the amici briefs said, that--I think
it was the one from the NASAA--stated that you virtually conceded that O'Hagan's
conduct would have violated the 1988 act if it had post-dated that legislation.

 MR. FRENCH:  I disagree, Your Honor.    The amici briefs--one of the amicus briefs
says the Congress codified the misappropriation theory.    The Government says the
Congress has validated the misappropriation theory.    A third amicus brief says
the Congress has not codified the misappropriation theory, but ratified it.

 I don't know what ratified or validated means in these circumstances.    I know
what enact means.    Congress has not enacted it.    So yes, I disagree.

 QUESTION:  Why hasn't Congress--what I'm actually thinking, Congress has-- think
of the case of the insider for the company itself, the company that's *42 going to
take over another company.    Everybody knows that those insiders shouldn't go out
and buy up stock in the takeover target secretly, and it deceives everybody in the
company for which he works.

 So the SEC, the expert organization, decides that that's so.    It fits within the
language of the statute.    And then of course you would be worried about criminal
liability for vague theories, but that's where I came back to the word willfully.
 So I'm really asking this to see if there's anything more you want to say in that
area.

 MR. FRENCH:  I'd be happy--

 QUESTION:  Should I see it as a delegation problem, an expert agency, literal
language complied with, and criminal liability taken--unfair criminal liability
taken care of by willfully?    I'm sketching that out for you so that I can get it--

 MR. FRENCH:  Yes, Justice Breyer.

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

1997 WL 182584                                                        Page 20
1997 WL 182584 (U.S.)

What we have is a--and I am not in a position to ask this Court to reverse
several decades' worth of law, but what we have is a situation that's slipped its
moorings.   Insider trading was supposed to be governed by section 16(b).

Katie Roberts worked very hard to get insider trading under 10(b) more than 30
years after the statute **43** was passed by saying it depends upon nondisclosure as
between participants to a transaction.   This Court went along with that in
Chiarella, but not further.

What the Congress needs, if it wants to get passed--and I can even conceptually
do that.   I can--in my mind I can say, misrepresentation-- deception can
encompass nondisclosure when there is a duty to speak.   I can't get beyond that.

So if the Congress wants within the framework of 60 years of law to get beyond
misrepresentation or nondisclosure constituting deception when there's a duty to
speak, it should pass a statute about it, which it has not.

Perhaps I should move to 14(e).   It seems to me that there are two serious
problems with 14(e) which I think the Government cannot deal with.   One is the
agency has not promulgated rules designed to help prevent frauds from arising. It
simply redefined the word fraud.

The statute prohibits fraudulent, deceptive, or manipulative acts.   The SEC
announces that something is a fraudulent, deceptive, or manipulative act which
doesn't have any element of fraud in it.   It just says you can't trade if you
have the information.

Again, if you look at one of the courts that's gone along with the rule, SEC v.
Maio in the Seventh **44** Circuit, says the rule requires a duty to disclose
regardless of whether such information was obtained through a breach of fiduciary
duty, so it seems to me that the rule has just outstripped the statute it's
supposed to be implementing, and that's impermissible.

The second thing wrong with the rule is, the rule says you mustn't trade in
connection with a tender offer.   The SEC has said you may not trade if
substantial steps have been taken toward a tender offer.   That's not in the law.
 That is an accretion to the law that's not there.   It--

QUESTION:  But their rulemaking authority under the law allows them to go beyond
the law.   It allows them to make rules that will prevent a violation of the law.
 You concede that that allows them to make unlawful by rule some things that are
not made unlawful by the statute, don't you?   Or don't you?

MR. FRENCH:  I do, but I don't concede that it authorizes them to change the
criminal application of this statute.

If the Court when it has an--

QUESTION:  I don't really understand your response.   If it authorizes them to go
beyond the law--you mean only for civil purposes?   Is that what you're saying?

**45** MR.  FRENCH:  I'm--I'll say two things.   First, it plainly can't do it in

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

1997 WL 182584                                                                    Page 21
1997 WL 182584 (U.S.)

the criminal context because it can't transform fraud into nonfraud and say, this
is criminal, but beyond that, what I think it can do--

 QUESTION:  Before you go beyond that, it's not transforming fraud into nonfraud.
 It's saying, this is nonfraud.  It's not covered by the statute, but we're
prohibiting it nonetheless because the statute allows us to do it. It allows us to
prohibit things in order to prevent fraud, not just to prohibit fraud but to
prohibit other things in order to prevent fraud.  That's how the statute reads.

 MR. FRENCH:  No, Your Honor.  This redefines the word, fraud.  It says, it
shall be, it shall constitute fraudulent activity if you purchase after
substantial steps have been taken.

 QUESTION:  That's a different point you're making.  You are making the point
that this rule might have been okay if it had read differently, if it had read,
thou shalt not do this.

 Instead, however, it reads doing this constitutes fraud under the--under 14(e),
and that's simply false, so the rule is false.  It's not that it--

 MR. FRENCH:  The rule is false.  The rule is--

 QUESTION:  It's not that it does something that *46 the Commission couldn't.  It
does it in the wrong way.

 MR. FRENCH:  The rule is false.  Moreover--

 QUESTION:  But could it have done it another way?

 MR. FRENCH:  I don't think it could do--let me try to do this in conjunction.  I
don't think it could do this in another way because there's no definition of
substantial steps, and it is not possible for most participants in securities
transactions to know that substantial steps have been taken.

 QUESTION:  Well, but that's essentially a vagueness argument.

 MR. FRENCH:  It certainly is a vague--

 QUESTION:  I suppose rather than a breach of delegated--or an excess of delegated
authority.

 MR. FRENCH:  That's correct.  May I take an example in an area in which I
practice heavily.  The Federal Trade Commission Act prohibits deceptive acts,
unfair or deceptive acts or practices.  In the context of that statute the
agency, in prosecuting for deception, just takes straightforward
misrepresentations, lots of different kinds but straightforward misrepresentations.

 In the concept of unfairness, it treads very carefully, conducts investigations,
promulgates trade regulation rules, and then says we have identified a *47
practice here that we deem to be unfair.  We haven't amended the law to allow us
to prohibit things that are fair.  We've identified this act as unfair.  And
then it goes forward on a very careful basis with prosecutions that only lead to

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

injunctive results.

 QUESTION:  But that basically is then kind of an administrative process argument,
and once again it seems to me you're not saying when you make that argument that
they have exceeded their--that the essential problem is that they have exceeded
their delegated authority, but the contrast that you are drawing is that they were
more careful about predicating their exercise of delegated authority.

 MR. FRENCH:  And they certainly have been more careful.

 QUESTION:  But if that's the nub of what you're arguing, it's not that they've
exceeded the authority in our case, if that's the point of your argument, but that
they just didn't go about it the right way.   Their process was defective.

 MR. FRENCH:  No, I really am going beyond that.   I am--

 QUESTION:  Okay, then I don't--

 MR. FRENCH:  I am saying--I am saying that when the statute says you must not
commit fraud in *48 connection with a tender offer, the agency cannot say, you are
also subject to prosecution when--even when you don't commit fraud, and even when
no tender offer has been launched, but because substantial steps have been taken.
 That rewrites the law.   That is not a rule that implements the law.   It
rewrites the law, and that's the distinction I'm drawing.

 QUESTION:  Mr. French, does the Federal Trade Commission Act say that the Federal
Trade Commission shall, by rules and regulations, define and prescribe means
reasonably designed to prevent unfair or deceptive trade practices.

 MR. FRENCH:  I don't recall the language producing the implementation.

 QUESTION:  I don't think it does.   That's the crucial sentence here which allows
this agency, as I think the Federal Trade Commission Act does not allow the
Federal Trade Commission to go beyond what the statute says and to define other
things as unlawful in order to prevent the things that the statute prohibits.

 I think that's the fair meaning of that sentence, now.   Maybe you say that's an
unconstitutional delegation or something, but it seems to me you have to grapple
with the reality that Congress has told this agency, you can make unlawful things
that the statute does *49 not make unlawful.

 MR. FRENCH:  You can put into a class of prohibited conduct in some way or
another things that you define as reasonably designed to prevent fraudulent acts.

 QUESTION:  And suppose you go on and say, and we will treat these as if they were
fraudulent acts?

 MR. FRENCH:  I do not believe you can go on and say, you may treat--we will treat
these as fraudulent acts.   There has to be for people to be not at risk all the
times--

 QUESTION:  Well but the sanction is the same.   It just says that the sanction

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

1997 WL 182584                                                              Page 23
1997 WL 182584 (U.S.)

mechanisms of the statute are employed.

 MR. FRENCH:  You may not, Your Honor, I think, put people at risk of prosecution
for fraudulent acts committed in connection with a tender offer by announcing that
nonfraudulent acts are fraudulent acts and can be prosecuted when there isn't any--

 QUESTION:  Well, there has to be the premise that they're necessary to avoid
other fraudulent acts.

 QUESTION:  Of course, the text says fraudulent, deceptive, or manipulative.  It's
kind of a broad term.

 MR. FRENCH:  It certainly is, but I believe the Court in Schreiber has equated
deceptive and manipulative under this statute with deceptive and manipulative
under *50 10(b), so it has some content that narrows somewhat the breadth of it.

 I don't know if the Court wishes me to speak on the subject of mail fraud.  Mr.
Dreeben did not, and I'm willing to leave it to the briefs.  I would say with
respect to that that all that happened here is that in the Eighth Circuit, the
Eighth Circuit--

 QUESTION:  Mr. French, your time has expired.

 MR. FRENCH:  Thank you, Mr. Chief Justice.

 QUESTION:  Mr. Dreeben, you have a little over a minute left.

                    REBUTTAL ARGUMENT OF MICHAEL R. DREEBEN
                         ON BEHALF OF THE PETITIONER
 MR. DREEBEN:  Thank you, Mr. Chief Justice.

 In order to convict respondent on the section 10(b) count, the jury had to find
that he acted with the intent to deceive, manipulate, or deprive--these are in the
jury instructions at page 199 of the joint appendix--and the statutory requirement
for the imposition of imprisonment requires that he be shown to have knowledge of
the regulation or rule that he violated.

 He cannot show that--if he shows that he did not have knowledge of it, he cannot
be imprisoned, but the statute does require proof of wilfulness in order to
sustain any criminal conviction.

 *51 QUESTION:  Mr. Dreeben, I hate to use up any of your short time, but there's
a new point which came out in oral argument here which I don't recall in the
briefs, and I want to know what your response to it is, and that is, assuming that
14(e), as I think is true, does allow this agency to make unlawful things that the
statute itself does not, has it purported to do that in its regulation?

 MR. DREEBEN:  Justice Scalia--

 QUESTION:  And if it has not purported to do that, has not purported by that
regulation to prescribe means reasonably designed, but rather in its regulation
simply redefines what constitutes fraud or deception, then is that an exercise of

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

the power that's given by that second sentence of 14(e)?

 MR. DREEBEN:  I think that it is, Justice Scalia.   The ultimate--may I answer?

 QUESTION:  Yes.

 MR. DREEBEN:  The ultimate question is whether the SEC's prohibition on trading,
which is clearly described in the rule, is within its statutory authority, which
is a question for the court, and the court may determine that the SEC's
prohibition does satisfy the statute based on either the defining prong or the
means reasonably designed to prevent, and it's analysis of the reasons that are
given.

 *52 We address this question in our brief in opposition in the Chestman case.

 CHIEF JUSTICE REHNQUIST:  Thank you, Mr. Dreeben.   I think you've answered the
question.   The case is submitted.

 (Whereupon, at 11:02 a.m., the case in the above-entitled matter was submitted.)

                               DIGEST

DIGEST CLASSIFICATION TO PETITIONER'S ARGUMENT:

U.S. v. O'Hagan

349B   SECURITIES REGULATION
349BI    Federal Regulation
349BI(C)   Trading and Markets
349BI(C)7    Fraud and Manipulation
349Bk60.17     Manipulative, Deceptive or Fraudulent Conduct
349Bk60.28    Nondisclosure;  Insider Trading
349Bk60.28(2)      Duty to Disclose or Refrain from Trading
  Most Cited Cases
349Bk60.28(2.1)  k. In general. Most Cited Cases
Did attorney's trading in securities on material, nonpublic information that he
misappropriated in breach of his fiduciary duties violate Securities Exchange Act
of 1934 and Rule 10b-5?  Securities Exchange Act of 1934, § 10(b), 15 U.S.C.A. §
78j(b);  17 C.F.R. § 240.10b-5.

DIGEST CLASSIFICATION TO PETITIONER'S ARGUMENT:

U.S. v. O'Hagan

349B   SECURITIES REGULATION
349BI    Federal Regulation
349BI(C)   Trading and Markets
349BI(C)7    Fraud and Manipulation
349Bk60.17     Manipulative, Deceptive or Fraudulent Conduct
  Most Cited Cases
349Bk60.30  k. Conduct of accountants, attorneys or other professionals. Most
Cited Cases

            © 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Did attorney's trading in securities on material, nonpublic information that he
misappropriated in breach of his fiduciary duties violate Securities Exchange Act
of 1934 and Rule 10b-5?  Securities Exchange Act of 1934, § 10(b), 15 U.S.C.A. §
78j(b);  17 C.F.R. § 240.10b-5.

DIGEST CLASSIFICATION TO PETITIONER'S ARGUMENT:

U.S. v. O'Hagan

349B    SECURITIES REGULATION
349BI    Federal Regulation
349BI(A)    In General
  Most Cited Cases
349Bk3   k. Administrative rules and regulations. Most Cited Cases
Did Securities and Exchange Commission (SEC) validly exercise its rulemaking
authority under Securities Exchange Act of 1934 in promulgating insider trading
rule relating to tender offers?  Securities Exchange Act of 1934, § 14(e), 15
U.S.C.A. § 78n(e);  17 C.F.R. § 240.14e-3(a).

DIGEST CLASSIFICATION TO PETITIONER'S ARGUMENT:

U.S. v. O'Hagan

306    POSTAL SERVICE
306III    Offenses Against Postal Laws
306k35    Use of Mails to Defraud
  Most Cited Cases
306k35(10)  k. Nature of scheme or device in general. Most Cited Cases
Did attorney's trading in securities on material, nonpublic information that he
misappropriated in breach of his fiduciary duties violate mail fraud statute, even
if his conduct did not violate securities laws?  18 U.S.C.A. § 1341.

DIGEST CLASSIFICATION TO RESPONDENT'S ARGUMENT:

U.S. v. O'Hagan

349B    SECURITIES REGULATION
349BI    Federal Regulation
349BI(C)    Trading and Markets
349BI(C)7    Fraud and Manipulation
349Bk60.17    Manipulative, Deceptive or Fraudulent Conduct
349Bk60.28      Nondisclosure;  Insider Trading
349Bk60.28(2)      Duty to Disclose or Refrain from Trading
  Most Cited Cases
349Bk60.28(2.1)  k. In general. Most Cited Cases
Is misappropriation theory, which allows finding of criminal liability for trading
in securities on material, nonpublic information in breach of fiduciary duties
owed to source of information, in absence of any evidence of misrepresentation or
nondisclosure to, and which induces action or inaction on part of, purchaser or
seller of securities or any other participant in securities transaction,
encompassed within text of section of Securities Act of 1934, which prohibits
deception in connection with purchaser or sale of security?  Securities Exchange

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

1997 WL 182584                                                    Page 26
1997 WL 182584 (U.S.)

Act of 1934, § 10(b), 15 U.S.C.A. § 78j(b).

DIGEST CLASSIFICATION TO RESPONDENT'S ARGUMENT:

U.S. v. O'Hagan

349B    SECURITIES REGULATION
349BI     Federal Regulation
349BI(A)    In General
  Most Cited Cases
349Bk3  k. Administrative rules and regulations. Most Cited Cases
Did Securities and Exchange Commission (SEC) exceed its rulemaking authority under
section of Securities Exchange Act of 1934, which prohibits untrue statements of
material fact or omissions of fact with respect to tender offer, by promulgating
rule prohibiting securities fraud in connection with tender offer, without
requiring breach of fiduciary duty, and by extending that section of Act to
prohibit trading in advance of tender offer if "substantial steps" have been taken
toward tender offer?  Securities Exchange Act of 1934, § 14(e), 15 U.S.C.A. §
78n(e);  17 C.F.R. § 240.14e-3(a).

DIGEST CLASSIFICATION TO RESPONDENT'S ARGUMENT:

U.S. v. O'Hagan

349B    SECURITIES REGULATION
349BI     Federal Regulation
349BI(C)    Trading and Markets
349BI(C)5-A A. Tender Offers
  Most Cited Cases
349Bk52.43  k. Persons liable. Most Cited Cases
Did Securities and Exchange Commission (SEC) exceed its rulemaking authority under
section of Securities Exchange Act of 1934, which prohibits untrue statements of
material fact or omissions of fact with respect to tender offer, by promulgating
rule prohibiting securities fraud in connection with tender offer, without
requiring breach of fiduciary duty, and by extending that section of Act to
prohibit trading in advance of tender offer if "substantial steps" have been taken
toward tender offer?  Securities Exchange Act of 1934, § 14(e), 15 U.S.C.A. §
78n(e);  17 C.F.R. § 240.14e-3(a).

DIGEST CLASSIFICATION TO RESPONDENT'S ARGUMENT:

U.S. v. O'Hagan

110    CRIMINAL LAW
110XXIV  Review
110XXIV(U) Determination and Disposition of Cause
110k1185    Reversal
  Most Cited Cases
110k1190  k. Effect. Most Cited Cases
Was indictment structured in such a way as to premise mail fraud counts on acts
allegedly constituting securities fraud such that reversal of securities fraud
counts necessarily compelled reversal of mail fraud counts?

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

1997 WL 182584                                                        Page 27
1997 WL 182584 (U.S.)

U.S.,1997.
U.S. v. O'Hagan
1997 WL 182584

### Briefs and Other Related Documents (Back to top)

. 1997 WL 33484611  (Appellate Petition, Motion and Filing) Respondent's Brief in
Opposition (Dec. 30, 1997)Original Image of this Document with Appendix (PDF)

. 1997 WL 174119 (Appellate Brief) REPLY BRIEF FOR THE UNITED STATES (Apr. 09,
1997)

. 1997 WL 143801 (Appellate Brief) BRIEF FOR RESPONDENT JAMES HERMAN O'HAGAN (Mar.
28, 1997)

. 1997 WL 145007 (Appellate Brief) BRIEF OF NATIONAL ASSOCIATION OF CRIMINAL
DEFENSE LAWYERS AS AMICUS CURIAE IN SUPPORT OF RESPONDENT (Mar. 28, 1997)

. 1997 WL 143793 (Appellate Brief) BRIEF OF AMICI CURIAE LAW PROFESSORS AND
COUNSEL IN SUPPORT OF RESPONDENT (Mar. 27, 1997)

. 1997 WL 86236 (Appellate Brief) BRIEF OF AMICI CURIAE NORTH AMERICAN SECURITIES
ADMINISTRATORS ASSOCIATION, INC, AND LAW PROFESSORS IN SUPPORT OF PETITIONER (Feb.
28, 1997)

. 1997 WL 86305 (Appellate Brief) BRIEF OF AMICUS CURIAE ASSOCIATION FOR
INVESTMENT MANAGEMENT AND RESEARCH IN SUPPORT OF PETITIONER (Feb. 28, 1997)

. 1997 WL 82678 (Appellate Brief) BRIEF OF AMERICAN INSTITUTE OF CERTIFIED PUBLIC
ACCOUNTANTS AS AMICUS CURIAE SUGGESTING REVERSAL IN PART (Feb. 27, 1997)

. 1997 WL 86306 (Appellate Brief) BRIEF FOR THE UNITED STATES (Feb. 27, 1997)

. 1996 WL 33414017 (Appellate Petition, Motion and Filing) Petition for a Writ of
Certiorari (Nov. 26, 1996)

END OF DOCUMENT

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.