## UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

|  |  |
|---|---|
| SECURITIES AND EXCHANGE COMMISSION, | : |
| **Plaintiff,** | : |
| v. | :    **CIVIL ACTION** |
|  | :    **NO. 05-CV-10074-MEL** |
| PATRICIA B. ROCKLAGE, WILLIAM M. BEAVER and DAVID G. JONES, | : |
| **Defendants.** | : |

## SECURITIES AND EXCHANGE COMMISSION'S MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANTS' MOTIONS TO DISMISS

Plaintiff, the Securities and Exchange Commission (the "SEC"), hereby opposes the motions to dismiss filed by Defendants Patricia B. Rocklage ("P. Rocklage"), William M. Beaver ("Beaver") and David G. Jones ("Jones") (collectively, "Defendants"). The SEC's Complaint sets forth all of the elements necessary to plead violations of Section 17(a) of the Securities Act of 1933 ("Securities Act"), Section 10(b) of the Securities Exchange Act of 1934 ("Exchange Act") and Rule 10b-5 thereunder and it complies with Fed. R. Civ. P. 9(b). Accordingly, Defendants' motions to dismiss should be denied.

### STATEMENT OF FACTS

In its Complaint, the SEC alleges that, on the afternoon of December 31, 2001, Scott M. Rocklage, Ph.D. ("S. Rocklage"), the then Chairman of the Board and Chief Executive Officer ("CEO") of Cubist Pharmaceuticals, Inc. ("Cubist") spoke by telephone to his wife, P. Rocklage, who was in a limousine on her way home from the airport. Complaint, at ¶ 12. During that call, S. Rocklage informed P. Rocklage that the

clinical trial for Cidecin, one of the company's most important products, had failed. *Id.* Prior to telling P. Rocklage about the trial results, S. Rocklage specifically instructed her not to react to what he was about to tell her and not to talk about the results in front of the limousine driver. *Id.*, at ¶ 14. P. Rocklage agreed to these instructions. *Id.* Based on this exchange as well as on their prior history of sharing nonpublic information concerning the company, P. Rocklage understood, before her husband conveyed the trial results to her, that S. Rocklage expected that she would not disclose them to anyone. *Id.*

Unbeknownst to her husband, P. Rocklage had a pre-existing understanding with her brother, Beaver, whereby she was to signal Beaver to sell his Cubist stock with "a wink and a nod" if she ever became aware of bad news about the company that might affect its stock price. *Id.*, at ¶ 15. By no later than the morning of January 2, 2002, P. Rocklage spoke to Beaver by telephone and induced him to sell, at approximately 10 a.m. that day, all 5,583 shares of Cubist stock he owned or controlled by saying, in sum and substance, "[a]s far as Cubist is concerned, I'm giving you a wink and a nod." *Id.*, at ¶¶ 17, 19. After he received the "wink and nod" from P. Rocklage, Beaver also tipped his close friend and neighbor, Jones, as to the negative news about Cubist and thus induced Jones to sell all 7,500 Cubist shares he owned on the morning of January 3, 2002. *Id.*, at ¶¶ 20, 22.

## ARGUMENT

Applying the well-established standard for deciding motions to dismiss, Defendants' motions should be denied. *See* Part I, *infra.* As a primary matter, the Complaint states a claim of insider trading against Defendant P. Rocklage under the misappropriation theory. *See* Part II(A), *infra.* Further, P. Rocklage's disclosure to her

husband does not negate her liability under this theory. *See* Part II(B), *infra.* The Complaint also states a claim against P. Rocklage under the classical theory of insider trading. *See* Part III, *infra.* As to Defendants Beaver and Jones, the Complaint states claims of liability against them as tippees. Further, this liability is not derivative of P. Rocklage's securities violation, but of her breach of fiduciary duty, which was not cured by her disclosure under any circumstances. *See* Part IV, *infra.* Finally, with respect to the claims against Jones, the Complaint more than satisfies the requirements imposed by Rules 8 and 9(b) of the Federal Rules of Civil Procedure. *See* Part IV, *infra.* For these reasons, Defendants' motions should be denied.

## I.      THE STANDARD FOR DECIDING A MOTION TO DISMISS.

In ruling on Defendants' motion to dismiss, the Court must accept as true all factual allegations in the Complaint and must make all reasonable inferences from those allegations in the SEC's favor. *See TAG/ICIB Services, Inc. v. Pan American Grain Co.*, 215 F.3d 172, 175 (1st Cir. 2000); *Gelfer v. Pegasystems, Inc.*, 96 F. Supp.2d 10, 13 (D. Mass. 2000); *see also North Bridge Assocs., Inc. v. Boldt,* 274 F.3d 38, 40 (1st Cir. 2001) (when considering a motion to dismiss, the court must "indulge every reasonable inference in favor of allowing the lawsuit to proceed"). Dismissal is appropriate "only if it is clear that no relief could be granted under any set of facts that could be proved consistent with the allegations." *Estate of Jaime Soler v. Rodriguez*, 63 F.3d 45, 53 (1st Cir. 1995) (citing *Hishon v. King & Spalding*, 467 U.S. 69, 73 (1984)). Applying this standard, the Court should deny Defendants' motions.

## II.  THE COMPLAINT STATES A CLAIM OF INSIDER TRADING AGAINST P. ROCKLAGE UNDER THE MISAPPROPRIATION THEORY.

### A.  The Complaint Alleges the Necessary Elements to Support Liability.

Liability under either Section 17(a) of the Securities Act[1] or under Section 10(b) of the Exchange Act and Rule 10b-5 thereunder[2] can be predicated upon a showing of deceptive conduct that occurs in connection with the sale of securities.  *See United States v. O'Hagan*, 521 U.S. 642, 653 (1997).  One can be held liable for insider trading under these statutes pursuant to two distinct theories of liability – the misappropriation theory and the classical theory.  Under the misappropriation theory, an individual may be held liable for misappropriating confidential information in breach of a duty owed to the source of the information for the purpose of trading in securities or tipping another to do so.  *O'Hagan*, 521 U.S. at 652; *United States v. Larabee*, 240 F.3d 18, 21 (1st Cir. 2001).  Under Rule 10b5-2 of the Exchange Act, a duty of trust or confidence exists "[w]henever

---

[1] Section 17(a) of the Securities Act makes it unlawful for any person, in the offer or sale of any securities, to directly or indirectly:

    (1)    to employ any device, scheme, or artifice to fraud; or

    (2)    to obtain money or property by means of any untrue statement of a material fact or any omission to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading; or

    (3)    to engage in any transaction, practice, or course of business which operates or would operate as a fraud or deceit upon the purchaser.

15 U.S.C. § 77q(a).

[2] Section 10(b) of the Exchange Act makes it unlawful for any person, directly or indirectly, "to use or employ, in connection with the purchase or sale of any security . . . any manipulative or deceptive device or contrivance in contravention of" rules promulgated by the SEC.  15 U.S.C. § 78j(b).  Rule 10b-5 promulgated thereunder makes it unlawful for any person:

    (a)    to employ any device, scheme, or artifice to fraud;

    (b)    to make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading; or

    (c)    to engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person.

17 C.F.R. § 240.10b-5.

a person receives or obtains material nonpublic information from his or her spouse."[3] 17

C.F.R. § 240.10b5-2.[4]  The misappropriation theory is designed "to protect the integrity

of the securities markets against abuses by outsiders to a corporation who have access to

confidential information that will affect the corporation's security price when revealed,

but who owe no fiduciary duty or other duty to that corporation's shareholders."

*O'Hagan*, 521 U.S. at 652 (quoting *Dirks v. SEC*, 463 U.S. 646, 655 n.14 (1983) (internal

quotation marks omitted)).  The fraud "derives from the inherent unfairness involved

where one takes advantage of information intended to be available only for a corporate

purpose and not for the personal benefit of anyone." *Dirks*, 463 U.S. at 654.

Here, the Complaint alleges that P. Rocklage had a duty of trust and confidence to

her husband and that in breach of that duty, she directly or indirectly tipped Beaver and

Jones as to negative, non-public information about Cubist and induced them to sell their

Cubist stock.  Complaint, at ¶¶ 17-19, 20, 22, 24-25.[5]  Because the Complaint states a

---

[3] The rule also provides that

> the person receiving or obtaining the information may demonstrate that no duty of trust or confidence existed with respect to the information, by establishing that he or she neither knew nor reasonably should have known that the person who was the source of the information expected that the person would keep the information confidential, because of the parties' history, pattern, or practice of sharing and maintaining confidences, and because there was no agreement or understanding to maintain the confidentiality of the information.

17 C.F.R. § 240.10b5-2.

[4] *See also SEC v. Yun*, 327 F.3d 1263, 1272-73 (11th Cir. 2003) (in pre-Rule 10b5-2 case, holding that duty of confidentiality exists where husband and wife had history of sharing business confidences and those confidences generally were maintained); *SEC v. Goodson*, No. 99CV2133, 2001 WL 819431, at *3 (N.D.Ga. March 6, 2001) (denying summary judgment in pre-Rule 10b5-2 case, where factfinder could conclude that defendant violated fiduciary duty to wife when he tipped his father on the basis of nonpublic information she provided him); *SEC v. Lenfest*, 949 F. Supp. 341, 345 (E.D. Penn. 1996) (denying summary judgment in pre-Rule 10b5-2 case, where factfinder could conclude that defendant violated fiduciary duty to husband when she traded on the basis of nonpublic information he provided her).

[5] The Complaint alleges that based on their discussion, as well as on their prior history of sharing nonpublic information concerning the company, S. Rocklage reasonably expected, before conveying the information about the trial results, that P. Rocklage would maintain the information in confidence.

claim of insider trading against P. Rocklage under the misappropriation theory,

Defendants' motions to dismiss should be denied.

> **B.     P. Rocklage's Disclosure to Her Husband Does Not Negate Liability Under the Misappropriation Theory.**

Faced with a classic case of misappropriation, Defendants pin their hopes on

language in the Supreme Court's opinion in *United States v. O'Hagan,* which states

> [F]ull disclosure forecloses liability under the misappropriation theory: Because the deception essential to the misappropriation theory involves feigning fidelity to the source of the information, if the fiduciary discloses to the source that he plans to trade on the nonpublic information, there is no "deceptive device" and thus no § 10(b) violation – although the fiduciary-turned trader may remain liable under state law for breach of a duty of loyalty.

521 U.S. at 655; P. Rocklage's Memorandum of Law in Support of Motion to Dismiss

(hereinafter "P. Rocklage Mem."), at 4-5; Beaver's Memorandum of Law in Support of

Motion to Dismiss (hereinafter "Beaver Mem."), at 3-4; and Jones Memorandum of Law

in Support of Motion to Dismiss (hereinafter "Jones Mem."), at 4.  As set forth below,

however, Defendants' reliance on this language is misplaced because, as a primary

matter, there is nothing in the Complaint that alleges that P. Rocklage's disclosure

necessarily preceded her tip to her brother. *See* Part II(B)(1), *infra.*  Further, the

language that Defendants cite is *dictum* and therefore has no precedential value here. *See*

Part II(B)(2), *infra.*  Moreover, the unique circumstances at issue here (a disclosure by

one spouse to the other) and the complex considerations they raise distinguish this case

from the *O'Hagan* hypothetical, which contemplated a traditional principal-agent

relationship.  *See* Part II(B)(1), *infra.*  Accordingly, the Court should reject Defendants'

---

Complaint, at ¶ 14.  The Complaint also alleges that P. Rocklage understood, before the results were conveyed to her, that S. Rocklage expected that she would not disclose the trial results to anyone.  *Id.*

attempt to force the inapposite *O'Hagan dictum* on this matter and thereby create a loophole.

### 1.    The Complaint Alleges Facts to Support P. Rocklage's Deceit.

The Complaint clearly alleges that P. Rocklage engaged in deceptive conduct. Prior to receiving the Cidecin trial results from S. Rocklage, P. Rocklage had a preexisting understanding with her brother that she would signal him to sell his Cubist stock if she were to ever obtain from her husband any nonpublic information about Cubist that might negatively affect its stock price. Complaint, ¶ 15. In addition, the Complaint alleges that P. Rocklage did not make her husband aware of the understanding with her brother. *See id.*, at ¶ 15. The Complaint also alleges that P. Rocklage knew, before S. Rocklage conveyed the trial results to her, that he expected her to keep those results confidential. *Id.*, at ¶ 14. By failing to tell her husband about her pre-existing understanding with her brother and by feigning that she would keep the trial results confidential, P. Rocklage deceived S. Rocklage into conveying the nonpublic information to her so that she could convey it to her brother, which she did. P. Rocklage's disclosure to her husband – after she had secured the information (if not after she tipped her brother) – does not cure this deceit.

According to Defendants, however, P. Rocklage's disclosure to her husband that she intended to signal Beaver to sell his Cubist stock rendered her conduct in tipping Beaver non-deceptive and thus prohibits any prosecution of her, Beaver or Jones under the misappropriation theory of insider trading. *See* P. Rocklage Mem., at 4-5, 7; Beaver Mem, at 3-4; Jones Mem., at 5-6. This position assumes that P. Rocklage made her disclosure before she tipped her brother. However, while the Complaint alleges that

7

Rocklage made the disclosure, it does not allege that she necessarily did so *before* she misappropriated the information and tipped her brother. *See United States v. Falcone*, 257 F.3d 226, 233 n.4 (2nd Cir. 2001) ("The breach of the tipper's duty to the information source occurs at the exchange of information to which the source has a right of exclusive use, not upon the use of the information by the tippee for a securities transaction.").

More specifically, while the Complaint clearly alleges that P. Rocklage tipped her brother, it does not allege exactly *when* she did so, other than that she did so "by no later than the morning of January 2, 2002." Complaint, ¶ 17. Further, although the Complaint alleges that P. Rocklage made her disclosure "*on or about* the evening of December 31, 2001," it does not allege *exactly* when she did that either. *Id.*, ¶ 16 (emphasis added). In short, the Complaint does not allege that P. Rocklage made the disclosure before she tipped her brother. For the purpose of considering Defendants' motions to dismiss, the Court is therefore obliged make the reasonable inference that P. Rocklage's tip to Beaver (if not Beaver's trade itself) preceded P. Rocklage's disclosure to her husband. Any such disclosure after the fact would not cure her deceit. Because the Complaint does not allege that P. Rocklage necessarily disclosed her intention to tip her brother before she did so, Defendants lack the factual predicate for reliance on the *O'Hagan* language and thus, their motions to dismiss should be denied.

### 2. The *O'Hagan Dictum* Has No Precedential Value.

Further, the language in *O'Hagan* upon which Defendants rely was not necessary to the Court's holding in that case. Indeed, the defendant in that matter, James Herman O'Hagan, did not disclose his intention to trade on nonpublic information before doing

so. *O'Hagan*, 521 U.S. at 660. Thus, the Supreme Court's discussion of what impact a hypothetical disclosure might have had on the issue of liability in that case is *dictum*. *See Best Life Assur. Co. v. Comm'r of Internal Revenue*, 281 F.3d 828, 834 (9th Cir.2002) (quoting Black's Law Dictionary 1100 (7th ed.1999) (defining *dictum* as "a statement 'made during the course of delivering a judicial opinion, but one that is unnecessary to the decision in the case and therefore not precedential.'").

"Dictum constitutes neither the law of the case nor the stuff of binding precedent." *Dedham Water Co., Inc. v. Cumberland Farms Dairy, Inc.*, 972 F.2d 453, 459 (1st Cir. 1992); *In re McMullen*, 386 F.3d 320, 328 (1st Cir. 2004) ("Dicta – as opposed to a court's holdings – have no binding effect in subsequent proceedings in the same (or any other) case."); *Jama v. Immigration and Customs Enforcement*, 125 S.Ct. 694, 706 n.12 (2005) ("Dictum settles nothing, even in the court that utters it."). As a result, the *O'Hagan* Court's musings on the hypothetical question of whether disclosure would nullify deception and thus negate liability under the misappropriation theory of insider trading are not controlling on the instant matter. To the extent it decides that the Complaint alleges a pre-deceit disclosure, this Court must decide for itself this issue of first impression – namely what effect, if any, a disclosure can have when made only to one's spouse. In any event, the *O'Hagan* language cited by Defendants should be recognized as *dictum* and should not be used to excuse P. Rocklage's deceit.

### 3.     Even if Disclosure Could Negate Liability Under the Misappropriation Theory, the Disclosure at Issue Here Is Not Sufficient To Do So.

Even if the SEC conceded (which it does not) that P. Rocklage's disclosure to her husband preceded her tip to her brother and that the language in *O'Hagan* upon which

Defendants rely is not *dictum*, such concessions would still not compel a finding in favor of Defendants on their motions to dismiss.  In *O'Hagan*, the Supreme Court examined a case dealing with a traditional principal-agent relationship and given that context, stated that "*full* disclosure forecloses liability under the misappropriation theory," *O'Hagan*, 521 U.S. at 655 (emphasis added).

    To constitute full or adequate disclosure, however, common sense dictates that such a disclosure must be made under circumstances that would reasonably allow the source to act upon it.  In its *dictum* in *O'Hagan*, for example, the Supreme Court assumed that with respect to its hypothetical disclosure in an agency context, a principal would have the opportunity and motivation to act once the agent made the disclosure.  *See* 521 U.S. at 659 n.9 ("once a disloyal agent discloses his imminent breach of duty, his principal may seek appropriate equitable relief under state law.").  Conversely, disclosure would be inadequate if the person making the disclosure is aware that under the circumstances, the source would be effectively unable to act upon the disclosure or to otherwise remedy the breach of duty.   For example, if a recipient of nonpublic information calls his information source on the telephone and tells him that he intends to trade on that information, the content of this disclosure, considered in a vacuum, might be deemed adequate.  However, the circumstances of the disclosure could render it inadequate if, for example, the individual made the disclosure only moments before he instructed his stock broker to place the trade.  In such a case, there would have been disclosure but because the disclosure failed to allow the source an opportunity to act upon it to prevent the misuse of the information, the disclosure would have been insufficient.  Similarly, if the recipient of the information disclosed his intent to trade but then

rendered the information source physically incapable of taking any steps to stop the trade from being made (*e.g.*, by binding or otherwise restraining him), one could hardly argue that the disclosure was adequate.[6]

By the same token, in the present matter, the source of the information (S. Rocklage) could not have been reasonably expected to act on the disclosure made by his wife. Indeed, one could infer that P. Rocklage told her husband of her intentions only because she knew that, given their marriage, he would be unable or unwilling to take actions to remedy her breach of duty. The complex considerations raised by the marital relationship distinguish the allegations in the instant action from the set of facts *O'Hagan* addressed, which involved a more typical principal-agent relationship (*i.e.*, that of a lawyer to his employer and its client). *See, e.g.*, *U.S. v. Chestman*, 947 F.2d 551, 569 (2nd Cir. 1991) (distinguishing marital relationship from traditional fiduciary relationship, such as principal-agent relationship).[7] Simply put, the *O'Hagan* language was not meant to apply to misappropriation of information gained by virtue of a martial relationship.[8]

---

[6] The various factual nuances created by insider trading cases and insider trading hypotheticals emphasize the danger of relying on *dicta* and the need instead to address the issues raised by the unique facts of the case before the court.

[7] *Chestman* was superseded by 17 C.F.R. § 240.10b5-2, which made clear that a duty of trust or confidence exists whenever a person receives material nonpublic information from his or her spouse; however, the court's analysis of some of the differences between the marital relationship and traditional fiduciary relationships remains relevant here

[8] In discussing the hypothetical effect disclosure might have on liability, the Supreme Court has made clear that it has only been doing so in the context of a **principal-agent** relationship. *See, e.g.*, *O'Hagan*, 521 U.S. at 656 ("the fiduciary's fraud is consummated, not when the fiduciary gains the confidential information, but when, without disclosure to his **principal**, he uses the information to purchase or sell securities") (emphasis added); *SEC v. Zandford*, 535 U.S. 813, 824 (2002) (quoting same); *see also O'Hagan*, 521 U.S. at 659 n.9("once a disloyal **agent** discloses his imminent breach of duty, his **principal** may seek appropriate equitable relief under state law") (emphasis added); *id.* at 653-54 ("A fiduciary who pretends loyalty to the **principal** while secretly converting the **principal's** information for personal gain . . . 'dupes' or defrauds the **principal**.") (emphasis added).

Since it did not speculate on the matter, one cannot know what, if any, weight the *O'Hagan* Court would have afforded to a disclosure made by one spouse to another. What is clear, however, is that the judicial system has long afforded to the institution of marriage unparalleled respect and deference. Unlike the ties between a principal and an agent, the courts have repeatedly deemed the bonds between husband and wife to be virtually sacrosanct. *See, e.g., Zablocki v. Redhail*, 434 U.S. 374, 384 (1978) (marriage is "the most important relation in life" and is "the foundation of the family and of society, without which there would be neither civilization nor progress" (quotations and citations omitted); *Roe II v. Butterworth*, 958 F. Supp. 1569, 1582 (S.D. Fla. 1997), *aff'd*, 129 F.3d 1221 (11th Cir. 1997) (special constitutional protection applies to the marital relationship); *see also Lovisi v. Slayton*, 539 F.2d 349, 352 (4th Cir.) (dissenting opinion) (stating that the Supreme Court has "elevated the marital relationship to a place of near inviolable sanctity").

Indeed, recognizing the special nature of the marital relationship, a privilege has been created under state statutes and the common law "to permit an individual to refuse to testify, and to prevent a spouse or former spouse from testifying, as to any confidential communication made by the individual to the spouse during the marriage." *See, e.g., United States v. Rakes,* 136 F.3d 1, 3 (1st Cir. 1998); Mass. Gen. L. Ch. 233, § 20 (with certain exceptions, "neither husband nor wife shall testify as to private conversations with the other"). There is also a separate marital privilege that permits an individual to refuse to testify against a spouse in a criminal case. *See, e.g., Rakes,* 136 F.3d at n. 2 (citing *Trammel v. United States*, 445 U.S. 40, 51 (1980)); Mass. Gen. L. Ch. 233, § 20 (with certain exceptions, "neither husband nor wife shall be compelled to testify in the trial or

an indictment, complaint or other criminal proceeding against the other."). The justification for these privileges is their "perceived role in fostering the harmony and sanctity of the marriage relationship." *See Trammel*, 445 U.S. at 44. They are premised on the notion that the law should not force testimony which would alienate the marital couple or inflame domestic differences. *See Hawkins v. United States*, 358 U.S. 74, 79 (1959).

Given the lengths to which the law will go to foster the harmony and sanctity of the marriage relationship, one cannot assume when the wife of a corporate insider tells her husband that she intends to trade or tip on inside information he provided her, the husband-insider should or would take legal action to prevent the misuse of the information.[9] In the present case, for example, one could infer that P. Rocklage's disclosure subjected S. Rocklage to a virtually irreconcilable conflict between his duties as a corporate official and his obligations as a husband. One could also infer that he resolved that conflict by reacting as a husband would and not as a corporate official would. Although S. Rocklage urged his wife not to signal her brother to sell his Cubist stock and he made it clear that he would be unhappy if she did so, he took no more meaningful steps to stop her. If he *had* acted as an objective corporate official and done more, he would likely have jeopardized the harmony of his marriage, if not subjected his wife to legal repercussions. While S. Rocklage's reaction, or lack thereof, to the disclosure at issue in this case is not excusable, it is nonetheless understandable under the circumstances and would have been foreseeable. Indeed, one could argue that P.

---

[9] To put a finer point on it, S. Rocklage would generally not have been required even to speak about his wife's disclosure in open court. It hardly makes sense that he would be expected to take legal action against his wife on the basis of this disclosure.

Rocklage would never have made the disclosure to her husband if she expected that he would have taken steps to stop her or to stop her brother. In sum, because S. Rocklage was not in a position where he could have been expected to act upon his wife's disclosure, that disclosure was no more effective than if no disclosure had been made at all.[10]

Not only is an individual unlikely to have the motivation to act upon a disclosure made by his or her spouse, but unlike the principal in the *O'Hagan* hypothetical, such an individual has little ability to remedy the situation under state law. *See* 521 U.S. at 659 n.9 ("once a disloyal agent discloses his imminent breach of duty, his principal may seek appropriate equitable relief under state law."); *see also id.* at 655 ("the fiduciary-turned-trader may remain liable under state law for breach of a duty of loyalty."). For example, he cannot fire or terminate his wife for breaching her duty of confidentiality, nor does he have a recognized state law claim against her for breach of loyalty. For this reason as well, the *O'Hagan dictum* should be distinguished.[11]

Finally, application of the *O'Hagan dictum* to the facts of this case would lead to an untenable result: spouses of corporate insiders, who are often necessarily privy to

---

[10] Given the realities of the marital relationship, which involves so many shared communications and interests, P. Rocklage and S. Rocklage could also be viewed as a single marital unit. When the realities of the marital relationship are acknowledged in this fashion, one sees that P. Rocklage's disclosure is not a real disclosure at all. Rather, it is no more effective than one making a disclosure to one's self in private.

[11] In addition, in its hypothetical, the *O'Hagan* Court said that there would be no deceptive devise "if the fiduciary discloses to the [information] source that he plans to trade on the nonpublic information." *O'Hagan,* 521 U.S. at 655. Here, P. Rocklage made no such definitive disclosure. Rather, the Complaint alleges that P. Rocklage told her husband that "she intended to warn her brother about the results" and "to signal her brother to sell his Cubist stock." Complaint, at ¶ 16. This disclosure, however, did not constitute a declaration that either she or Beaver planned to make a securities trade based on the Cidecin trial results. Indeed, notwithstanding what P. Rocklage told her husband she intended to do, there was nothing to indicate to S. Rocklage that anyone would necessarily act on this misappropriated inside information and sell their stock. As a result, the disclosure lacked the degree of certainty, found in the *O'Hagan* hypothetical, that a securities violation would result.

material, non-public information, will be able to trade upon or tip this information with

impunity, so long they convey their intentions to their spouses (who would not be

required or even expected to act upon such information). Such a result would

considerably undermine confidence in the integrity of the markets and cannot be

countenanced. As the *O'Hagan* Court noted,

> [a]lthough informational disparity is inevitable in the securities markets,
> investors likely would hesitate to venture their capital in a market where
> trading based on misappropriated nonpublic information is unchecked by
> law. An investor's informational disadvantage vis-á-vis a misappropriator
> with material, nonpublic information stems from contrivance, not luck; it
> is a disadvantage that cannot be overcome with research or skill.

521 U.S. 658.

In conclusion, the complex circumstances at issue here when one spouse makes a

disclosure to another distinguishes this case from the hypothetical raised by the *O'Hagan*

Court. Quite simply, there cannot be full or adequate disclosure sufficient to negate

liability where the disclosure is made to a spouse. Accordingly, the Court should reject

Defendants' assertion that P. Rocklage's disclosure negates her liability.


## III.    THE COMPLAINT ALSO STATES A CLAIM AGAINST P. ROCKLAGE UNDER THE CLASSICAL THEORY OF INSIDER TRADING.

Even if the court determines that P. Rocklage's conduct in this matter does not

subject her to liability under the misappropriation theory of insider trading, she can still

be held accountable as a corporate insider under the classical theory. *O'Hagan*, 521 U.S.

at 651-52; *SEC v. Sargent*, 229 F.3d 68, 77 (1st Cir. 2000). Under the classical theory of

insider trading, a corporate insider may be held liable for trading or tipping others to trade

in a company's securities on the basis of material, nonpublic information about the firm.

*O'Hagan,* 521 U.S. at 651-52; *Dirks,* 463 U.S. at 659.  The theory is aimed at

"'preventing a corporate insider from . . . tak[ing] unfair advantage of . . . uniformed . . .

stockholders.'" *O'Hagan* 521 U.S. at 652 (quoting *Chiarella v. United States*, 445 U.S.

222, 228 (1980)).  Disclosure by a corporate insider to the information source of his

intent to use the nonpublic information at issue to trade or tip does not therefore negate

liability under the classical theory of insider trading.  *See id.* at 652-53; *Chiarella*, 445

U.S. at 227-28.

Corporate insider status applies "not only to officers, directors, and other

permanent insiders of a corporation, but also to attorneys, accountants, consultants, and

others who temporarily become fiduciaries of a corporation." *O'Hagan,* 521 U.S. at 652

(citing *Dirks*, 463 U.S. at 655).  Insiders include "those having a special relationship

affording access to inside information.  The test to determine insider status is whether the

person has access to confidential information intended to be available only for a

corporate purpose and not for the personal benefit of anyone." *SEC v. Lund*, 570 F.Supp.

1397, 1402 (D.C. Cal. 1983) (quoting *Feldman v. Simkins Industries, Inc.*, 679 F.2d

1299, 1304 (9th Cir.1982)); *see also Dirks*, 463 U.S. at 655, n.14 (citations omitted)

(holding that a duty of confidentiality can be imposed upon a person who is not a

traditional corporate insider if that person has "entered into a special confidential

relationship in the conduct of the business of the enterprise and [is] given access to

information solely for corporate purposes.").[11]

---

[11] The SEC provided guidance on the term "corporate insider" in *Cady, Roberts & Co.*, 40 S.E.C. 907, 912 (1961), noting that the term was broad enough to encompass anyone who had a relationship with a company which gave them "access, directly or indirectly, to information intended to be available only for a corporate purpose and not for the personal benefit of anyone."  The SEC noted that:
> under the broad language of the anti-fraud provisions, we are not to be circumscribed by
> fine distinctions and rigid classifications . . . our task here is to identify those persons
> who are in a special relationship with a company and privy to its internal affairs, and

In the present case, P. Rocklage had a special relationship with the CEO of Cubist which afforded her access to inside information.  *See Lund*, 570 F.Supp. at 1402. Further, by expressly agreeing in advance to respect the confidentiality of the trial results, P. Rocklage induced Cubist's CEO to trust her with those results in the expectation that she would keep them to herself and not use them for an improper purpose.  *See* Complaint, at ¶¶ 13, 14.  In attempting to secure her agreement to keep the information confidential, Cubist's CEO was acting with the company's interests in mind and arguably acting in his capacity as a corporate agent.  As such, P. Rocklage could be said to have entered into a confidential arrangement with Cubist.  At a minimum, she entered into a confidential arrangement with respect to Cubist's nonpublic information and became a fiduciary of that information.

Further, this information was not conveyed to P. Rocklage for her personal benefit, and indeed, served a corporate purpose.  By sharing company developments with their spouses, corporate officials are often able to better harmonize the demands of their professional and personal and thereby benefit their respective companies.  *See SEC v. Switzer*, 590 F. Supp. 756, 762, 766 (W.D. Okla. 1984) (noting that Chairman and CEO did not breach duty to company where he disclosed possible liquidation of subsidiary with wife for the purpose of informing her of business schedule so that arrangements for child care could be made).  In the instant matter, one could reasonably infer from the Complaint that S. Rocklage's communication of the Cidecin trial results to his wife advanced the corporate purpose of enabling him, a key Cubist officer, to better balance

---

thereby suffer correlative duties in trading in its securities.  Intimacy demands restraint lest the uninformed be exploited.

*Id.*

his family and work life and to receive the support he needed to better fulfill his responsibilities as the company's leader at a critical and challenging moment. One could therefore reasonably infer that S. Rocklage's conveyance of the trial results to his wife served an important corporate purpose.

In sum, the circumstances of this case warrant a finding that, at the moment she received the Cidecin trial results, P. Rocklage qualified as a Cubist insider. As such, P. Rocklage violated the classical theory of insider trading when she used this information to induce her brother to sell his Cubist stock.[12]

## IV.  THE COMPLAINT STATES CLAIMS OF INSIDER TRADING AGAINST BEAVER AND JONES AS TIPPEES.

Beaver and Jones argue that, if P. Rocklage is not liable as a tipper, they cannot be liable as tippees.[13] However, their liability is derivative not of P. Rocklage's securities violation, but of her breach of fiduciary duty, which was not cured by her disclosure under any circumstances.

Under either the misappropriation theory or the classical theory, tippee liability results where there is (i) a breach by the tipper of a duty owed to the owner of nonpublic information; and (ii) the tippee knows or should know that the tipper breached the duty. *See Dirks*, 463 U.S. at 660-61; *Sargent*, 229 F.3d at 77 (quoting *United States v. Libera*, 989 F.2d 596, 600 (2d Cir. 1993)); *see also SEC v. Musella*, 578 F. Supp. 425, 436 (S.D.N.Y. 1984) ("tippee liability requires a fiduciary breach on the part of the

---

[12] In *SEC v. Goodson*, the court noted the SEC's argument that the wife of a corporate insider could herself be considered an insider under the classical theory; however, the court declined to address this argument, finding instead that she could be held liable under the misappropriation theory. 2001 WL 819431, at *2.

[13] Beaver Mem., at 2-4; Jones Mem., at 5-6.

insider/tipper . . . coupled with the tippee's knowledge that the information subsequently passed along was improperly disclosed.").[14]  "[T]he issue is whether a tippee, wherever he stood in a chain of tippees, 'either knew or should have known that he was trading on improperly obtained non-public information.'"  *SEC v. Musella*, 748 F. Supp.1028, 1038 (S.D.N.Y. 1989), *aff'd*, 898 F.2d 138 (2d Cir. 1990) (quoting *SEC v. Musella*, 678 F. Supp. 1060, 1062 (S.D.N.Y. 1988)).

In the instant action, the SEC has alleged that "P. Rocklage had a duty of trust and confidence to her husband and/or to Cubist and its shareholders" and that she "knowingly or recklessly breached her duty" when she disclosed the nonpublic information about Cubist.  Complaint, at ¶¶ 24-25.  The SEC has also alleged that when they received this information, Beaver and Jones respectively knew or were reckless in not knowing that the information had been conveyed in breach of a duty of trust and confidence owed to S. Rocklage and/or to Cubist and its shareholders.  *Id.*, at ¶¶ 26-27.  Finally, the SEC alleges that Beaver and Jones each sold their Cubist shares while in possession of this information.  *Id.*  As a consequence, the Complaint sets forth claims of insider trading against Beaver and Jones as tippees.[15]

---

[14] Under the classical theory, one must also show that the tipper intended to benefit personally from the tip.  *Dirks*, 463 U.S. at 662.  As the First Circuit has noted, there is some disagreement about whether this element is also required to prove liability under the misappropriation theory.  *See Sargent*, 229 F.3d at 77.  However, the Court need not address this disagreement here, where the Complaint alleges that P. Rocklage and Beaver provided a gift of confidential information to a relative and to a close friend respectively and thereby intended to benefit personally from the disclosure.  Complaint, at ¶¶ 17, 20.  It is well-settled that an individual derives a personal benefit from using nonpublic information to tip a trading relative or friend.  *See Dirks,* 463 U.S. at 663-64; *Sargent*, 229 F.3d at 77.

[15] The Complaint also sets forth a claim against Beaver as a tipper under the misappropriation theory insofar as he tipped Jones to Cubist's nonpublic information in breach of a duty, derived from P. Rocklage's duty, owed to S. Rocklage and/or to Cubist and its shareholders.  *See* Complaint, at ¶¶ 26-27; *O'Hagan*, 521 U.S. at 652; *Larabee*, 240 F.3d at 21.

Even if P. Rocklage's disclosure negates her securities liability (which it does not), it does not negate Beaver and Jones's liability as tippees. Their liability as tippees derives not from P. Rocklage's liability but from her breach of duty, which is not cured by her disclosure.[16] Indeed, in the *O'Hagan dictum*, the Supreme Court expressly stated that, even though disclosure might negate *securities* liability in a principal-agent context, the principal would still have a claim against the agent for *breach of duty. See* 521 U.S. at 655 ("the fiduciary-turned trader may remain liable under state law for breach of a duty of loyalty"); *id., at* 559 n.9 ("once a disloyal agent discloses his imminent breach of duty, his principal may seek appropriate equitable relief under state law."). Accordingly, because the liability of Beaver and Jones is premised on P. Rocklage's breach of fiduciary duty and because that breach was in no way cured by her disclosure, the motions to dismiss filed by Beaver and Jones should be denied.

## V.    THE ALLEGATIONS AGAINST JONES SATISFY THE REQUIREMENTS OF FED. R. CIV. P. 9(b) AND 8.

In his motion to dismiss, Jones argues that the SEC's claims against him are legally insufficient because they fail to allege fraud with the particularity required by Federal Rule of Civil Procedure 9(b). Jones Mem., at 6-12. In particular, Jones faults the SEC for not stating exactly what Beaver said to Jones, how he tipped him, and when he did it. As set forth below, however, the First Circuit has made clear that the SEC is not required to make such details so long as it alleges sufficient circumstantial evidence to support its claim of insider trading.

---

[16] In their motions, Beaver and Jones suggest that their *liability* is derivative of P. Rocklage's *liability*, yet none of the cases they cite support for that proposition. Rather, these cases state that a tippee's *duty* is derivative of a tipper's *duty. See* Beaver Mem., at 2-3; Jones Mem., at 5-6.

As a primary matter, Rule 9(b)'s requirement that "in all averments of fraud or mistake, the circumstances constituting the fraud or mistake shall be stated with particularity" must be read in conjunction with Fed. R. Civ. P. 8, which sets forth the general rules of pleading and which requires that a complaint contain only "a short and plain statement of the claim" and that each averment be "simple, concise and direct." *See U.S. ex rel. Franklin v. Parke-Davis, Div. of Warner-Lambert Co.*, 147 F. Supp.2d 39, 46-47 (D. Mass. 2001). For that reason, Rule 9(b) does not require a claimant to set out in detail each and every fact upon which he bases his claim, or to plead evidentiary matters. *Id.* Rule 9(b) exists to serve the important policy interest of providing adequate notice to the defendant of the grounds on which the plaintiff's fraud claim rests. *Wayne Inv., Inc. v. Gulf Oil Corp.*, 739 F.2d 11, 13 (1st Cir. 1985).

In cases involving insider trading, where the specific facts are "peculiarly within the knowledge of Defendants," the application of Rule 9(b) is "relaxed" to allow circumstantial evidence to plead the specific content and circumstances of insider tips. *See SEC v. Alexander*, 160 F. Supp.2d 642, 649 (S.D.N.Y. 2001); *see also Energy Factors, Inc. v. Nuevo Energy Co.*, No. 91 Civ. 4273, 1991 WL 259425, at *4 (S.D.N.Y. Nov. 22, 1991) ("to require the plaintiff to produce more concrete evidence of these details would put a heavy burden on plaintiff and would practically preclude the possibility of pleading an adequate complaint in cases, such as insider trading, that are profoundly secretive in nature") (citations omitted); *SEC v. Platt*, 565 F. Supp. 1244, 1261 (W.D. Okla. 1983) ("[i]t would contravene the broad remedial policies behind the federal securities laws to dismiss the complaint for failure of the plaintiff to plead their evidentiary facts when neither the securities laws nor the case law require such

specificity."); *cf. Franklin*, 147 F. Supp.2d at 47 (noting that 9(b) standard is relaxed where facts are peculiarly within defendant's control).

Also, as Jones acknowledges, the SEC is clearly entitled to rely on circumstantial evidence to provide insider trading. *Larrabee*, 240 F.3d at 21; *Sargent*, 229 F.3d at 75; *see also* Jones Mem., at 8. Indeed, most insider trading cases are based on circumstantial evidence; "there are generally two people who can provide direct evidence that insider trading has occurred – the source of the information and the trader. It is very rare for one of these two persons to admit that they have engaged in insider trading." *Elysian Federal Savings Bank v. First Interregional Equity Corp.*, 713 F. Supp. 737, 744 (D.N.J. 1989) (quoting H.R. Rep. No. 100-09190, 100th Cong., 2d Sess. at 15, U.S. Code Cong. & Admin. News 1988, p. 6052).

Jones faults the SEC for not providing more detail regarding the circumstances surrounding Beaver's tip to him. However, given the inherently secret nature of inside trading, the SEC need not provide such detail, so long as it alleges facts sufficient to show that Jones traded on the basis of nonpublic information which he knew or should have known was the product of a breach of duty. In *United States v. Larrabee*, for example, the First Circuit upheld the defendant's conviction for insider trading as a tipper even though there had been no evidence of the specific contents of any communication between the defendant and the source of the information, or between the defendant and his eventually tippee. *Id.* at 20. The court held that the defendant's access to information, the relationship between the tipper and the tippee, and the suspicious timing of trades, among other things, presented compelling circumstantial evidence to support the conviction. *Id.* at 21-23. In rendering its decision, the court noted that while opportunity or access to

material, nonpublic information "does not constitute proof of possession, opportunity in combination with circumstantial evidence of a well-timed and well-orchestrated sequence of events, culminating with successful stock trades, creates a compelling inference of possession . . . ." *Larrabee*, 240 F.3d at 21.

By the same token, in *SEC v. Sargent*, the First Circuit reversed a directed verdict in favor of the defendant tippee where "[a]s is often true in securities fraud cases, the Commission was unable to produce direct testimony establishing that [tipper] communicated nonpublic information to [the tippee]." 229 F.3d at 74. Similar to *Larrabee*, the court nonetheless held that the SEC had presented more than sufficient circumstantial evidence to support its claim; this evidence again included, *inter alia*, the tippee's access to the information from the tipper, the relationship between the tipper and the tippee, and the suspicious timing of trades. 229 F.3d at 72, 75, 77.

Here, the SEC has alleged the following sequence of events with respect to Jones:

- On December 31, 2000, S. Rocklage conveyed to P. Rocklage negative nonpublic information about the Cubist trial results. Complaint, at ¶ 12.

- Thereafter, P. Rocklage told S. Rocklage she intended to warn her brother, Beaver. *Id.*, at ¶ 16.

- By no later than the morning of January 2, 2002, P. Rocklage spoke to Beaver by telephone and warned him that negative nonpublic information about Cubist that was going to affect its stock price and induced him to trade the company's stock. *Id.*, at ¶ 17.

- On Wednesday, January 2, 2002, after receiving the signal from P. Rocklage, Beaver sold all the Cubist stock he owned or controlled. *Id.*, at ¶ 19.

- After he receiving the signal from P. Rocklage, Beaver also tipped his close friend and neighbor, Jones, as to the negative news about Cubist and induced Jones to sell all the Cubist stock Jones owned. *Id.*, at ¶ 20.

- Jones, Beaver, and P. Rocklage grew up on the same street in Charlotte. Jones and Beaver also attended the same college, where they were fraternity brothers. Since 1984, Beaver and Jones have lived across the street from one another and each considers the other to be one of his best friends. *Id.*, at ¶ 8.

- At the time he received this tip about Cubist, Jones knew that Beaver's brother-in-law was Cubist's Chairman and CEO. *Id.*, at ¶ 21.

- On the morning of January 3, 2002, after having communicated with Beaver about Cubist, and just a day after Beaver had sold all of his stock, Jones sold all the Cubist shares he owned for $262,000. *Id.*, at ¶ 22.

These facts as alleged create a number of compelling inferences to support the

SEC's claim that Jones engaged in insider trading. As a primary matter, Jones had access

to the nonpublic information because he was one of Beaver's best friends and lived

directly across the street from him. Indeed, from these facts, one could infer that Beaver

needed only to walk a few steps to tip Jones; or that he could have tipped him on any one

of many occasions that close friends and neighbors have to interact; or that he needed

only to pick up the telephone and make a local call to do so. *See Larrabee,* 240 F.3d at

22 (tipper had access to the information because he worked on same floor as attorneys

working on confidential merger); *Sargent,* 229 F.3d at 76 (tipper had access to the

information because he shared a small office with the source of the confidential

information). Jones's close relationship with Beaver provides additional compelling

evidence to support the alleged tip. *See Larrabee,* 240 F.3d at 22 (tipper and tippee

shared personal, financial, and professional relationship); *Sargent*, 229 F.3d at 76 (tipper

and tippee were friends) *SEC v. Warde*, 151 F.3d 42, 45, 48-49 (2nd Cir. 1998) (tipper

and tippee were close personal friends); *Musella,* 578 F. Supp. at 441 (same).

The suspicious timing of Jones's trade in relation to Rocklage's warning to

Beaver and to Beaver's trade also presents compelling evidence of the tip. *See, e.g.,*

*Larrabee*, 240 F.3d at 23 ("The timing of events is also significant."); *see also Sargent*,

229 F.3d at 76 (noting that defendant made stock purchase the morning after talking to

alleged tipper). Here, on or about December 31, 2001, P. Rocklage told her husband she

was going to warn her brother, Beaver, about the negative news so he could sell his stock;

on January 2, 2002, Beaver did, in fact, sell all of his Cubist stock; and the very next day,

Beaver's best friend and neighbor, Jones, sold all of his Cubist stock as well. It defies

credulity to suggest that these were merely coincidences.[17]  Finally, the nature of Jones's

trade – he sold not just some but *all* of his Cubist stock for $262,000 – also provides

circumstantial evidence of his receipt of Beaver's tip. *See Larrabee,* 240 F.3d at 23

(substantial trades provided circumstantial evidence of insider trading); *Sargent*, 229 F.3d

at 73 (same).

     In *SEC v. Blackwell*, the court denied a motion similar to that brought by Jones,

stating:

> Defendants have been provided with more than enough information to
> apprise them of the basis for the SEC's claims; hence the notice
> requirement has been met.  The fact that the Commission has not provided
> the exact words used in particular conversations or, for some Defendants,
> the exact dates that disclosures were made does not preclude Defendants
> from being aware of which conduct they pursued that the SEC finds
> objectionable. . . . Here, . . . the exact terms that [the tipper] might have
> used to inform his family members and friends . . . are relatively
> unimportant.  The Complaint has alleged, via inference, that [the tipper]
> provided the tippees with enough information about the [confidential

---

[17] In addition, the Complaint alleges that "[o]n September 16, 2002, three days after telling the staff that Beaver had been aware of the inquiry into Beaver's Cubist trading, Jones called the staff to change his testimony.  He said that he had since discussed this issue with Beaver and now wanted to state that he may only have dreamt that Beaver had told him two weeks earlier about an inquiry into Beaver's Cubist trading." *See SEC v. Euro Security Fund*, 2000 U.S. Dist. Lexis 13847, at *9 (S.D.N.Y. Sept. 22, 2000) ("evidence of evasiveness and inconsistent conduct [by a trader] support an inference of guilty knowledge"); *Musella*, 748 F. Supp., at 1038-40 (false exculpatory statements to SEC investigators by insider trader "evidence consciousness of guilt and ha[ve] independent probative value of scienter"), *aff'd* 898 F.2d 138 (2nd Cir. 1990).

news] to convince them to purchase [the company's] stock. Any further
information about the contents of the conversations is not necessary.

291 F. Supp.2d 673, 691 (S.D. Ohio 2003). Under the same reasoning, Jones's motion
should be denied.[18]

　　　To the extent that Jones contends that any of the SEC's allegations are conclusory
or lack basis, he may contest them with a motion for summary judgment; a motion to
dismiss is not an appropriate tool for doing so. *See Blackwell*, 291 F. Supp.2d at 689
*Truong*, 98 F.Supp.2d at 1098; *see also Walling v. Beverly Enters.*, 476 F.2d 393, 397
(9th Cir.1973) ("The pleading rules, designed to avoid and reduce long and technical
allegations, are necessarily supplemented by procedures including summary judgment
which enable a party to have a judgment in a relatively short time if there is actually no
bona fide claim presented."); *cf. Michaels Bldg. Co. v. Ameritrust Co., N.A.*, 848 F.2d
674, 680-81 (6th Cir. 1988) (expressing reluctance to dispose of claim on motion to
dismiss as long as "there is a reasonable basis upon which to make out a cause of action
from the events narrated in the complaint" and "Defendants have adequate notice of why
they are being sued and are capable of preparing a responsive pleading").

　　　Finally, Jones asserts that the Complaint does not specify how Jones knew or was
reckless in not knowing that the information allegedly communicated to him by Beaver

---

[18] In his motion to dismiss, Jones relies heavily on *SEC v. Troung*, 98 F. Supp.2d 1086, (N.D.Cal.
2000). However, as a primary matter, the court there was deciding a *summary judgment* motion, as
opposed to a motion to dismiss, and evaluating the SEC's case after the SEC had already had the benefit of
discovery. *See id.* at 1102. Further, with respect to Nguyen, the court suggested that the SEC had
presented no circumstantial evidence to support a claim against Nguyen, and hardly even mentioned
Nguyen in its opposition to the summary judgment motion. *See id.* at 1102. Here, the SEC has already
alleged considerable circumstantial evidence of Beaver's tip to Jones and intends to further enhance its case
through discovery. In addition, although the *Nguyen* court granted summary judgment as to Nguyen, it
denied it with respect to certain trades made by another alleged tippee, Hen. *See id.* at 1101, 1102. With
respect to Hen, the SEC presented no evidence of a communication between the alleged tipper and Hen, but
the court found that, as here, a jury could nonetheless infer such a communication from the circumstantial
evidence. *See id.* at 1101.

was being conveyed to him as a result of a breach of a duty of trust and confidence owed to S. Rocklage and/or to Cubist and its shareholders.  As the court noted in *SEC v. Blackwell*, however, "[t]his element does not need to be pled with particularity."  *See* 291 F. Supp.2d at 696; *see also* Fed. R. Civ. P. 9(b) ("Malice, intent, knowledge, and other condition of mind of a person may be averred generally.").

While a general averment on this point would suffice, the Complaint alleges that, at the time Beaver tipped him, Jones knew that S. Rocklage was Beaver's brother-in-law and that he was also the Chairman and CEO of Cubist.  Complaint, at ¶ 21. Therefore, one could reasonably infer that Jones knew or should have known that this information was being conveyed to him as a result of a breach of a duty of trust and confidence owed to S. Rocklage and/or to Cubist and its shareholders.  Because the SEC has adequately pled the bases for its claims against Jones, the Court should deny his motion to dismiss on this basis as well.

## CONCLUSION

For all the foregoing reasons, the SEC respectfully requests that this Court deny

Defendants' motions to dismiss.

Respectfully submitted,

**UNITED STATES SECURITIES AND
EXCHANGE COMMISSION**

By its attorneys,

Luke T. Cadigan (Mass. Bar No. 561117)
  Senior Trial Counsel
Daniel P. Barry (Mass. Bar No. 564037)
  Senior Counsel
73 Tremont Street, Suite 600
Boston, MA 02108
(617) 573-8919 (Cadigan)
(617) 424-5940 (facsimile)

Dated: April 18, 2005

### Certificate of Service

I certify that on April 18, 2005, I caused a copy of the foregoing to be served upon the following counsel electronically through the ECF system and by first-class mail:

David H. Erichsen, Esq.
Daniel H. Gold, Esq.
Wilmer Cutler Pickering Hale & Dorr LLP
60 State Street
Boston, MA 02109
(617) 526-6950

David E. Marder, Esq.
Benjamin D. Stevenson, Esq.
Robins, Kaplan, Miller & Ciresi, LLP
111 Huntington Ave., Suite 1300
Boston, MA 02199
617-859-2750

Brian E. Whiteley, Esq.
C. Alex Hahn, Esq.
Scibelli, Whiteley and Stanganelli, LLP
50 Fedeal Street, 5th Floor
Boston, MA 02110
(617) 227-5725

Luke T. Cadigan