**UNITED STATES DISTRICT COURT**
**DISTRICT OF MASSACHUSETTS**

| | |
|---|---|
| SECURITIES & EXCHANGE COMMISSION<br><br>         Plaintiff<br><br>    v.<br><br>PATRICIA B. ROCKLAGE, WILLIAM M.<br>BEAVER, and DAVID G. JONES<br><br>         Defendants. | C.A. No. 05-CV-10074 MEL |

**REPLY MEMORANDUM OF LAW IN FURTHER SUPPORT OF DEFENDANT**
**PATRICIA B. ROCKLAGE'S MOTION TO DISMISS**

The Securities and Exchange Commission's ("Commission") Memorandum of Law In

Opposition To Defendants' Motions to Dismiss ("Opposition" or "Opp.") does not salvage the

Complaint.  In arguing that a claim under the misappropriation theory against Mrs. Rocklage can

be sustained, the Commission mischaracterizes both the Supreme Court's O'Hagan decision that

squarely forecloses any such claim, as well as its own Complaint.

The Commission fares no better by contending that Mrs. Rocklage somehow became a

corporate "insider" and can therefore be held liable under the "classical theory."  The

Commission does not and cannot allege that Mrs. Rocklage had a business relationship with

Cubist -- she was merely the wife of its CEO -- and it cannot concoct a "corporate purpose" for

Dr. Rocklage's disclosure of information to her.

**I.      The Supreme Court's Decision In O'Hagan Forecloses Liability Under the Misappropriation Theory**

When the Supreme Court adopted the misappropriation theory of liability in O'Hagan, it made clear that there is no liability if an alleged misappropriator discloses to the source of her information that she intends to use the information for securities-trading purposes. See Memorandum of Law In Support of Defendant Patricia B. Rocklage's Motion to Dismiss ("Rocklage Mem.") at 4-7.  That is because insider trading must involve the use of a *deceptive* device, and under the misappropriation theory, it is the source that must be deceived -- not the ultimate investor.  Id.  The Complaint in this case clearly and specifically alleges that Mrs. Rocklage did just what the Supreme Court said would preclude liability -- disclosed to her husband (the source of her information) that she intended to use that information to signal her brother to sell his stock.  Id. at 5; Compl. ¶16 ("P. Rocklage told [Dr. Rocklage] that she intended to signal her brother to sell his Cubist stock . . . . Notwithstanding her husband's entreaties, P. Rocklage said that she intended to warn her brother about the [clinical trial] results anyway.").

Undaunted, the Commission (1) relies on irrelevant allegations about how Mrs. Rocklage obtained the information; (2) suggests that Mrs. Rocklage might have told her husband only after she had signaled her brother; (3) downplays the relevant portion of O'Hagan as dictum; and (4) purports to distinguish O'Hagan on the basis that this case arises in the marital context.  None of these arguments is availing.

**A.      Mrs. Rocklage's Failure To Tell Dr. Rocklage About Her Alleged Preexisting Understanding With Her Brother Is A Red Herring**

The Commission initially suggests that it has adequately alleged deceptive conduct because Mrs. Rocklage failed to tell Dr. Rocklage about her alleged preexisting understanding with her brother.  See Opp. at 7.  This argument, however, ignores that even deceptive conduct only

violates §10(b) when it is "in connection with" securities transactions.  Indeed, it was the

necessity of satisfying that statutory element that caused the Supreme Court in O'Hagan to make

clear that under the misappropriation theory, "the fiduciary's fraud is consummated not when he

obtains the confidential information, but when, without disclosure to his principal, he uses the

information in purchasing or selling securities."   U.S. v. O'Hagan, 521 U.S. 642, 656 (1997).[1]

Any deception by Mrs. Rocklage at or before the time she obtained the information is therefore

irrelevant; what controls is whether Dr. Rocklage was deceived at the time Mrs. Rocklage

allegedly used the information for securities-trading purposes by signaling her brother.

**B.       The Chronology Is Clearly Alleged In The Complaint**

Apparently recognizing that the key issue is whether Dr. Rocklage was deceived at the time

Mrs. Rocklage allegedly tipped her brother, the Commission claims that the Complaint "does not

allege that P. Rocklage necessarily disclosed her intention to tip her brother before she did so."

Opp. at 7-8.  But that is exactly what the Complaint does allege.  The Commission's position

simply cannot be reconciled with the plain language of the Complaint itself, which alleges that

Mrs. Rocklage "told [her husband] that she *intended* to signal her brother" and said that she

"*intended* to warn her brother" despite Dr. Rocklage's urgings not to.  Compl. ¶16 (emphasis

added).[2]  This repeated, deliberate use of the word "intended" -- referring obviously to an event

that had not happened yet -- leaves no doubt that Mrs. Rocklage first disclosed to her husband,

then signaled her brother.  Indeed, were the sequence reversed, the allegations about Dr.

Rocklage warning her not to do so, see Compl. ¶16, would make no sense.  The inference as to

chronology the Commission asks this Court to draw is utterly untenable.  See, e.g., Correa-

---

[1]      See also S.E.C. v. Zandford, 535 U.S. 813, 824 (2002) (under the misappropriation theory, "the fiduciary's fraud is consummated, not when the fiduciary gains the confidential information, but when, without disclosure to his principal, he uses the information to purchase or sell securities.") (quoting O'Hagan, 521 U.S. at 656).

[2]      Indeed, the Commission titles this portion of its Complaint as "**P. Rocklage Tells S. Rocklage That She Intends to Tip Beaver**."  See Complaint at 5.

Martinez v. Arrillaga-Belendez, 903 F.2d 49, 58 (1st Cir. 1990) ("While Rule 12(b)(6) requires

deference to the well-pleaded allegations of plaintiff's complaint, we are not obligated to give

free rein to imagination. . . Although we must draw all reasonable inferences in plaintiff's favor,

we are not obligated to credit every conceivable inference"), overruled on other grounds by

Educadores Puertorriquenos en Accion v. Hernandez, 367 F.3d 61 (1st Cir. 2004).

### C.    O'Hagan Defines Nondisclosure To The Source As An Element Of Misappropriation Liability And Cannot Be Dismissed As Dicta

The Commission next asks this Court to disregard the Supreme Court's statements in

O'Hagan, arguing that they are "dictum" or mere "musings" that can be ignored. See Opp. at 8-

9. This argument both misconstrues the O'Hagan decision and ignores the First Circuit's

guidance that considered Supreme Court dicta are binding on it and the lower courts.

First, as explained previously, the Supreme Court's statements in O'Hagan about the

requirement of nondisclosure to the source reflect its explanation of the theoretical underpinnings

and statutory basis of the misappropriation theory. See Rocklage Mem. at 4-7. The Court was

clear that "[d]eception through nondisclosure is central" to the misappropriation theory.

O'Hagan, 521 U.S. at 654. Accordingly, nondisclosure to the source is properly viewed as an

element of the Commission's prima facie case, and the necessary corollary -- that disclosure

precludes liability -- cannot be considered non-essential to the result.

Second, even if the Supreme Court's discussion of disclosure to the source is technically

dictum, that does not affect its binding application here. As the First Circuit has "recognized

before" and recently "reaffirm[ed]," "'[c]arefully considered statements of the Supreme Court,

even if technically dictum, must be accorded great weight and should be treated as

authoritative.'" Crowe v. Bolduc, 365 F.3d 86, 92 (1st Cir. 2004), quoting United States v.

Santana, 6 F.3d 1, 9 (1st Cir. 1993).[3]  Here, the Commission cannot seriously contend that the

Supreme Court's statements were an unconsidered slip of the pen or mere "musings," and the

relevant portions of O'Hagan must be followed.[4]

### D.    The O'Hagan Requirement Of Nondisclosure Applies In All Contexts, Including The Marital Context

The Commission next tries to distinguish O'Hagan by arguing that in the context of alleged

misappropriation of inside information from a spouse, disclosure to the source is always

insufficient to preclude liability because the spouse may not be motivated or able prevent use of

the information.  See Opp. at 9-15.  But even if that is so, it has no legal significance.  The

Commission cites nothing in O'Hagan or any other case that suggests that the existence vel non

of the critical element of deception under §10(b) somehow depends on the source's ability to

prevent an ultimate violation.  Either the source is deceived, or he is not, and in O'Hagan the

Court concluded that disclosure to the source negated liability for the tautological reason that one

who is informed cannot be deceived.  Policy-driven considerations such as whether the source

could or could not prevent the ultimate violation had nothing to do with that case, and have

nothing to do with this case.[5]

---

[3]      See also McCoy v. Massachusetts Institute of Technology, 950 F.2d 13, 19 (1st Cir. 1991) ("We think that federal appellate courts are bound by the Supreme Court's considered dicta almost as firmly as by the Court's outright holdings, particularly when, as here, a dictum is of recent vintage and not enfeebled by any subsequent statement.").

[4]      Indeed, since O'Hagan the Supreme Court has reaffirmed that liability under misappropriation theory is not viable where, as here, the fiduciary discloses her intent to use the information for trading purposes before doing so. See Zandford, 535 U.S. at 824 (under the misappropriation theory, "the fiduciary's fraud is consummated, not when the fiduciary gains the confidential information, but when, *without disclosure to his principal*, he uses the information to purchase or sell securities.") (emphasis added) (quoting O'Hagan, 521 U.S. at 656).

[5]      The Commission, as is evidenced by the Complaint, does not really believe that Mrs. Rocklage deceived her husband.  So either the Commission is advocating that liability can be found where there is no deception -- a position squarely at odds with §10(b) on its face and as interpreted by the Supreme Court -- or it is claiming that Mrs. Rocklage is liable because her brother whom she allegedly tipped deceived other investors.  That is an attempt to establish liability under the classical theory (which fails for the reasons describes infra), not the misappropriation theory.

The Commission's argument appears to be based on a single sentence from O'Hagan that it takes out of context.   Contrary to the Commission's suggestion, the Supreme Court did not "assume[]" that if disclosure was made the source of the information would be able to prevent the misappropriator from going forward and using the information. See Opp. at 10.  Rather, the Court emphatically stated that its decision was based on adherence to the text of the statute and the requirement of deception: "the textual requirement of deception precludes § 10(b) liability when a person trading on the basis of nonpublic information has disclosed his trading plans to, or obtained authorization from, the principal--even though such conduct may affect the securities markets in the same manner as the conduct reached by the misappropriation theory." O'Hagan, 521 U.S. at 659 n.9.  The Court then acknowledged, in response to a point raised by the dissent, that one consequence of adherence to the text was that "§ 10(b) is only a partial antidote to the problems it was designed to alleviate." Id. It then noted that one factor that could ameliorate against this harsh result was the fact that "once a disloyal agent discloses his imminent breach of duty, his principal may seek appropriate equitable relief under state law." Id. The Court nowhere suggested that if in a particular case the principal was not inclined to seek such relief, that would affect one iota its strict adherence to the letter of the statute in requiring deception in all cases.[6]

This recognition by the Supreme Court that §10(b) does not prevent all "misuse" of inside information also dispenses with the Commission's argument about potential "untenable result[s] that might "undermine confidence in the integrity of the markets." See Opp. at 14-15.  Simply put, just because the Court, the Commission or the public may disapprove of Mrs. Rocklage's

---

[6]    The Commission's alternative suggestion that Mrs. Rocklage's disclosure was insufficient because it lacked certainty that a securities violation would result, see Opp. at 14 n.11, fails on its face.  In O'Hagan, where the misappropriator was accused of trading, there would have been no deception if the misappropriator revealed his plan to trade on the information.  Here, where Mrs. Rocklage is accused of tipping, there is no deception because Mrs. Rocklage is alleged to have disclosed her intent to tip.  The degree of definiteness regarding the alleged misuse of the information is exactly the same.

alleged conduct does not make it a violation of §10(b).  See Dirks v. S.E.C., 463 U.S. 646, 661 n.

21 (1983) ("in a statutory area of the law such as securities regulation, where legal principles of

general application must be applied, there may be 'significant distinctions between actual legal

obligations and ethical ideals'").

Moreover, it is disingenuous of the Commission to argue against application of O'Hagan to

this case because it might open a floodgate of spouses of corporate insiders trading on inside

information with "impunity."  See Opp. at 14-15.  As an initial matter, the Commission has not

cited, and Mrs. Rocklage cannot locate, a single other reported decision where an alleged

misappropriator has disclosed to her source before allegedly making use of inside information,

suggesting that this is an isolated occurrence unlikely to repeat itself.  More importantly, the

Commission's argument ignores that in convincing the Supreme Court to adopt the

misappropriation theory in the first instance, the government argued that what is "distinctive"

about the theory is that it involves not only breach of a duty, but a "deceptive breach," thereby

falling within the confines of §10(b).  See Rocklage Mem. at 6-7 (quoting oral argument in

O'Hagan).  By successfully persuading the Court that the misappropriation theory only covered

deceptive conduct, the government is now able to take action against broad groups of persons

whose conduct (breaches of duties to employers, friends or family) is not covered by the

"classical theory."   The Commission must now live with the limitation on the misappropriation

theory that allowed its adoption in the first place -- disclosure to the source precludes liability

because there is no deception.  See O'Hagan, 521 U.S. at 659 n.9 ("§ 10(b) is only a partial

antidote to the problems it was designed to alleviate").

## II.    Mrs. Rocklage Did Not Become A Corporate Insider

The Commission cannot state a claim against Mrs. Rocklage under the "classical theory" because she did not become a Cubist "insider." See Rocklage Mem. at 9-12.   The Commission's argument to the contrary stretches the concept of a "temporary insider" far beyond the contours recognized by the Supreme Court.

As an initial matter, the Commission does not argue that Mrs. Rocklage was a Cubist "insider" before she received confidential information from Dr. Rocklage, or that Dr. Rocklage had an improper purpose for telling her about the clinical trials results (which would be required to show "tippee" liability).  Compare Opp. at 15-18 with Rocklage Mem. at 8-11.  Accordingly, the Commission can only claim that Mrs. Rocklage acquired a duty to Cubist shareholders by becoming a "temporary insider," a concept that has been applied to fiduciaries such as attorneys or accountants who are given corporate information in order to perform a service to the corporation   See Rocklage Mem. at 9-12.

As explained more fully in Mrs. Rocklage's opening memorandum, however, the temporary insider concept is limited to persons who obtain corporate information because they (i) "have entered into a special confidential relationship in the conduct of the business of the enterprise" and (ii) "are given access to information solely for corporate purposes."  Rocklage Mem at 11, quoting Dirks, 463 U.S. at 657 n.14.    Neither circumstance applies here.

First, the Commission essentially argues that Mrs. Rocklage became an insider merely because she obtained information from her husband with an expectation of confidentiality.  That argument, however, ignores the Dirks requirement that the recipient obtain information as a result of entering into a "special confidential relationship *in the conduct of the business or*

*enterprise*." See Opp. at 17 (emphasis added).[7]  Significantly, the Commission does not even try

to argue -- nor could it -- that Mrs. Rocklage obtained corporate information because she was

involved in the conduct of Cubist's business.  See Opp. at 17.

Lund does not support the Commission's position.  There, the court explained that

"temporary insiders . . . . assume the duties of an insider temporarily, ***by virtue of a special***

***relationship with the corporation***" and applied the concept to an outsider who obtained

confidential information about a proposed business venture when he was approached by a

corporate insider "ask[ing] if [the outsider's company] would be interested in providing a capital

investment of $600,000 for the venture" at issue.  See SEC v. Lund, 570 F. Supp. 1397, 1400,

1403 (C.D. Cal. 1983).[8]  Here, Mrs. Rocklage is not alleged to have any relationship ("special"

or otherwise) with Cubist; her only relationship was with her husband.

Second, the Commission's attempt to ascribe a business purpose for Dr. Rocklage's

disclosure to his wife not only lacks any substance but shows how far afield it is willing to go to

sustain a case with no merit under the law.  Without citing to any allegations in the Complaint

(because there are none), the Commission baldly asserts that one could "reasonably infer" that

Dr. Rocklage told Mrs. Rocklage about the clinical trials results for the purportedly corporate

purpose of being able to "better balance his family and work life" and "receive the support he

needed" to fulfill his job responsibilities.  Opp. at 17.  Not only is this sheer speculation, it makes

no sense on its face.  No business purpose can reasonably be imputed to the normal, human

---

[7]    As noted in Mrs. Rocklage's opening memorandum, the courts that have applied the temporary insider concept have done so in the context of professionals who were providing services to the corporation.  See Rocklage Mem. at 11-12.

[8]    To the extent Lund can be read to support the Commission's apparent position that Mrs. Rocklage became an insider simply by receiving information in confidence, such a reading has been recognized as inconsistent with the Supreme Court's guidance in Dirks.  See S.E.C. v. Ingram, 694 F. Supp. 1437, 1440 n.3 (C.D. Cal. 1988) ("What the Court seems to be saying in *Lund* is that anytime a person is given information by an issuer with an expectation of confidentiality or limited use, he becomes an insider of the issuer. But under *Dirks*, that is not enough; the individual must have expressly or impliedly entered into a fiduciary relationship with the issuer.").

- 9 -

inclination of a husband to tell his wife (or vice versa) in a private conversation about important

events at work.  And taken to its logical conclusion, the Commission's argument would make

every spouse a per se insider -- a wholly untenable result.[9]  Notably, the Commission does not

cite a single case where the spouse of an insider was held to have become a "temporary insider."

## CONCLUSION

For the reasons set forth above and in her opening memorandum, Defendant Patricia B.

Rocklage respectfully requests that the Complaint against her be dismissed in its entirety.

Respectfully Submitted,

/s/ Daniel H. Gold
David H. Erichsen (BBO #155600)
Daniel H. Gold (BBO #654909)
Wilmer Cutler Pickering Hale and Dorr LLP
60 State Street
Boston, Massachusetts 02109
(617) 526-6000
(617) 526-5000 (facsimile)
*Attorneys for defendant Patricia B. Rocklage*

Dated:  April 28, 2005

---

[9]    The Commission's citation to SEC v. Switzer, 590 F. Supp. 756 (W.D. Okla. 1984) does not support its attempt to twist a personal purpose into a corporate purpose.  In Switzer, a company insider told his wife while attending a college track meet that there was going to be a possible liquidation of the company; his purpose for telling her was to inform her of his upcoming business schedule so that child-care arrangements could be made. Defendant Switzer overheard that conversation and used it to purchase securities.  The court held that the company insider did not breach his duties to the company by telling his wife about the possible liquidation because he did not do so for an improper purpose.  The case does not discuss whether such a reason is a "corporate purpose," and accordingly is irrelevant to the issue here.

CERTIFICATE OF SERVICE

I, Daniel H. Gold, hereby certify that I caused a copy of the within document to be served

electronically on:


Luke T. Cadigan                                     David E. Marder
U.S. Securities and Exchange Commission             Robins, Kaplan, Miller & Ciresi L.L.P.
Boston District Office                              111 Huntington Avenue
73 Tremont Street                                   Boston, MA 02199
Suite 600                                           617-267-2300
Boston, MA 02108                                    Fax: 617-267-8288
617-573-8919
Fax: 617-424-5940

Brian E. Whiteley
Scibelli, Whiteley and Stanganelli, LLP
50 Federal Street
5th Floor
Boston, MA 02110
617-227-5725
Fax: 617-722-6003


                                    /s/ Daniel H. Gold
                                    Daniel H. Gold


Dated:  April 28, 2005