UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| SECURITIES AND EXCHANGE COMMISSION, Plaintiff, v. PATRICIA B. ROCKLAGE, WILLIAM M. BEAVER and DAVID G. JONES, Defendants. | 05-CV-10074-MEL |

MEMORANDUM AND ORDER

LASKER, D.J.

Is a wife who receives inside information from her corporate executive husband insulated from insider trading liability if she discloses to her husband her intentions to leak that information? This case presents a compelling example of the "Muddled Duty to Disclose Under Rule 10b-5" explored by Langevoort and Gulati in an October 2004 article by that title. 57 Vand. L. Rev. 1675 (2004).

On December 31, 2001, defendant Patricia B. Rocklage ("Rocklage") learned from her husband, Scott M. Rocklage, the Chairman of the Board and Chief Executive Officer of Cubist Pharmaceuticals, Inc. ("Cubist"), that Cubist had received negative results in clinical trials for Cidecin, one of the company's most important products. Shortly thereafter, Rocklage

1

informed her husband that she intended to notify her brother, defendant William M. Beaver ("Beaver"), about the negative trial results so that he could sell his Cubist stock.  Although her husband urged her not to do so, Rocklage did tip Beaver, and on January 2, 2002, Beaver sold all his Cubist stock, worth approximately $196,000.  In turn, Beaver allegedly tipped his close friend and neighbor, defendant David G. Jones ("Jones"), about the negative trial results, thereby inducing Jones to sell all his Cubist stock, worth approximately $262,000.00, on January 3, 2002.  After the market closed on January 16, 2002, Cubist publicly announced the negative clinical trial results for Cidecin, and Cubist's stock price dropped 46%, from a closing price of $31.75 per share on January 16 to a closing price of $17.02 on January 17.  By selling before Cubist's announcement, Beaver and Jones avoided losses of $99,527.00 and $133,222.00, respectively.

The Securities and Exchange Commission ("SEC") brought this enforcement action against Rocklage, Beaver and Jones for securities violations pursuant to Sections 20(b) and 20(d) of the Securities Act, 15 U.S.C. §§ 77t(b) and 77t(d), and Sections 21(d) and 21A of the Exchange Act, 15 U.S.C. §§ 78u(d) and 78u-1. The SEC claims that the defendants violated Sections 17(a) and 10(b) of the Securities Act, 15 U.S.C. §§ 77q(a) and 78j(b), as well as Rule 10b-5 thereunder, 17 U.S.C. § 240.10b-5.

The defendants move to dismiss the Complaint on the grounds that Rocklage's disclosure to her husband precludes them from liability under the "misappropriation theory" of insider trading, that lack of insider status protects Rocklage from liability under the "classical theory", and that Beaver and Jones cannot be held liable if Rocklage is not.  Jones moves separately to dismiss for failure to allege the elements of fraud with sufficient particularity as required by Fed. R. Civ. P. 9(b). The motions to dismiss are DENIED.

### I. Governing Legal Theories

Trading securities on the basis of material nonpublic information does not always violate federal securities laws.  To the contrary, the Supreme Court has frequently rejected theories of insider trading liability based on mere possession of nonpublic market information.  See Chiarella v. U.S., 445 U.S. 222, 233-35 (1980) (declining to recognize "a general duty between all participants in market transactions to forego actions based on material, nonpublic information" and holding that "a duty to disclose under § 10(b) does not arise from the mere possession of nonpublic market information"); Dirks v. S.E.C., 463 U.S. 646, 657 (1983) (stating that "only some persons, under some circumstances, will be barred from trading while in possession of material nonpublic information").

A person may not be held liable for insider trading

unless she employs a "deceptive device" in connection with the
trade, typically a breach of duty owed to corporate shareholders
or to the source of the inside information.  <u>U.S. v. O'Hagan</u>, 521
U.S. 642, 651-52 (1997); <u>see</u> 17 C.F.R. § 240.10b-5 (1996).  This
is because deception undermines the purpose of the securities
laws, which is to ensure honest markets, thereby promoting
investor confidence.  <u>O'Hagan</u>, 521 U.S. at 658-59.  When an
individual trades on confidential information obtained through
contrivance, she places ordinary investors at "a disadvantage
that cannot be overcome with research or skill."  <u>Id.</u>

        The Supreme Court has recognized two theories of
liability for insider trading, each based on a deceptive breach
of duty: (1) the "classical theory," which generally applies to
corporate insiders, and (2) the "misappropriation theory," which
reaches outsiders with access to confidential information, such
as insiders' family and friends.  <u>See</u> <u>id.</u> at 652.

        Under the classical theory, a corporate insider
violates federal securities laws by tipping or trading on
material nonpublic information in breach of her duty to corporate
shareholders. <u>Id.</u>  That duty is born of the "relationship of
trust and confidence" between the shareholders and the insiders
who have "obtained confidential information by reason of their
position with the corporation." <u>Id.</u>  The breach of fiduciary duty
to shareholders is thus the deceptive device that creates

4

liability under the classical theory.

Misappropriation theory, on the other hand, extends liability to outsiders who have no fiduciary duty to shareholders, but who are otherwise entrusted with confidential information and then tip or trade on that information. See O'Hagan, 521 U.S. at 652. In O'Hagan, a corporation had hired a law firm to represent it in a potential tender offer. A partner of the firm, who was not involved in the representation, traded on information he gained by virtue of his firm's relationship with the corporation. The Supreme Court held that under misappropriation theory, an outsider can be liable for insider trading based on his breach of a duty of trust and confidence owed to the source of the confidential information (in that case, his law firm), rather than directly to corporate shareholders. Id. at 652. To codify this decision the SEC promulgated Rule 10b5-2 under Title 17 § 240, enumerating the duties of trust and confidence to which misappropriation theory applies. The Rule explicitly recognizes the duty of trust and confidence that exists between spouses when they have a "history, pattern or practice of sharing and maintaining confidences." 17 C.F.R. § 240.10b5-2(b)(3).

<u>II. Defendant Rocklage's Motion to Dismiss</u>

<u>A. Misappropriation Theory</u>:

The SEC argues that Rocklage is liable for insider

trading under misappropriation theory because she had a duty of
trust and confidence to her husband which she breached by tipping
her brother about Cubist's stock.  Rocklage's husband routinely
confided in Rocklage about Cubist developments, and she had a
history of maintaining those confidences.  Therefore, the SEC
contends, her actions were governed by Rule 10b5-2, which states
in pertinent part that:

> [A] "duty of trust or confidence" exists . . . [w]henever a
> person receives or obtains material nonpublic information
> from his or her spouse, parent, child or sibling; provided,
> however, that the person receiving or obtaining the
> information may demonstrate that no duty of trust or
> confidence existed with respect to the information, by
> establishing that he or she neither knew nor reasonably
> should have known that the person who was the source of the
> information expected that the person would keep the
> information confidential, because of the parties' history,
> pattern, or practice of sharing and maintaining confidences,
> and because there was no agreement or understanding to
> maintain the confidentiality of the information.

17 C.F.R. § 240.10b5-2(b)(3).  According to the SEC, Rocklage's
husband had an expectation that she would keep information about
Cubist's trial results confidential, and she breached her duty to
him by electing not to do so.

        Rocklage counters that she is not liable under
misappropriation theory because as detailed in O'Hagan, the SEC's
rationale applies only when the outsider does not disclose to the
source her intention to tip or trade, whereas here Rocklage did
disclose to her source, namely her husband.  See O'Hagan, 521
U.S. at 654.  In O'Hagan, the Supreme Court held that although

6

the defendant had no duty to the company's shareholders, he did have a duty to his law firm, as the source of the inside information upon which he traded, and his failure to disclose his plans to the firm rendered him liable under misappropriation theory. Id. The Court stated: "if the fiduciary discloses to the source that he plans to trade on the nonpublic information, there is no 'deceptive device' and thus no Section § 10(b) violation". Id. at 660. Rocklage argues that because she told her husband that she intended to tip her brother, there was no "deceptive device," and she cannot be held liable for insider trading under the misappropriation theory. Rocklage draws particular attention to the transcript of the oral arguments in O'Hagan, in which the government itself advanced this principle:

> Question (posed by unidentified Supreme Court Justice): I mean, suppose the defendant here had instead come clean, and he told his superiors in the law firm that he was going to use this information. Then he would not be posing as a loyal employee anymore, and it would have been ok?
> Answer (by Mr. Michael R. Dreeben, Esq. for the SEC): He would not have deceived his employer. He still would have breached independent fiduciary duties that he owed to that employer.
> Q: And you say he would still have breached securities laws?
> A: No, I do not think he would have breached the securities laws.
> Q: So that's the line. He didn't tell them that he was going to go out and use it.
> A: That's absolutely correct, and the reason why that is significant is that section 10(b) prohibits deceptive devices and contrivances. It requires deception. The misappropriation theory does involve a breach of fiduciary duty, but the distinctive factor about that breach is that it is a deceptive breach.

Ex. A at pp. 1-7. Rocklage contends that the SEC accepted and mandated this interpretation of misappropriation theory by creating Rule 10b5-2, and that therefore her disclosure to her husband shields her from liability per the SEC's own rules.

The SEC responds that the O'Hagan colloquy on disclosure does not apply to this case and therefore Rocklage's disclosure to her husband is immaterial. First, the SEC notes, the Complaint does not specify whether Rocklage disclosed to her husband before or after tipping her brother, making the latter a reasonable inference. Reporting her indiscretion after the fact would not exempt Rocklage from liability under O'Hagan. Even if Rocklage did inform her husband prior to tipping her brother, the SEC continues, the language relating to disclosure in the O'Hagan decision has no precedential value in the case at bar. In its discussion of disclosure as a cure for outsider liability, the Supreme Court in O'Hagan was discussing a hypothetical situation, and not O'Hagan's actual crime, and therefore the SEC argues that segment of the opinion is not binding.

Even if it were binding, however, the SEC maintains that the facts of this case distinguish it from O'Hagan. Rocklage's deceptive device, the SEC asserts, was not mere use of confidential information, as in the O'Hagan case, but active deceit of her husband. The SEC argues in its memorandum that by feigning that she would keep the trial results confidential,

Rocklage deceived her husband into conveying the nonpublic information to her so that she could convey it to her brother, which she did.  Later informing her husband of plans to tip her brother, the SEC argues, did not remove the deceptive device from Rocklage's actions, because the deceit took place at the time her husband confided in her.

Furthermore, the SEC contends, Rocklage's disclosure to her husband did not satisfy O'Hagan's requirement of "full disclosure" because Rocklage's husband did not "have the opportunity and motivation to act once [Rocklage] made the disclosure."  See 521 U.S. at 659 n.9 ("once a disloyal agent discloses his imminent breach of duty, his principal may seek appropriate equitable relief under state law").  The SEC argues that in the instant case, the disclosure from wife to husband was ineffective because it offered no such opportunity for relief.  Rather, the SEC continues, one could infer that Rocklage told her husband of her intentions only because she knew that, given their marriage, he would be unable or unwilling to take actions to remedy her breach of duty.  The SEC concludes that the O'Hagan language indicating that disclosure would preclude liability was specific to the principal-agent relationship in that case, and was not meant to apply to the unique characteristics of the marital relationship.

9

*     *     *

The SEC's contention that Rocklage may have informed her husband after, rather than before tipping her brother, is unconvincing. The repeated use of the word "intended" in the Complaint must reasonably be interpreted to mean that the SEC understood Rocklage to be warning her husband of a future event. Indeed, it would be nonsensical for Rocklage's husband to urge her not to tip her brother, as alleged in the Complaint, if she had not discussed the matter with him prior to the tip.

Nor is there merit to the SEC's assertion that the discussion of disclosure as a cure in O'Hagan has no precedential value because it is dictum. In the First Circuit, "carefully considered statements of the Supreme Court, even if technically dictum, must be accorded great weight and should be treated as authoritative." U.S. v. Santana, 6 F.3d 1, 9 (1st Cir. 1993). In O'Hagan, the Supreme Court carefully considered the subject of disclosure as an antidote to insider trading and made a clear, if hypothetical, conclusion based on the other facts of that case. It stated, "[i]f the fiduciary discloses to the source that he plans to trade on the nonpublic information, there is no 'deceptive device' and thus no Section § 10(b) violation." That conclusion, whether or not technically dictum, cannot be disregarded here.

Taking the Supreme Court's statement at face value,

10

Rocklage has ably argued that she did exactly what the Court required of her to escape liability: she disclosed her plans to the source of her information.  The question is whether the facts of the instant case distinguish it from O'Hagan so that her disclosure did not remove the "deceptive device" from the equation.  I find that they do.

Disclosure - whether to shareholders or to the source - is required in insider trading cases because it ultimately serves to prevent shareholders from being manipulated by investors with an unfair advantage.  O'Hagan, 521 U.S. at 652; Chiarella v. U.S., 445 U.S. 222, 228-229 (1980).  The source of inside information in O'Hagan was a law firm which contracted to do business with the company whose stock O'Hagan illegally traded.  Because of the firm's obligations to the company, O'Hagan's hypothetical disclosure to his firm would have been tantamount to informing the shareholders, and they would not have been deceived.  In the instant case, however, no such relay of information could reasonably have been expected.  Although Rocklage's husband (Cubist's CEO) was under a fiduciary obligation to Cubist, his loyalties lay first and foremost with his wife, both legally and pragmatically.  Therefore, because of the special nature of the marital relationship, disclosure in this case did nothing to cure Rocklage's manipulation of the stock market and Cubist's shareholders were accordingly deceived.

At the argument on this motion, Rocklage asserted that the SEC created Rule 10b5-2 with the express purpose of identifying the outsider relationships to which the Supreme Court's ruling in O'Hagan could be applied. Because the marital relationship is listed in Rule 10b5-2, Rocklage maintains that husband-wife disclosure has the same legal effect as principal-agent disclosure, that is, to preclude liability under misappropriation theory. However, Rule 10b5-2 does not mention disclosure at all. In fact, on the same day and in the same document that Rule 10b5-2 was released, Rule 10b5-1 was also released, specifying a number of affirmative defenses to a related form of insider trading. If the SEC had intended to include disclosure as an affirmative defense to the misappropriation theory of insider trading in Rule 10b5-2, it certainly could have done so. The absence of disclosure as an affirmative defense suggests that the SEC intended to let the courts determine the relative weight of disclosure based on the specific facts of each case, as the Supreme Court did in O'Hagan.

On the alleged facts of this case, therefore, I find that Rocklage's disclosure to her husband did not remove the deceptive device from Rocklage's conduct and accordingly does not insulate her from liability under misappropriation theory.

B. Classical Theory:

The SEC next asserts that Rocklage is liable under the

12

classical theory of insider trading because at the time her husband confided in her about Cubist's trial results, she was a "temporary insider."  The test of insider status is whether a person has "entered into a special confidential relationship in the conduct of the business of the enterprise and [is] given access to information solely for corporate purposes." <u>Dirks</u>, 463 U.S. at 657 n.14.  Rocklage fits this description, says the SEC, because she had a special relationship with Cubist's CEO, who gave her confidential information in the normal course of his work day, for a corporate purpose and not for any personal benefit.  The habit of sharing confidences with his wife, the SEC maintains, served a corporate purpose because it allowed the Cubist CEO to better harmonize the demands of his professional and personal lives, thereby benefitting Cubist.  <u>See</u> <u>S.E.C. v. Switzer</u>, 590 F.Supp. 756, 762, 766 (W.D. Okla. 1984) (noting that Chairman and CEO did not breach duty to company where he disclosed possible liquidation of subsidiary with wife for the purpose of informing her of business schedule so that arrangements for child care could be made).  According to the SEC, the fact that Rocklage exploited her special relationship with Cubist's CEO and used confidential information for personal benefit, though it was given to her for a corporate purpose, makes her liable as a temporary insider under the classical theory.

Rocklage responds that regardless of her relationship with her husband, she had no duty to Cubist shareholders and did not acquire one by virtue of being given confidential information.  As the Supreme Court stated in Dirks: "we do not believe that the mere receipt of information from an insider creates . . . a special relationship between the tippee and the corporation's shareholders."  Dirks, 463 U.S. at 657 n.15. Rocklage asserts that any special relationship she had was with her husband, not with Cubist, and that no duty to Cubist shareholders arose upon her receipt of material nonpublic information.  Even if Rocklage had somehow acquired a relationship with Cubist shareholders, she maintains that her husband's confidences came to her within the context of their personal relationship, and were therefore not "solely for corporate purposes" as required for her to attain insider status. Id. at 657 n.14.  Rocklage adds that the fact that the SEC has defined the spousal duty of trust and confidence in the context of misappropriation theory cases but not classical theory cases confirms that spouses are not temporary insiders.  17 C.F.R. § 240.10b5-2(b)(3).

Rocklage concludes that the only way she could have acquired a derivative duty to Cubist's shareholders was if her husband's disclosure to her had been improper, i.e., if he had breached his fiduciary duty by speaking to her about Cubist's

14

trial results.  <u>Dirks</u>, 463 U.S. at 660 (stating that "the tippee's duty to disclose or abstain is derivative from that of the insider's duty").  The Complaint does not assert that Rocklage's husband had a duty not to discuss confidential information with his wife, so Rocklage contends that she had no derivative duty under the classical theory which could render her liable.

*   *   *

Because the SEC has not asserted that Rocklage's husband breached a duty by telling his wife about Cubist's trial results, I agree that Rocklage is not liable as a tippee. Whether she is liable as a temporary insider depends on whether Rocklage had a "special relationship" with Cubist via her husband, whether that relationship stemmed from the "conduct of the business of the enterprise," and whether she received the news about Cubist's negative trial results "solely for corporate purposes."  <u>Id.</u> at 657 n.14.  Neither party has presented authority as to whether a wife can be held to have a special relationship with her husband's company solely by virtue of their marriage.  The matter need not be decided here, however, because the Complaint does not allege facts to support the SEC's contention that Rocklage's husband discussed the Cidecin trials in the conduct of Cubist business, much less solely for corporate purposes.

15

The Complaint alleges that Rocklage's husband "spoke by telephone to his wife . . . who was in a limousine on her way home from the airport," and that later that evening, they spoke "in more depth about the failure of the Cidecin clinical trial." The Complaint does not allege that anyone else from Cubist was party to these conversations, nor does it assert any other facts that would imply a solely corporate purpose behind them. The SEC makes a logical argument that personal discussions with spouses help corporate officers manage their work load. However, such conversations are nonetheless personal, and therefore by definition, not "solely for corporate purposes." Id.

Nor does it seem that the intent of the Supreme Court in defining "temporary insiders" was to include close relatives. To the contrary, Rule 12b5-2 lists spouses and immediate family members among the "outsiders" that may be liable under misappropriation theory. 17 C.F.R. § 240.10b5-2(b)(3). The SEC has not cited any cases in which a family member has been found to be a temporary insider. Rather, the case law cited by both parties is limited to instances of information acquired by fiduciaries, such as attorneys or accountants, who are given corporate information in order to perform a service to the corporation, which is not the case here. See, e.g., Dirks, 463 U.S. at 657; SEC v. Lund, 570 F. Supp. 1397, 1400, 1403 (C.D. Cal. 1983).

16

Rocklage does not meet the requirements for temporary insider status as outlined in <u>Dirks</u>, and she therefore cannot be held liable under the classical theory of insider trading.

### III. Defendants Beaver and Jones' Motions to Dismiss

The SEC's Complaint alleges that Beaver and Jones are each liable for insider trading as tippees, because they each "knew or [were] reckless in not knowing that P. Rocklage was breaching a duty of trust and confidence that she owed to her husband and/or to Cubist and its shareholders." The SEC asserts that Beaver's and Jones' liability exists independently of whether Rocklage is found liable, because their liability is derivative not of Rocklage's securities violations, but of her breach of fiduciary duty, which was not cured by her disclosure under any circumstances.

Beaver and Jones do not dispute that under either the classical theory or the misappropriation theory, tippee liability results where there is: (1) a breach by the tipper of a duty owed to the owner of nonpublic information; and (2) the tippee knows or should know that the tipper breached the duty. <u>See Dirks</u>, 463 U.S. at 660 (stating that a tippee assumes a duty "only when the insider has breached his fiduciary duty to the shareholders by disclosing the information to the tippee and the tippee knows or should know that there has been a breach"). Beaver and Jones contend, however, that Rocklage breached no duty, and they

17

therefore acquired no duty and cannot be held liable.

Jones also argues, in a second memorandum to the Court, that the SEC has failed to satisfy the element of scienter requiring it to establish at least a strong inference that Jones knew or should have known of the allegedly wrongful conduct of Rocklage. O'Hagan, 521 U.S. 642, 652; SEC v. Alexander, 160 F.Supp. 2d. 642, 649 (S.D.N.Y. 2001) ("it is well established that a plaintiff must . . . 'allege facts that give rise to a *strong inference of fraudulent intent'*")(emphasis in original). The SEC's allegations focus almost exclusively on Jones' friendship with Beaver, and with respect to Rocklage are limited to the allegation that she grew up in the same neighborhood as Jones and that Jones knew her husband was the CEO of Cubist. Jones maintains that no facts give rise to the implication that Jones should have known of Rocklage's alleged breach of some sort of a fiduciary duty, let alone that he knew or should have known that she had breached the duty by in some way deceiving her husband.

\*    \*    \*

The argument that Beaver and Jones acquired no duty because Rocklage breached no duty fails upon the determination that Rocklage did breach a duty to her husband which was not cured by her disclosure. Therefore, to the extent that Rocklage is ultimately found liable, that liability attaches to downstream

tippees if they knew or should have known of Rocklage's breach of duty.  Whether they knew or should have known of the breach is of course a question of fact, the existence of which precludes dismissal on this motion.

C. Additional Elements of Defendant Jones' Motion to Dismiss

Jones further asserts that the Complaint against him is legally insufficient because it does not allege fraud with the particularity required by Fed. R. Civ. P. 9(b).  He notes that the Complaint lacks basic information as to how the tip was supposedly made, when it occurred, the surrounding circumstances, and any conduct by Jones from which the possession of material non-public information could be inferred (other than the trade itself).  Jones maintains that the SEC's allegations regarding him are thus circumstantial and limited to the mere fact of his friendship with Beaver and the timing of the trade.

Jones contends that although the SEC may rely upon circumstantial evidence to make a claim for insider trading, the evidence must be substantial and cannot be mere inference or guesswork.  He relies on S.E.C. v. Sargent, a First Circuit case in which the SEC prevailed because it offered testimonial evidence indicating details including that the tip took place during a dinner conversation, that it identified the relevant company, that on the following day the tippee purchased his largest investment ever in a single stock contrary to the advice

of his broker, and that he took out a $50,000.00 bank loan to finance the purchase. 229 F.3d 68, 72, 74-75 (1st Cir. 2000). Jones concludes that the facts alleged in the Complaint against him are a far cry from the layers of circumstantial evidence discussed in Sargent.

The SEC counters that the application of Fed. R. Civ. P. 9(b) is relaxed in insider cases because the knowledge as to particularity is normally exclusively in the hands of the defendant. SEC v. Alexander, 160 F. Supp.2d 642, 649 (S.D.N.Y. 2001); see also Energy Factors, Inc. v. Nuevo Energy Co., No. 91 Civ. 4273, 1001 WL 259425, at *4 (S.D.N.Y. Nov. 22, 1991) ("to require the plaintiff to produce more concrete evidence of these details would put a heavy burden on plaintiff and would practically preclude the possibility of pleading an adequate complaint in cases, such as insider trading, that are profoundly secretive in nature").

The SEC further argues that its allegations against Jones are comparable to those in other cases in which the allegations were held to be sufficient. See U.S. v. Larrabee, 240 F.3d 18, 20 (1st Cir. 2001) (holding that defendant's access to information, relationship between tipper and tippee, and suspicious timing of trades was sufficient evidence to support the conviction). The SEC adds that its allegation that Jones sold all, not just some, of his stock, provides additional

20

circumstantial evidence of his receipt of Beaver's tip.

In reply, Jones disputes the claim that Fed. R. Civ. P. 9(b) should be relaxed in this case.  He points out that as the SEC acknowledged in its memorandum, such relaxation is appropriate only where the relevant facts are "peculiarly within the knowledge of the Defendants."  <u>Boston & Me. Corp. v. Hampton</u>, 987 F.2d 855, 866 (1st Cir. 1993).  In this case, however, the SEC had access to the defendants' spouses, brokers, and records, as well as extensive investigative powers that have allowed it to conduct depositions and other evidentiary inquiries.  In spite of all of this pre-discovery investigation, Jones argues, the SEC has been unable to unearth any of the basic information required by Fed. R. Civ. P. 9(b).  According to Jones, it would therefore be inappropriate to relax Fed. R. Civ. P. 9(b) in this case, and would conflict with an important policy behind the rule, which is to safeguard defendants from spurious charges of fraudulent behavior.

\*    \*    \*

Fed. R. Civ. P. 9(b) provides in pertinent part: "In all averments of fraud or mistake, the circumstances constituting fraud or mistake shall be stated with particularity."  To the extent that this Rule serves to appraise the defendant of the acts that form the basis for the claims against him, "the Rule does not permit a complainant to file suit first, and

21

subsequently to search for a cause of action." <u>Lopez v. Bulova
Watch Co., Inc.</u>, 582 F.Supp. 755, 766 (D.R.I. 1984) (citing
<u>Deyhle v. Barclay Investments, Inc.</u>, No. 82-0662, slip op. at 4
(D.R.I. Oct. 13, 1983)).  However, where the relevant facts are
peculiarly within the defendant's knowledge, the First Circuit
has relaxed the requirements of Fed. R. Civ. P. 9(b).  <u>U.S. ex
rel. Franklin v. Parke-Davis, Div. of Warner- Lambert Co.</u>, 147
F.Supp.2d 39 (D.Mass. 2001).  Thus, the Court's task in such
cases is to allow Complaints often based solely on circumstantial
allegations, without permitting charges so vague as to fail to
illustrate a cause of action.

       Although the allegations in connection with Jones'
trade are spare, the Complaint nonetheless paints a clear enough
picture of the acts that form the basis for the claim against
him.  Taking into account Jones' relationship with Beaver, the
timing of both mens' trades, the fact that they both traded <u>all</u>
of their Cubist shares, and the fact that Jones later made a
number of false and inconsistent statements under SEC
investigation, the circumstances constituting the fraud have been
pleaded with adequate particularity.

       Nor do the alleged facts threaten to undermine the
second purpose of Fed. R. Civ. P. 9(b), which is to safeguard
defendants from spurious charges of fraud.  Given the related and
substantial allegations against Rocklage and Beaver, the lifelong

relationship between them and Jones, and the fact that Jones did in fact trade his Cubist stock the day after Beaver's trade, the charge against him can hardly be described as irresponsible.  The SEC has alleged facts comparable to those presented in <u>Larabee</u>, a relevant First Circuit case, and Jones has provided no First Circuit law to the contrary.  I am therefore satisfied that the Complaint meets the requirements of Fed. R. Civ. P. 9(b).

* * * * *

Because the SEC's claim survives under the misappropriation theory of insider trading, and because the SEC has met the requirements of R. Civ. P. 9(b), the defendants' motions to dismiss are DENIED.

It is so ordered.


Dated:    August 23, 2005
          Boston, Massachusetts     /s/ Morris E. Lasker
                                        U.S.D.J.