# United States Court of Appeals
## For the First Circuit

No. 06-1571

SECURITIES AND EXCHANGE COMMISSION,

Plaintiff, Appellee,

v.

PATRICIA B. ROCKLAGE; WILLIAM M. BEAVER; DAVID G. JONES,

Defendants, Appellants.

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

[Hon. Morris E. Lasker,* Senior U.S. District Judge]

Before

Torruella, Lynch, and Lipez,
Circuit Judges.

David H. Erichsen, with whom Peter Spaeth, Pratik A. Shah, and Wilmer Cutler Pickering Hale and Dorr LLP were on brief, for appellant Patricia B. Rocklage.
David E. Marder, with whom Benjamin D. Stevenson and Robins, Kaplan, Miller & Ciresi LLP were on brief, for appellant William M. Beaver.
Brian E. Whiteley and Scibelli, Whiteley and Stanganelli, LLP on brief for appellant David G. Jones.
Randall W. Quinn, Assistant General Counsel, with whom Brian G. Cartwright, General Counsel, Jacob H. Stillman, Solicitor, and Jeffrey Tao, Senior Counsel, were on brief, for appellee.

---

*Of the Southern District of New York, sitting by designation.

November 14, 2006

**LYNCH, Circuit Judge.**  This is an interlocutory appeal from the denial of defendants' motion to dismiss a civil complaint based on an issue of law.

The complaint was brought by the SEC on a misappropriation theory of insider trading.  It alleged that defendant Patricia B. Rocklage intentionally used deceptive means to obtain from her husband highly negative and non-public information about his publicly-traded company, in order to tip her brother who owned company stock, which then led to trading of the stock by her brother and another.  Specifically, Mrs. Rocklage initially concealed from her husband her prior agreement with her brother to tip him if she learned significant negative information about the company.  She also concealed that she did not intend to maintain the confidentiality that her husband had reasonably understood to bind her.  After Mrs. Rocklage acquired the information on the basis of this deception, and shortly before she actually tipped her brother, however, she told her husband that she was going to give her brother the information.  Her husband asked her not to do so, but she did so anyway, pursuant to the agreement. Under the circumstances and timing of the events, there was little her husband could do to prevent her from tipping her brother or to prevent her brother from trading on the information.  Her brother sold his stock in the company on the next day the market opened and he passed the information on to a friend who did the same.  The

brother, William M. Beaver, and friend, David G. Jones, are also defendants.

The three defendants moved under Federal Rule of Civil Procedure 12(b)(6) to dismiss the SEC's complaint for failure to state a claim; they argued that under language in United States v. O'Hagan, 521 U.S. 642 (1997), Mrs. Rocklage's pre-tip disclosure to her husband, telling him that she intended to tip-off her brother, completely negated any liability under the misappropriation theory. We conclude that O'Hagan does not require dismissal of this suit for failure to state a claim.

I.

On January 12, 2005, the SEC filed a civil complaint against the defendants. The complaint alleged the following key facts, which we must take as true under Rule 12(b)(6). See Conley v. Gibson, 355 U.S. 41, 45-46 (1957). We draw all reasonable inferences in the SEC's favor. See Ramirez v. Arlequin, 447 F.3d 19, 20 (1st Cir. 2006).

Mrs. Rocklage was the wife of Scott M. Rocklage. Mr. Rocklage was the Chairman and CEO of Cubist Pharmaceuticals, Inc., a publicly-traded biotechnology company. Mrs. Rocklage was not an employee of Cubist.

On December 31, 2001, Mr. Rocklage learned that one of the company's key drugs had failed its clinical trial. That afternoon, he phoned Mrs. Rocklage to discuss the trial results and

-4-

he reached her while she was in a limousine. Before discussing the results with her, Mr. Rocklage made clear his intention that the results be kept confidential. He told her that she was not to react to what he was about to say, and he instructed her not to discuss the results in front of the limousine driver. She agreed. From the time that Mr. Rocklage joined Cubist in 1994, he had routinely communicated material, nonpublic information to his wife, and she had always kept the information confidential. Based on Mrs. Rocklage's agreement, and based on their prior history of sharing nonpublic information about the company and her keeping that information confidential, Mr. Rocklage had a reasonable expectation that she would not disclose the trial results to anyone. Based on his understanding that she would keep the information confidential, Mr. Rocklage informed his wife that the clinical trial had failed. Before the results were disclosed to her, Mrs. Rocklage understood her husband's expectation of confidentiality.

Unbeknownst to her husband, Mrs. Rocklage had a preexisting understanding with her brother, defendant Beaver, that she would inform him with "a wink and a nod" if she learned significant negative news about Cubist. At the time that Mrs. Rocklage learned the negative trial results, she knew or had reason to believe that Beaver owned Cubist stock. She also knew or

-5-

had reason to know her brother would trade in Cubist securities if she disclosed the nonpublic information to him.

On the evening of December 31, 2001, Mr. Rocklage discussed the failure of the drug trial in more depth with Mrs. Rocklage. He informed her that Cubist would be making a public announcement about the results, and that until that happened the results were nonpublic. Mrs. Rocklage asked how the news would affect Cubist's stock, and Mr. Rocklage informed her that the stock price would drop significantly. As before, at the time that Mr. Rocklage originally conveyed this information to Mrs. Rocklage, he had a reasonable expectation that she would keep it confidential and would not otherwise have disclosed the information. In effect, by her deception Mrs. Rocklage induced her husband to disclose material non-public information he would not otherwise have disclosed, and she did so with the intention of sharing this information with her brother to allow him to trade securities.

After that conversation, and on or about the evening of December 31, 2001, Mrs. Rocklage informed her husband that she planned to signal her brother to sell his stock. Mr. Rocklage urged her not to do so, and he expressed his displeasure at the idea. Nevertheless, sometime before the morning of January 2, 2002, Mrs. Rocklage called Beaver and gave him "a wink and a nod" regarding Cubist. Beaver interpreted this to mean that he should sell his Cubist stock, and so on the morning of January 2, 2002 --

the first possible trading day after he was tipped off -- Beaver sold all of his 5,583 shares of Cubist stock. By tipping her brother, Mrs. Rocklage was providing a gift of confidential information to a relative, and so she personally benefitted.

Beaver also tipped off his close friend and neighbor, defendant Jones. Jones knew that Beaver's brother-in-law, Mr. Rocklage, was Chairman and CEO of Cubist. Jones sold all of his 7,500 shares of Cubist stock on the morning of January 3, 2002.

Cubist publicly announced the negative drug trial results on January 16, 2002, after the market had closed for the day. By selling when they did, Beaver and Jones avoided losses of $99,527 and $133,222, respectively.

The SEC alleged that on the basis of these facts all three defendants were guilty of insider trading under § 10(b) of the Securities Exchange Act of 1934, see 15 U.S.C. § 78j(b), and Rule 10b-5 thereunder, see 17 C.F.R. § 240.10b-5.[1] It sought both injunctive relief and monetary penalties from the defendants.

All three defendants filed a Rule 12(b)(6) motion to dismiss for failure to state a claim. On August 23, 2005, the district court issued an opinion denying their motion. In its opinion, the court explained that the Supreme Court has recognized

---

[1] The SEC also alleged that the defendants had violated § 17(a) of the Securities Act of 1933. See 15 U.S.C. § 77q(a). All parties agree that the analysis under § 17(a) is identical to the analysis under § 10(b) and Rule 10b-5. Accordingly, we analyze the issues solely under the latter two provisions.

two theories of insider trading liability: the "classical theory" and the "misappropriation theory." The classical theory generally only imposes liability when a trader or tipper is an insider of the traded-in corporation. The classical insider-trader thus breaches a fiduciary duty owed to the corporation's shareholders. The misappropriation theory, however, creates liability when a tipper or trader misappropriates confidential information from his source of the information. The misappropriator thus breaches a fiduciary duty owed to the source.

The district court agreed with defendants that Mrs. Rocklage could not be held liable under the classical theory. She was not a traditional insider at Cubist. And the court determined that the relationship between Mrs. Rocklage and Cubist's shareholders was not of the kind that could lead to "temporary insider" status: no alleged facts demonstrated that Mr. Rocklage's disclosure to her was "solely for corporate purposes." See Dirks v. SEC, 463 U.S. 646, 655 n.14 (1983).

The district court disagreed, however, with the defendants' argument that there was no liability under the misappropriation theory. Although O'Hagan had said that disclosure to the source would negate liability under the misappropriation theory, the district court found O'Hagan distinguishable. However, the court's grounds for distinguishing O'Hagan were based on a misreading of O'Hagan's facts. The court reasoned that because

-8-

O'Hagan's law firm had obligations to the traded-in company (as the district court read the case), any hypothetical disclosure by O'Hagan would have quickly made its way to the shareholders. In Mrs. Rocklage's case, by contrast, the special nature of the marital relationship meant that her disclosure would never make its way to the shareholders; Mr. Rocklage's loyalties lay first and foremost with his wife. Thus the district court found that the complaint stated facts sufficient to support a misappropriation theory of liability.

The district court also refused to dismiss the case against the downstream tippees, Beaver and Jones. If a claim was stated against Mrs. Rocklage, it held, then the tippees' liability turned on whether they knew or should have known of Mrs. Rocklage's breach of duty. The district court determined this last question to be one of fact, and thus inappropriate for resolution on a 12(b)(6) motion.[2]

All three defendants moved the district court for reconsideration, correctly arguing that the district court had misread O'Hagan. Contrary to the court's reading, O'Hagan's firm had represented the bidding company in a tender offer, not the target company whose shares O'Hagan traded. See O'Hagan, 521 U.S. at 647. Thus, the defendants argued that O'Hagan's firm had no

---

[2] The district court also rejected Jones' argument that the complaint did not allege fraud with sufficient particularity. See Fed. R. Civ. P. 9(b).

obligation to inform the target's shareholders, and any hypothetical disclosure by him would not have had real effect. In the alternative, the defendants asked the court to certify the issue for interlocutory appeal pursuant to 28 U.S.C. § 1292(b).

On December 14, 2005, the district court denied the motion for reconsideration. The court conceded that it had misread O'Hagan but reasoned that O'Hagan was distinguishable because a hypothetical disclosure by O'Hagan would have given either his firm or the bidding company the opportunity and motivation to take remedial action. By contrast, the nature of the marital relationship meant that Mrs. Rocklage's disclosure did not give her husband adequate opportunity to take similar remedial action. The court certified the issue for an interlocutory appeal, see 28 U.S.C. § 1292(b), which this court accepted.

## II.

This case turns on an understanding of the underpinnings of the misappropriation theory, an understanding of the acts that are the deceptive or manipulative device or devices alleged, and a careful reading of the O'Hagan opinion. We first discuss the misappropriation theory, examining why the Supreme Court concluded that this theory came within the ambit of § 10(b). Then we explain our resolution of the remaining disputed issues, and how our resolution of those issues flows from O'Hagan.

-10-

A.          The Misappropriation Theory of Insider Trading Liability

The text of § 10(b) makes it unlawful to "use or employ, in connection with the purchase or sale of any security . . . any manipulative or deceptive device or contrivance in contravention of" rules promulgated by the SEC.  15 U.S.C. § 78j(b).  Rule 10b-5 furnishes further explication of this statute, providing inter alia that it is unlawful to "engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person, in connection with the purchase or sale of any security."  17 C.F.R. § 240.10b-5(c).  From these two sources of law on insider trading, the Supreme Court has fashioned two theories of liability: the "classical" theory, and the "misappropriation" theory.  See O'Hagan, 521 U.S. at 651-52.

Under the classical theory, § 10(b) and Rule 10b-5 are violated when an insider trades (without disclosure) in a corporation's securities based on material, nonpublic information that he has acquired.  So long as that insider owes a fiduciary duty to the corporation's stockholders, the Supreme Court has deemed such trades to be deceptive because they constitute a breach of that fiduciary duty.  Id.  However, when the trading individual owes no fiduciary duty to the stockholders of the traded-in corporation, and he has not obtained the information from one who has breached such a duty, there can be no insider trading liability

-11-

under the classical theory. <u>See</u> <u>Chiarella</u> v. <u>United States</u>, 445 U.S. 222, 231-35 (1980).

In such cases, however, liability may still be premised on a misappropriation theory. Liability under that theory is based on deception of the source of the information, rather than on deception of the shareholders; it is that deception which brings this trading within the statutory language. <u>See</u> <u>O'Hagan</u>, 521 U.S. at 652 ("[T]he misappropriation theory premises liability on a fiduciary-turned-trader's deception of those who entrusted him with access to confidential information."). Such deceptive trading exploits unfair informational disparities in the securities market; making such trading illegal also comports with the congressional purposes underlying § 10(b). <u>See</u> <u>id.</u> at 658-59.

<u>O'Hagan</u>, the case in which the Supreme Court first recognized the misappropriation theory, illustrates the theory's underpinnings. The defendant, James O'Hagan, worked at a law firm representing the bidding company in a contemplated tender offer. <u>Id.</u> at 647. O'Hagan learned about the proposed deal and purchased shares in the target company before the deal was made public. <u>Id.</u> at 647-48. Because O'Hagan's firm represented the bidder, he owed no fiduciary duty to the target's stockholders and could not be prosecuted under the classical theory. <u>Id.</u> at 653 n.5. Nevertheless, the Court held he was liable under a misappropriation theory because he had deceived both his law firm and its client: he

-12-

had pretended to be loyal to them while secretly converting information obtained from them into personal gain.  See id. at 653-55.  The Court remarked that it would make "scant sense to hold a lawyer like O'Hagan a § 10(b) violator if he work[ed] for a law firm representing the target of a tender offer, but not if he work[ed] for a law firm representing the bidder.  The text of the statute requires no such result."  Id. at 659.

The Court did say, however, that "[b]ecause the deception essential to the misappropriation theory involves feigning fidelity to the source of information, if the fiduciary discloses to the source that he plans to trade on the nonpublic information, there is no 'deceptive device' and thus no § 10(b) violation."  Id. at 655.  It is this language in O'Hagan, arguably dicta,[3] on which defendants pin their argument: they contend that Mrs. Rocklage's disclosure to her husband eliminated any deception involved with her tipping, which would mean that her actions did not come within the text of § 10(b).

B.      Liability Under the Misappropriation Theory After O'Hagan

To establish liability under the misappropriation theory, the SEC must show that Mrs. Rocklage communicated material nonpublic information, with scienter, in violation of a fiduciary

---

[3] Since O'Hagan presented no issue of actual disclosure by O'Hagan, the statement could be viewed as dicta.  Even dicta in Supreme Court opinions is looked on with great deference.  See United States v. Santana, 6 F.3d 1, 9 (1st Cir. 1993).

-13-

duty she owed to her husband. See Ernst & Ernst v. Hochfelder, 425 U.S. 185, 193 (1976); SEC v. Sargent, 229 F.3d 68, 74-76 (1st Cir. 2000). Additionally, to satisfy the language of § 10(b), the SEC must demonstrate that Mrs. Rocklage engaged in a "manipulative or deceptive device," and that she did so "in connection with the purchase or sale of any security." 15 U.S.C. § 78j(b); see also O'Hagan, 521 U.S. at 653-56.[4]

The defendants do not dispute that the complaint meets the scienter requirement, and that the disclosed information was material and nonpublic. They also do not seriously challenge the SEC's allegation that Mrs. Rocklage breached a duty she owed to her spouse under 17 C.F.R. § 240.10b5-2(b)(3).[5]

---

[4] In Sargent this court left open whether the SEC must also show that a tipper received sufficient personal benefit. See 229 F.3d at 77. As in Sargent, we need not decide this issue here. Even if there is a requirement that the tipper receive a personal benefit, the mere giving of a gift to a relative or friend is a sufficient personal benefit. See id. The gift of information Mrs. Rocklage gave her brother meets that standard.

[5] This regulation, which the defendants do not challenge for purposes of the Rule 12(b)(6) motion, provides that there is a "duty of trust or confidence" for purposes of the misappropriation theory when

> a person receives or obtains material nonpublic information from his or her spouse, parent, child, or sibling; provided, however, that the person receiving or obtaining the information may demonstrate that no duty of trust or confidence existed with respect to the information, by establishing that he or she neither knew nor reasonably should have known that the person who was the source of the information expected that the person would keep the information confidential, because of

-14-

The heart of this case is thus whether the SEC's complaint has stated a claim that Mrs. Rocklage engaged in any "manipulative or deceptive device" that was "in connection with the purchase or sale of any security." In answering that question, we find it helpful to examine the issue in two parts. First, we identify exactly what "manipulative or deceptive devices" Mrs. Rocklage was alleged to have engaged in and we assess whether they were sufficiently "in connection with" a securities transaction. Second, we examine Mrs. Rocklage's pre-tip disclosure to her husband to determine whether that disclosure eliminated the deception from her actions.

1.      The Deceptive Devices

The SEC contends that Mrs. Rocklage engaged in deceptive devices, in connection with a securities transaction, when she tricked her husband into revealing confidential information to her so that she could, and did, assist her brother with the sale of his Cubist stock. We agree and think it helpful to view the devices in terms of deceptive acquisition of information and then deceptive tipping of her brother, both of which were steps in a broader scheme to enable her brother to trade in Cubist securities. The

---

the parties' history, pattern, or practice of sharing and maintaining confidences, and because there was no agreement or understanding to maintain the confidentiality of the information.

17 C.F.R. 240.10b5-2(b)(3) (emphasis added).

question of whether Mrs. Rocklage's disclosure makes these acts nondeceptive is a different question, which we address later.

We start with the second of these actions. Had Mrs. Rocklage never made any disclosure of her intent to tip her brother, there would have been deception in connection with a securities transaction when she did tip her brother, without her husband's consent, to enable her brother to trade in securities. Under O'Hagan, this would have been the case irrespective of the means by which Mrs. Rocklage acquired the information.[6]

Still putting aside for the moment any consideration of the effects of disclosure, we turn to the other alleged deceptive action -- Mrs. Rocklage's acquisition of information. Here more analysis is required. We agree that this acquisition of information was deceptive. The complaint alleges, and we must take as true, that before her husband's initial disclosure about the clinical trial, Mrs. Rocklage did absolutely nothing to correct his mistaken understanding that she would keep the trial results confidential. This was so even though Mrs. Rocklage knew that her husband had this (mis)understanding, and even though she had a preexisting arrangement to disclose certain confidential information to her brother.

---

[6] Indeed, had Mrs. Rocklage legitimately acquired the information, and then tipped her brother without disclosure, she would have been in essentially the same position as the defendant in O'Hagan. The defendants do not argue that her act of tipping was not "in connection with" a securities transaction.

-16-

The defendants argue that this acquisition of information, even if deceptive, was not "in connection with" a securities transaction. They point to language from O'Hagan discussing the "in connection with" requirement and explaining that "the fiduciary's fraud is consummated, not when the fiduciary gains the confidential information, but when . . . he uses the information to purchase or sell securities." O'Hagan, 521 U.S. at 656. In defendants' view, Mrs. Rocklage's deceptive acquisition of information was simply too far removed from her brother's sale of securities to satisfy § 10(b)'s "in connection with" requirement.

We disagree with defendants' reading of O'Hagan and of the "in connection with" requirement. We read the quoted sentence in O'Hagan as explaining when a misappropriator's deceptive scheme ends, and not as indicating when it begins. See Webster's 3d New International Dictionary of the English Language Unabridged 490 (Philip Babcock Gove ed., 1993) (defining the verb "to consummate" as meaning "to bring to completion"). Next, O'Hagan had no occasion to interpret the "in connection with" requirement in a case alleging deceptive acquisition of information intended to be used in a securities transaction. The opinion does not discuss whether O'Hagan tricked or deceived his law firm into telling him about the tender offer, and whether while doing so he knew he would use the information for trading. The government's brief to the Supreme Court stated that "[t]he record does not indicate how

-17-

[O'Hagan] first learned" about the potential tender offer. See Brief for the United States at 4 n.1, O'Hagan, 521 U.S. 642 (No. 96-842). There was no claim that O'Hagan had used deception to obtain the information. On those facts, it is no surprise that the Supreme Court based liability only on O'Hagan's act of undisclosed trading itself. See United States v. Falcone, 257 F.3d 226, 233 (2d Cir. 2001) (noting that the defendant in O'Hagan "legitimately possessed the information" and that any misappropriation only occurred "when he used that information to trade securities").

Since the act of trading was itself deceptive in O'Hagan, the "securities transaction and the breach of duty thus coincide[d]." O'Hagan, 521 U.S. at 656. In this case it is true there was no such exact coincidence. But that disjunction does not mean the deception in obtaining the information was not in connection with the sale of securities.

This case differs from O'Hagan in that the SEC squarely alleges that Mrs. Rocklage deceptively obtained information, and that she did so as part of a preexisting scheme to assist her brother in the sale of securities. The question is how that difference is relevant to the "in connection with" requirement. Indeed, in a case raising somewhat similar concerns the Second Circuit recognized that "the Supreme Court in O'Hagan did not purport to set forth the sole combination of factors necessary to

-18-

establish the requisite connection in all contexts." Falcone, 257
F.3d at 233.

The Second Circuit's opinion in Falcone held that O'Hagan
did not alter that circuit's long standing rule, stated in United
States v. Carpenter, 791 F.2d 1024, 1027 (2d Cir. 1986), aff'd by
an equally divided court and aff'd by the full court on other
grounds, 484 U.S. 19 (1987), that the government can satisfy the
"in connection with" requirement when a tipper misappropriates
information that his tippees later trade on.  The court reasoned
that

> the defendants' use of the misappropriated
> information for the[ir] financial benefit
> . . . and to the financial detriment of those
> investors with whom [the defendants] traded
> supports the conclusion that [the defendants']
> fraud was "in connection with" the purchase or
> sale of securities under section 10(b) and
> Rule 10b-5.  We can deduce reasonably that
> those who purchased or sold securities without
> the misappropriated information would not have
> purchased or sold, at least at the transaction
> prices [they obtained], had they had the
> benefit of that information.  Certainly the
> protection of investors is the major purpose
> of section 10(b) and Rule 10b[-]5.

Falcone, 257 F.3d at 230 (quoting Carpenter, 947 F.2d at 566).
Although neither Carpenter nor Falcone was a case in which the
court relied on the tipper specifically engaging in deception in
order to acquire information, both stand for the proposition that
the "in connection with" requirement may be satisfied even when the
act of misappropriation in breach of a duty (in those cases,

-19-

tipping), and the act of trading, do not coincide. In our view O'Hagan not only left this untouched, see id. at 233-34, but reinforced it.

Indeed, O'Hagan's discussion of the "in connection with" requirement actually bolsters the SEC's position in this case. O'Hagan discussed a hypothetical in which a person defrauds a bank into giving him a loan and then uses the proceeds to purchase securities. See 521 U.S. at 656-57. That hypothetical thus dealt with a case of deceptive acquisition, albeit the deceptive acquisition of money. Importantly, the Supreme Court indicated that such deception was not "in connection with" a securities transaction because the acquired item was money and not information. See id. The wide variety of uses for money made this deceptive acquisition "sufficiently detached from a subsequent securities transaction." Id. at 657. But the information Mrs. Rocklage deceptively obtained and gave her brother did not have that same variety of uses; it was instead the sort of information "that misappropriators ordinarily capitalize upon to gain no-risk profits through the purchase or sale of securities." Id. at 656. Thus her deceptive acquisition of the information is fairly regarded as an act that was part of a broader scheme of deception in connection with the sale of securities.

Moreover, we think that Mrs. Rocklage's actions fit within a natural reading of the "in connection with" requirement.

Mrs. Rocklage's preexisting arrangement with her brother can easily be understood as a "scheme" or "practice" or "course of business," 17 C.F.R. § 240.10b-5(a),(c), whose goal was to enable her brother to trade in Cubist securities at a substantially reduced level of risk. Her deception of her husband was a natural and integral part of this scheme; she induced her husband to reveal material negative information to her about Cubist, knowing full well that in obtaining that information she would enable her brother to execute a securities transaction. She then actively facilitated a securities transaction by tipping her brother, and securities were in fact sold based on her information. These events show that her deceptive acquisition of material inside information was "in connection with" a securities transaction.

Finally, our interpretation finds further support in the investor protection purposes of § 10(b). See SEC v. Zandford, 535 U.S. 813, 819-20 (2002) (interpreting § 10(b)'s "in connection with" requirement "flexibly" so as to further the statute's broad investor protection purposes); O'Hagan, 521 U.S. at 658-59 (same). One of the animating purposes of the statute was to "insure honest securities markets and thereby promote investor confidence." O'Hagan, 521 U.S. at 658. It furthers that purpose if the "in connection with" requirement reaches schemes in which one party deceptively and intentionally obtains material nonpublic information to enable another to trade with an unfair informational

-21-

advantage.  See id. at 658-59 (discussing how informational disparities can negatively impact securities markets).

2.        The Effect of Mrs. Rocklage's Pre-Tip Disclosure of her
          Intent to Tip her Brother

We have determined that the complaint alleges that Mrs. Rocklage engaged in a scheme involving devices that would have been deceptive in the absence of disclosure, and we have concluded that these devices were employed "in connection with" a securities transaction.   We now turn to the heart of defendants' argument: whether Mrs. Rocklage's pre-tip disclosure to her husband, indicating her intent to pass the information to her brother, nonetheless means no claim of deception is stated by virtue of O'Hagan's language about disclosure.

The defendants' view is that a pre-tip disclosure to the source of an intention to trade or tip completely eliminates any deception involved in the transaction.   They rely on O'Hagan's language that "if the fiduciary discloses to the source that he plans to trade on the nonpublic information, there is no 'deceptive device' and thus no § 10(b) violation."   Id. at 655.   The defendants argue that O'Hagan put no qualifiers on what is meant by "disclos[ure] to the source" of a plan to trade on nonpublic information, and so the SEC is not free to qualify the concept.

The SEC disagrees, arguing that the disclosure referenced in O'Hagan must mean disclosure that is "useful" to the fiduciary's principal.   The SEC draws support from a footnote in O'Hagan which

-22-

may be read as implying that disclosure enables a source to take remedial action.  See id. at 659 n.9 (explaining that "once a disloyal agent discloses his imminent breach of duty, his principal may seek appropriate equitable relief under state law").  As the SEC sees it, disclosure to the source serves a useful purpose when "the source of material non-public information reasonably could be expected to, and reasonably could, prevent the unauthorized use of the information for securities trading."

Under that standard, the SEC argues, Mrs. Rocklage's disclosure was not a useful one for her source -- and in this regard was unlike O'Hagan's hypothetical disclosure.  The SEC argues this is so due to both the timing of the events and the marital relationship of the people involved.  The timing of Mrs. Rocklage's disclosure that she intended to tip her brother -- coming during or right before the New Year's holiday -- meant that Mr. Rocklage would have had a great deal of difficulty pursuing remedial action to stop the sale of the securities.  In fact, the sale was effectuated immediately at the next opening of the market. Also, the SEC argues it would be unreasonable to expect Mr. Rocklage to have risked marital discord by taking action against his wife; once she made clear she would tell her brother despite her husband's wishes, his interest may have shifted to protecting her against liability.  The SEC makes the point that under Massachusetts law Mr. Rocklage was probably unable to pursue legal

-23-

action against his wife in reaction to her disclosed intention to tip (such as by seeking to enjoin her from tipping).  See Mass. Gen. L. ch. 233 § 20 (preventing husbands and wives from testifying about their private conversations).[7]

In our view this case presents a narrower question.  We start by asking about the nature of the various acts in the deceptive scheme before considering the role of and the nature of the disclosure.  Unlike this case, O'Hagan was not a case which involved the deceptive acquisition of information.  Arguably, the language in O'Hagan can be read to create a "safe harbor" if there is disclosure to the fiduciary principal of an intention to trade on or tip legitimately acquired information.  This is because under O'Hagan's logic such a "safe harbor" applies, if at all, when the alleged deception is in the undisclosed trading or tipping of information.  In those cases, disclosure of the intent to trade arguably will eliminate the sole source of deception.  But a case of deceptive acquisition of information followed by deceptive tipping and trading is different.  It makes little sense to assume

---

[7] There are difficulties with both sides' proposed tests on the effect of disclosure.  The SEC's general "usefulness" test does not provide clear lines, and to the extent that the test depends on state law it has the potential for creating a lack of uniformity in the application of federal securities law.  On the other hand, defendants' position would lead to the conclusion that even a useless and pro forma disclosure could preclude insider trading liability; their theory would protect from liability a disclosure made only a few seconds before a trade was executed.  Such a result clearly would not advance § 10(b)'s investor protection purposes. Cf. O'Hagan, 521 U.S. at 658-59.

that disclosure of an intention to tip using deceptively acquired information would necessarily negate the original deception.

Indeed, by framing the issues this way, we see a second important distinction between O'Hagan and the case at bar. O'Hagan was a case in which only one deceptive device was alleged: undisclosed trading on confidential information. In this case the SEC's complaint is fairly read as alleging sequential acts that could each constitute deceptive devices: (1) the acquisition of material non-public information through the deception of Mrs. Rocklage's husband, and (2) Mrs. Rocklage's use of this information to tip off her brother without her husband's consent, followed by the tippees' use of the information to trade. Perhaps, under O'Hagan, Mrs. Rocklage's disclosure made the second of these devices non-deceptive. But then the proper question becomes whether disclosure that negates deception as to one set of actions in a scheme necessarily renders all prior deceptive acts non-deceptive.

While that question was not directly addressed in O'Hagan, the opinion does offer helpful clues. In a passage that leads to a third distinction between O'Hagan and the fact pattern here, the Court in O'Hagan seemed to contemplate that any liability-avoiding disclosure would come before the defendant engaged in the deceptive activity. See O'Hagan, 521 U.S. at 655 (explaining that there would be no liability "if the fiduciary

-25-

discloses to the source that he plans to trade on the nonpublic information") (emphasis added).    There is no indication that O'Hagan meant to change the earlier understood view of § 10(b), albeit one articulated outside the insider trading context, that a disclosure "is not effective if it comes after the positions of the parties have changed" in reliance on an earlier deceptive statement.  5C Jacobs, Disclosure and Remedies Under the Securities Laws, § 12:110, at 12-502.7 (2006) (citing In re Commonwealth Oil/Tesoro Petroleum Corp. Sec. Litig., 467 F. Supp. 227, 246-47 (W.D. Tex. 1979)).  Indeed, in a non-insider trading § 10(b) case, this court has sustained liability in the face of post-transaction disclosures; the after-the-fact disclosures did not cure the fact that the key information was originally withheld.    See Holmes v. Bateson, 583 F.2d 542, 559 (1st Cir. 1978).  On the facts of this case, we are unwilling to say that O'Hagan requires us to conclude that Mrs. Rocklage's post-acquisition disclosure of her intention to tip somehow rendered her acquisition of information non-deceptive.

Our analysis is bolstered by the Supreme Court's explanation that the misappropriator "defrauds the principal of the exclusive use of [his] information."    O'Hagan, 521 U.S. at 652 (emphasis added).  Mr. Rocklage was deprived of the exclusive use of the information, before his wife stated her intention to tip,

through Mrs. Rocklage's deceptive acquisition. Her later disclosure did nothing to change this.

Once the various distinctions between this case and O'Hagan are understood, defendants' position is really that because some of Mrs. Rocklage's actions may have been non-deceptive, her scheme as a whole had no deceptive elements. We do not believe that O'Hagan requires such an understanding of § 10(b), and we in fact conclude that O'Hagan rejects such an understanding.

In related areas of the law, it is well accepted that a scheme can be deceptive or fraudulent even if not all parts of the scheme are deceptive or fraudulent. The Supreme Court's decision in Carpenter, discussing the mail and wire fraud statutes, is especially instructive. O'Hagan cited with apparent approval the government's argument that Carpenter's discussion of fraud was "a particularly apt source of guidance . . . because [the mail fraud statute] (like section 10(b)) has long been held to require deception." 521 U.S. at 654 (alteration in original) (quoting Brief for the United States, supra, at 18 n.9) (internal quotation marks omitted); see also id. (describing Carpenter as addressing a "fraud of the same species" as the fraud that the misappropriation theory targets); 2 Welling et al., Federal Criminal Law and Related Actions § 17.5, at 8 (1998) (recognizing the "central role of deception" in the mail and wire fraud statutes at issue in Carpenter).

-27-

The scheme in Carpenter was fraudulent insofar as the defendants were misappropriating articles from the Wall Street Journal in advance of publication. See 484 U.S. at 25-28. They did so in order to trade in stocks the articles covered, with the understanding that the Journal's future coverage would affect stock prices. In sustaining the defendants' convictions for mail and wire fraud, the unanimous Court noted that it was sufficient that the Journal itself, in its final published form, was ultimately distributed to customers via the wires and the mail. Id. at 28. Importantly, the Court deemed distribution of the articles to Journal customers to be "an essential part of the scheme." Id. There was no suggestion in that case, nor could there be, that the distribution of the Journal to its regular customers was somehow fraudulent. Yet the defendants' actions as a whole still comprised a "scheme or artifice to defraud," see 18 U.S.C. §§ 1341,1343, and so the Court sustained their convictions under the mail and wire fraud statutes. See id. at 25; see also Schmuck v. United States, 489 U.S. 705, 714-15 (1989) (holding that innocent and non-fraudulent mailings can support a conviction under the mail fraud statute if they are part of a scheme that has a fraudulent element); cf. Carpenter, 791 F.2d at 1027-34 (finding, under a misappropriation theory, that the Carpenter events constituted a deceptive scheme for § 10(b) purposes), aff'd by an equally divided court, 484 U.S. at 24.

In light of her disclosure to her husband, Mrs. Rocklage's mechanism for "distributing" the information to her brother may or may not have been rendered non-deceptive by her stated intention to tip. But because of the way in which Mrs. Rocklage first acquired this information, her overall scheme was still deceptive: it had as part of it at least one deceptive device. Thus as a matter of the facts alleged in the complaint, and taking all facts and inferences in favor of the plaintiff, a § 10(b) claim is stated.

Contrary to the parties' arguments, we decline to articulate a broad, generalized test for exactly when disclosure will negate deception under a § 10(b) misappropriation theory. That is deliberate. The import and reach of the Supreme Court's language in O'Hagan about disclosure as a cure for deception has created uncertainty in the courts and has provoked a great deal of academic commentary.[8] Until the Supreme Court has clarified its language about disclosure, this uncertainty is an important factor

---

[8] See, e.g., Karmel, Outsider Trading on Confidential Information -- A Breach in Search of a Duty, 20 Cardozo L. Rev. 83, 95 (1998); Langevoort & Gulati, The Muddled Duty To Disclose Under Rule 10b-5, 57 Vand. L. Rev. 1639, 1675-77 (2004); Nagy, Reframing the Misappropriation Theory of Insider Trading Liability: A Post-O'Hagan Suggestion, 59 Ohio St. L.J. 1223, 1256-59 (1998); Painter et al., Don't Ask, Just Tell: Insider Trading After United States v. O'Hagan, 84 Va. L. Rev. 153, 180-81 (1998); Prakash, Our Dysfunctional Insider Trading Regime, 99 Colum. L. Rev. 1491, 1506-32 (1999); Quinn, The Misappropriation Theory of Insider Trading in the Supreme Court: A (Brief) Response to the (Many) Critics of United States v. O'Hagan, 8 Fordham J. Corp. & Fin. L. 865, 893-95 (2003).

in why we are unwilling to state generalized rules. Our task is to decide cases on an individual basis, and it suffices for us to say that on the facts asserted in the complaint, the SEC has stated a claim. Given the variety of types of deception and types of disclosure, caution is warranted until the complexity and variety of problems are understood. Furthermore, the SEC may wish to address this issue through the regulatory process.

We acknowledge that defendants' argument is both strong and very well presented. In the end, only the Supreme Court, Congress, or the SEC can bring the needed clarity to these questions.

### III.

The defendants' brief does not challenge the district court's finding that if Mrs. Rocklage is liable under the misappropriation theory, the complaint also states a claim against the downstream tippees, Beaver and Jones. Also, because we find that the complaint states a claim under the misappropriation theory, we decline to reach the issue of whether it also states a claim under the classical theory because Mrs. Rocklage was a temporary insider. Finally, we have no occasion to reach the contingent issue of whether Beaver and Jones can be liable for insider trading even if the complaint states no valid claim against Mrs. Rocklage.

The district court's decision is <u>affirmed</u>, and the case is remanded for further proceedings consistent with this opinion. Costs are awarded to the SEC.